IN THE

# COURT OF APPEALS

OF

# MARYLAND.

---

## DECEMBER TERM, 1829.

### Pawson's Adm'rs *vs.* Donnell.  Donnell *vs.* Pawson's Adm'rs.

It is the unquestionable and exclusive right of the Jury to decide on facts, of the existence of which, contradictory testimony is adduced.

The owner of a ship and cargo has the uncontrolled power of breaking up, or changing the voyage.

The principles which should govern such cases, in the absence of all commercial usage on the subject, and by which the effect of its action on the contract of the ship master or supercargo with the ship owner, is to be determined, are

1st. If by the exercise of this privilege a special injury is done to either, the ship owner must bear the loss, and make a reasonable indemnity.

2. If by the change of the voyage, the captain or surpercargo be necessarily discharged from the performance of all the duties, for which a remuneration has been stipulated, his claim to such remuneration is thereby extinguished.

3. If a part of the duties have been executed, then such a proportion of the stipulated compensation should be allowed, as appears just on comparing the services rendered, with those which remain unperformed. For the interpolated part of the voyage, the usual compensation must be paid. The parties should be placed, as nearly as may be, in the same condition in which they would have stood, had a previous contract for the voyage as changed, been entered into between them. To all the customary emoluments of a captain, or supercargo, on such a voyage, are those officers respectively entitled.

A ship master, who was also the supercargo, was directed to proceed with his ship to several ports ; his compensation, in addition to monthly wages,

Vol. I—1.

## 2 CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

was a sum certain, with a privilege of bringing home a specified quantity of merchandize from one of such ports. After a part performance of the voyage, the ship owner changed its direction, and shortened it; so that the port at which the privilege might have been exercised, was not visited by the ship; before the termination of the voyage, the ship master died. HELD that the privilege was so inseparably connected with the vessel's destination to the particular port, at which it was to have been exercised, that upon its ceasing to be one of the *termini* of the voyage, the privilege of necessity expired, and that the sum certain stipulated to be paid the captain had relation to the voyage as originally contemplated, and was therefore subject to abatement, in the discretion of the Jury. *First,* for the alteration of the voyage, if they believed, that the ship master's labour and responsibility were thereby lightened; and, *secondly,* for that portion of his contemplated services, which were lost by his death.

The misconduct of a captain or supercargo, which produces neither injury nor inconvenience to his employer, forms no defence to the payment of his wages.

The consignees selected by a ship master or supercargo in a foreign port, according to the usual course of trade, and in good faith, are so far the agents of the owners of the ship and cargo, that upon the death of the captain or supercargo, his representatives are not responsible for the consequences of the neglect or misconduct of such consignees, in the execution of their agency after his death not imputable to instructions given in the life of such captain or supercargo.

A shipment of merchandize, whose exportation is prohibited, made by a supercargo for account of his principal, is at his own risk, and if seized and condemned at the place of exportation, the supercargo must bear the loss.

The acceptance by a ship owner of the letters and invoices sent to him by the consignees of his ship in a foreign port, is not such a ratification of the acts of those agents, as would throw a loss arising from the seizure of merchandize exported against the laws of the port of shipment by them, for his account, upon such ship owner.

These were CROSS APPEALS from *Baltimore* County Court, from a judgment rendered in an action of *Assumpsit* in favour of the plaintiffs, (the appellants in the *first* and appellee in the *second* of these appeals) against the defendant (the appellee in the *first* and appellant in the *second* of these appeals.) The declaration contained two counts—One for work and labour, &c. goods, &c. sold and delivered, money lent, and for money had and received; and the other on an *insimul computassent,* between the defendant and the plaintiff's intestate. The defendant pleaded *non assumpsit,* and issue was joined. It was

agreed between the parties, "that the defendant may give in evidence under his plea, any items of account which he may have in bar of the plaintiff's claim, and which he might legally set off, or give in evidence, had he filed an account in bar or given regular notice of set off"—Also, "that all errors in the pleadings be mutually released, and that each party shall be at liberty to give any special matter in evidence under the issue joined." Also, "that by the shipping articles entered into in relation to the voyage referred to in this case, *John C. Pawson* was to receive the sum of sixty dollars per month, as captain of the ship *Chesapeake;* and that the sum of $2000, also referred to in these proceedings, was a compensation agreed to be paid to him, as stated in the letter of instructions, dated the 18th of November, 1819."

1. At the trial of this cause, the plaintiffs read in evidence, by consent, the following letters of instructions: the first dated *Baltimore* the 18th of November, 1819, from the defendant to the plaintiffs' intestate, *John C. Pawson,* viz:

" With my ship, Chesapeake, of which you are commander, you will proceed with all possible despatch, to the port of *London.* On your arrival, you will deliver my letters to *John Horstman,* Esq. to whom your ship and cargo are consigned. In the discharge of the cargo lose no time, and be careful to have it delivered in good order. It may be advisable, that immediately on arrival, you will engage sufficient ballast for your ship, and in every other respect provide what may be necessary to perform a long voyage. When so prepared, apply to Mr. *Horstman,* who will deliver you, on my account, eight thousand doubloons, which you will endeavour to ship on board without the knowledge of your crew. If they are under a belief that you have no specie, less danger may be apprehended from them; but I recommend to you never to be off your guard. With the ship, and the coin on board, you will proceed to the port of *Coquimbo,* in *Chili,* for the purpose of loading entirely with copper, and with it proceed to *Canton;* there dispose of it, and with the proceeds, load your ship agreeably to the list I have furnished, and return with the same

direct to me here.   On your arrival from *London* at *Coquimbo*, you must not let it be known the quantity of copper you want, nor of your having only doubloons to purchase it.   In the purchase of the copper, if made known how much you wanted, the price would be raised on you, and in relation to the doubloons, if it should be known that you have nothing else to purchase with, it might have the effect of reducing their value.   There can be no doubt, from the best information I have, that they will bring $17¼, and may exceed that by receiving for them the coined dollars under the present government there.   All these points you must attend to.   If you have the means of completing the purchase, you must put on board at least 12,200 *quintals*.   It may be necessary to apprise you, that much benefit may accrue by your attending and making the proper arrangements for receiving and weighing the copper. I suppose it to be useless to mention the necessity of discharging from the ship every pound of ballast, or useless matter on board of her, before you take the copper on board, because every pound so discharged, enables you to put in place thereof a pound of copper.   Since writing the above, on examining letters from *Chili*, dated in January last, it appears there is a paper currency, depreciated in its value—this being the case, and that this depreciated paper is payable and receivable for the products of the country, I say, if this is the case, much benefit might be made by selling the doubloons for the paper money ; but you might find that with the coin you could even do better to purchase, and pay in it, than to first sell your coin for the depreciated currency, and to purchase and pay with it.   In all these points, you are to make your estimates and calculations. About two years since, I sent my schooner *Midas*, Capt. *Dickinson*, with *Edward M'Clure*, supercargo, who loaded the schooner at *Coquimbo*, with copper, and despatched her to me. *M'Clure* remained at *Valparaiso*, to dispose of a part of the outward cargo then unsold, and close the entire business of the voyage.   He would certainly be there until the month of September, and he may still be at *Valparaiso* on your arrival at *Coquimbo*.   Should you see him, and he has any funds of mine, or

that he has departed from thence, and you find he has placed any of my property in the hands of any person there, in either case, I authorise and empower you to receive and carry it with you, either in copper or *Spanish* dollars, *of the old coin.*   Mr. *Richard R. Boughan,* residing at *Valparaiso,* will give you every information in relation to the affairs of *McClure,* should he have left that country before you arrive.   *Boughan* ought to have property of mine in his hands from a former transaction, which I authorise you to receive from him also.   *Boughan* may be able to give you useful information.   Be particular in the purchase of every article in *Canton,* to have them of the very best quality, and more particularly that the teas are so.   To prevent misunderstanding, I deem it necessary to state your compensation to be two thousand dollars, payable on your return, with a privilege from *Canton,* not to exceed twenty-five tons, but it is to be understood that you are not to put any copper or heavy article on board at *Chili,* as my views are that you completely load her there with copper, and that only for my account.   After my property and your privilege are on board, and the ship should not be full, if freight offers deliverable here, you will accept it.

" Should you fail in procuring copper at *Chili,* you will proceed in the ship with the doubloons direct to *Batavia,* where they are rated as high as in *Chili,* and with them purchase an entire cargo of coffee, which will require with proper storage from 8,500 to 9,000 picols.   This quantity was brought in her by Captain *Munn,* but she was full in every part.   Do not purchase a picol of sugar; and should your funds prove insufficient to fill her, I authorise you to draw bills for my account on *Messrs. Baring, Brothers & Co. of London,* or on *Messrs. Hope & Co. of Amsterdam.*   When you complete your business in *Batavia,* you will proceed from thence direct to this port. In stating your privilege, it is to be understood the twenty-five tons are measurement, and if in weighty articles, twenty-five thousand pounds.

The other dated *Baltimore,* the 26th December, 1819, from the defendant to the plaintiff's intestate, viz:

"I think it is probable you are this day in London, notwithstanding I have concluded to address you, and to take the chance of its reaching you before you depart from thence. The object is to state to you, that from mature reflection, supported by various calculations, resulting in a conviction that the voyage will turn out to better advantage by returning direct from the coast of *Chili* to *Baltimore* with copper, than to proceed with it from thence to *Canton*, as originally intended. I need not remark to you the great difficulty and delay (and without an adequate profit) of realizing a *Canton* cargo in this market. It is not to be accomplished, and I would consequently be compelled to send it from hence to *Europe*, where no gain can be calculated upon. I therefore revoke and countermand the orders I gave to you to proceed from *Chili* to *Canton*, and now *substitute that you will return with the ship and cargo of copper direct from the coast of Chili to Baltimore.* As relates to the investment and disposal of your own funds, you must use your own discretion by investing it in copper or any thing else, and bringing it with you in the ship—the copper may (as I hope it will) be bought on terms that will, with my funds and yours, load the ship very deep, but if necessary you must load her very deep. Should you fail in getting copper on the coast of *Chili*, you will immediately, on finding it so, proceed from thence to *Samarang*, in the Island of *Java*, and there invest my funds and your own in coffee, (no other article of the produce of the Island will answer) and proceed from thence direct to *Baltimore*. The government of *Batavia* may object to your loading at *Samarang*, being an out port, but you must use every means in your power to obtain from the government a permission, as you will be able to put on board coffee at *Samarang*, two or three dollars pr. picol less than at *Batavia*."

The plaintiffs also offered in evidence that the ship *Chesapeake*, at the date of the said letter, and before, was owned by Donnell, who continued to be the owner of the said ship during the voyage hereinafter mentioned, and until and after her return to *Baltimore*, as hereinafter stated—that *Pawson*, now deceased, was master and supercargo of the said ship, at the date

of the said letter, and so continued until his death at *Coquimbo*, as hereinafter mentioned. That the said vessel sailed on the said voyage from the port of *Baltimore*, November 19th, 1819, and arrived at *London* January 25th, 1820. That she sailed on the 4th day of May, 1820, from *London* for *Coquimbo*, and arrived there on the 15th of August, 1820, and sailed from *Coquimbo* for *Guasco* in January 19, 1821, arrived at *Guasco* January 21, 1821, and continued there until January 29, 1821, when she sailed for *Baltimore*. That, after being out only six hours, *the ship sprung aleak*, and put back to *Guasco*, where she remained until February 7, 1821, when she sailed for *Coquimbo*, and remained there until July 9, 1821, when she sailed for *Valparaiso*, where she arrived on the 12th July, 1821, and remained there until the 19th of that month, when she sailed for *Baltimore*, where she arrived October 1, 1821. That *Pawson* died at *Coquimbo*, December 4th, 1820, when the mate, *Thomas A. Lane*, took charge of the ship, and continued master and commander until she returned to *Baltimore*, as above stated.

The plaintiffs' then offered and read in evidence, the following letters and papers, which were admitted to be in the handwriting of the respective parties thereto, viz: A letter from the plaintiffs' intestate to the defendant, dated London, the 7th of February, 1820.

"After a very long and fatiguing passage, I arrived in the river on the 23d ult. without any material damage—In consequence of our ship's heavy draught of water, we were delayed several days in getting up. We are now about two thirds discharged, and proceeding with all possible despatch. As the ship wants caulking in the bends and upperworks, and a new beam in her (one of them being broken entirely off) I have concluded to put her into a dry dock where it can be done with more despatch and facility, and will not increase the expense above £5, and it will afford a cheap opportunity to examine her bottom, as the copper may have been injured when she lost her rudder. I am sorry to find that doubloons cannot be got at the price you contemplated, and that the quantity cannot be procured in *London*—they have only yet got about one third of

the number wanted, but have no doubt they can be obtained from *France* and *Holland*, they, by the last accounts from *Paris*, are quoted lower than they cost here, from which circumstance Mr. *Horstman* thinks they are plenty there—the price here is 75 1-6 per oz.

"I have had the pleasure to receive your letter of the 26th December, in which you are pleased to alter the original intention of the voyage, which will be cheerfully and strictly attended to, and if on my arrival at *Chili*, I should find it necessary to proceed to the island of *Java*, no exertions shall be wanting to have your wishes fulfilled in getting the cargo of coffee only at *Samarang*."

Another letter from the plaintiffs' intestate to the defendant, dated *London*, the 27th of April, 1820.

"On the 24th inst. Mr. *Horstman* addressed a letter to me, stating that in consequence of the advanced price of doubloons, and the probability that the flour would not produce so great a sum as you calculated on, the funds you had provided him with, would not be sufficient to fulfil your order in the purchase of the eight thousand doubloons which I am directed to receive from him, and requested me to state in writing what I thought best to be done—In answer to which I wrote him that in my opinion had you foreseen or supposed any deficiency such as above mentioned, you would not have ordered a less quantity of doubloons but would have made the requisite provision to obtain the full quantity of eight thousand.  I was the further confirmed in this opinion by reflecting that your only object in sending the ship to *London* was to obtain the doubloons, and to be disappointed therein would frustrate the ultimate object of the voyage you had in view.  I was, therefore, clearly of the opinion that you would expect him to supply the deficiency (which was about 950 doubloons) so that your ship might proceed without further delay.  With this answer he was satisfied, and continued the purchase, and has now ready 7650 doubloons, leaving a deficiency of 350, which he thinks can be obtained in one or two days.  Under these circumstances, we have fixed on the first day of May for the departure of the ship, with determina-

tion of taking what may then be deficient, in dollars, rather than incur further expense by delay.   In consequence of the scarcity of doubloons, I have thought it adviseable to invest my own funds in merchandize, in hopes that it may do as well, and because I would not interfere in any manner with your business, I therefore request that you will effect insurance from hence to *Coquimbo,* on the following merchandize and amount: 1 bale 8 cases *British* piece goods," &c. the whole amounting, with commission, &c. to £1115 13 3.

" I shall send copies of the invoices to my family, in case they should be necessary.   The circumstance of the crew nearly all running away, after I had paid them the month's advance they were to receive here, and my being obliged to advance others two months' pay, this long and unavoidable detention, and the great necessities of the ship in sails, cables, &c. which was indispensable for the voyage, has added greatly to the disbursements, the bills of which Mr. *Horstman* will forward to you ; but being now supplied, I shall be careful to keep the expenses for the remainder of the voyage, as low as possible, which I trust will appear to your satisfaction in the event."

A letter from *Horstman* to the plaintiffs' intestate, dated *London,* the 24th of April, 1820.

" You have been verbally acquainted by me of the difficulties which have arisen since Mr. *John Donnell* despatched the *Chesapeake* to my address with a cargo of flour, and with order to invest the proceeds, and a credit of £21,000, on Messrs. *Varkevessar, Derrapool & Brown,* of Rotterdam, in the purchase of 8000 doubloons.

"You are aware that the literal execution of this order has become impossible by circumstances.   You know that of the flour I have only been able to sell about 700 bbls. and that the remainder remains on my hands—that I cannot, for the present, sell it, and that the ultimate proceeds of the 4721 bbls. is uncertain.   You have been eye-witness of the impossibility of getting the doubloons otherwise than gradually, and this part of the business has only lately taken a turn by the unexpected arrival of about 1600 doubloons from the *Mediterranean,* and think the re-

mainder, (about 900) or very near, may now be had.   But the
£21,000, and the amount of the 700 bbls. which are sold, are
not, by far, sufficient for the draft of Mr. *Donnell* for £1160,
to your order, together with the ship's expenses, and the cost of
the 8000 doubloons; and if you judge that, under all the cir-
cumstances of the case, it is necessary for Mr. *Donnell's* inter-
est that the deficiency be supplied by me to make up the 8000
doubloons, I am ready to do so, in order to get the vessel away
immediately, and to furthering Mr. *Donnell's* ulterior views in
this affair.   You will therefore please to say, in writing, what
you deem to be for Mr. *Donnell's* interest, and what you wish
me to do."

A letter from the plaintiffs' intestate to *Horstman*, dated *Lon-
don* the 24th of April, 1820.

"Understanding from you that there is a deficiency in the
means Mr. *Donnell* has placed in your hands, in order to supply
the eight thousand doubloons, I am directed by him to receive
from you, which deficiency, it appears, arises from the doub-
loons being at a more advanced price than he had contempla-
ted, and from the probability that the *Chesapeake's* cargo of
flour, which you hold for sale on his account, not producing so
great a sum as he calculated on, I have to state to you, as my
decided opinion, that had Mr. *Donnell* foreseen or supposed
any deficiency, such as above mentioned, he would not have
ordered a less quantity of doubloons, but would have made the
requisite provision by enlarging the means he has placed at
your disposal, so as to supply the full quantity of eight thous-
and doubloons.   I am the further confirmed in this opinion, by
the knowledge that the grand object of the voyage he has in
view for the *Chesapeake*, depends entirely on obtaining the re-
quisite funds in *London*, (say the eight thousand doubloons) to
accomplish which was Mr. *Donnell's* only object in sending
the ship to *London*.   I am therefore clearly of opinion, that
Mr. *Donnell* will not only expect, but esteem it a favor, that
you supply that deficiency for his account as soon as possible,
so that his ship may, without further delay, proceed on her

voyage, and I am confident he will hold himself responsible for the transaction."

A letter from the plaintiffs' intestate to the defendant, dated *London* the 27th of April, 1820.

" I am happy to inform you, that after a very long and tedious delay, Mr. *Horstman* has at length nearly completed your order for the doubloons, having now already purchased 7650.   We have fixed the first day of May for the departure of the ship, and if the remainder of the doubloons cannot be purchased in time, we have determined, rather than incur any further delay, to take the amount in dollars.

[This letter then incorporates a copy of the previous letter of same date.]

" May 3d.   Since writing the above, we have completed the quantity, and shall proceed on board to-morrow morning. There is a ship just arrived from *Chili*, by which I learn indirectly, there is a great probability of our accomplishing our object there.   Mr. *Horstman* will transmit to you the duplicates of the bills for the ship's outfits, which, together with the enclosed, (which accounts for the cash received from him,) will shew the whole amount.   I have one passenger, who has paid £100, one half of which I have paid for stores, and divided the other between myself and the ship, which you will find credited on the enclosed."

Another letter from the plaintiffs' intestate to the defendant, dated *Coquimbo* the 15th of August, 1820.

" I arrived here on the 13th inst. after a passage of ninety-three days, all well.   I have not yet been able to collect sufficient information to act decisively with respect to loading, and shall not determine until I have heard from *St. Jago* and *Valparaiso*, whither I have written to Mr. *Boughan*, and Mr. *M'Clure*, (who I understand is yet in this country,) for that purpose; the information I get here is, that about 6000 quintals of copper may be got immediately here, and at *Guasco*, a port a little way to the northward of this, and that I could complete the quantity as far as my funds would go, in the course of three months; the price is said to be somewhat lower than hitherto,

and I think may be bought for $12, and will stand on board at about $14, or $14¼, with the duties paid.   I believe, however, that something may be done to save a part of the duties; the doubloons are worth $17¼ as you supposed, and 8000 amount to $138,000, which will put on board at the above price, upwards of 9600 quintals, or 998,400 lbs. and valuing that quantity at 20 cents, and the doubloons at cost, I am of the opinion will yield a better result than continuing the voyage to *Batavia;* but as there is no ship here wanting copper, I shall not commence the purchase until I make myself better acquainted on the subject, and until I am certain of getting the whole quantity. With respect to the depreciated paper currency you mention in your instructions to me, I find it only receivable by the government in payment for duties, and only for half the amount, they requiring the other half in cash: it may be bought at a discount of twenty per cent. which advantage I shall not neglect to avail myself of.   I have not yet learned any thing concerning the state of your business here, under the superintendence of Messrs. *Boughan* and *M'Clure,* but shall take the earliest opportunity of forwarding to you whatever I may learn on the subject."

Another letter from the plaintiffs' intestate to the defendant, dated *Coquimbo,* August 24, 1820.

" Since writing you on the 15th inst. stating that 6000 quintals of copper might be immediately secured; and our whole cargo contracted to be delivered in three months, I have concluded to load here, and hope that it may meet your views and approbation.   So large a quantity of copper as I want, cannot ever be procured here at once, and from what I learn from the best authority, there has never been a more favourable opportunity than the present, for obtaining so large a quantity.   I have therefore thought it most prudent, and have accordingly secured the 6000 quintals at $12, and have every prospect of getting the balance at the same price, and in the time above mentioned.   The copper, at this price, will stand, on board, duties paid, at $14, 14⅓--100.   The value of the doubloons are $17¼, and with the funds I have, will put on board upwards of 9600

quintals.   Mr. *Boughan* writes me that he has not made any collections for your account, and indeed, says there is very little probability of his ever doing so.   He has instituted a law suit against the debtor, who he says is so poor that he does not expect any thing from him, even if he is cast; he speaks also, of great difficulties he has had in ascertaining the amount of the debt, in consequence of some necessary books or papers having been destroyed in the revolutionary wars of this country. Upon the whole, there is very little prospect of getting any thing from him.   I have not yet received any communication from Mr. *M'Clure*, (who is married at *Santiago*) but Mr. *Boughan* informs me that he believes Mr. *M'Clure* holds some government paper for your account, and if this intelligence is confirmed, my purchasing copper here offers a favourable opportunity of making use of it to advantage, as it is at twenty per cent. discount, but will be received at par by the government, in payment for half the amount of duties, but the other half must be paid in cash—this arrangement will also increase the quantity of copper, if effected.   In my former letter, I informed you that the government here had issued orders that have a direct tendency to encourage desertion of seamen from our ships, in consequence of which I have shared the fate of several others by losing sixteen of my crew, which entirely disables me from proceeding in the discharge and loading my ship—they are now on board one of their brigs of war, and unless captain *Downes* arrives here this evening, as we expect he will, they will succeed in carrying them off.   I think, however, that if captain *Downes* should not arrive time enough to prevent this diabolical proceeding, that he will no doubt give me a crew from the frigate."

"Account sales of sundries made by *Edwards & Stewart* to the government of *Chili*, for account of captain *John C. Pawson*, ship *Chesapeake*.   August 25, 1820.   45 coils cordage, weighing 113 qrs. 87 lbs. a $20, $2277 3½—and one day and night glass, $30, amounting in the whole, after deducting $92 02 for commissions, to $2215 01½."

14     CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

A letter from the plaintiffs' intestate to *Lemuel Goddard*, dated *Coquimbo*, the 25th of August, 1820.

"Above you have the account sales of the cordage you shipped on board the *Chesapeake*, which you will perceive I have obtained a good price for. I also sold the spy glass, but the foul air extractor and the compasses yet remain on hand, without any probability of selling them, and if I am obliged to take them to the *United States*, shall deliver them to your order there. My principal object in addressing you now, is to give you an opportunity to make insurance on the amount of your interest in the above transaction. This I think the more advisable, because a chance now offers for conveyance to *England*, and it is quite uncertain if I shall have an opportunity to write to the *United States* for insurance. Our interest, as per agreement, stands thus: Nett amount of sales, $2215 01½. Deduct cost and charges per invoice, $1232 01½—leaving $983 00½—One half of which is $496 04½. Which added to the original costs and charges, $1232 01, makes $1728 05¼.

"Which sum, say $1728 05¼, I leave you to get insured from hence direct to *Baltimore*, where, on the safe arrival of the funds, I hold myself responsible to pay said amount to your order. It was a mere chance I was enabled to get so good a price for the cordage. The fleet from *Valparaiso* on the way to attack *Lima*, put in here, and was very much in want of it, or I fear we should have a poor account of it, and I would advise you not to let our present success induce you to ship any quantity of cordage to this country, as the probability is, it would not sell."

A letter from the plaintiffs' intestate to *Edwards & Stewart*, dated at *Coquimbo* the 19th of August, 1820.

"In consequence of the representations made by you, that six thousand quintals of copper might be immediately bought at $12 per quintal, and your decided opinion that the balance of my cargo may be contracted for at the same price, to be delivered on the first of November, I have determined to load my ship here, and hereby authorise you to purchase the 6000 quintals, and secure the remainder, amounting to between three and

four thousand quintals with all possible despatch, on the terms above mentioned, or lower if possible. In making these contracts, I would recommend your particular attention to have them only with men in whom you have perfect confidence, both as to the quality of the copper and to the punctuality of the delivery. It is understood that you secure to me the just and true performance of the said contracts, so that I shall not meet with material delay to my ship. It is also agreed that you are to receive two and a half per cent. commission, and one per cent. storage, amounting to three and a half per cent. on the amount of the purchase. I must also request your particular care and attention to secure every advantage that can be obtained in weighing the copper and in paying the charges and duties. It is also understood that you are not to purchase copper for any other order, until my cargo is completed.

"Understand that the two and a half per cent. is on the amount of the invoice, and the one per cent. on the amount of the copper at first cost, exclusive of duties and other charges."

A letter from *Edwards & Stewart* to the plaintiffs' intestate, dated *Coquimbo* the 4th of September, 1820.

"We have received your letter of this date, in which you request our purchasing for your account from 9 to 10,000 quintals of copper, at or under $12 per quintal. Agreeably to verbal information given you by us, that we thought 6000 quintals might be secured much before the time limited, we have now the pleasure of confirming it by enclosing you herewith, our obligation at sight, for said amount, say six thousand quintals copper, which you may dispose of when you judge most proper. As regards the residue of your order, although we cannot come under an obligation for its purchase, yet we think our success will be almost certain from information we have, and a pledge we make you on not purchasing on any other order until yours is completed—on this point we can say no more. We accept the commissions as stated by you, two and one half per cent. on cost and charges, and one per cent. on storage on the amount of the purchase of the copper. All contracts made by us come under our responsibility, not only as to the faithful

delivery, but likewise as to the quantity of the copper.   All copper received is weighed by us in person, and every regard is paid to this branch that the interest of the concern requires."

A letter from the plaintiffs' intestate to the defendant, dated *Coquimbo*, the 4th of September, 1820.

"I have to inform you that your business remains nearly in the same state as when I wrote you on the 24th ult. viz. that I have purchased 6000 quintals of copper, and shall have the remainder, amounting to between three and four thousand quintals, ready by the first of November, at $12 per quintal, which, with the duties and shipping charges paid, will stand on board at about $14 more or less.   In this transaction I was determined by reflecting that a pound of copper at that price, would nett in the *United States*, as much profit, and with more certainty, than a pound of coffee, and that the additional expense of pursuing the voyage further would be saved, and I trust that this view of the subject will meet your approbation.   I have not yet received any communication from Mr. *M'Clure* respecting your property in his hands, nor can I give you any certain information, except that I have understood that he had invested the government paper which he held in silks, a part of which he sent down the coast for sale, and the remainder he had deposited in this place, but has recently ordered them somewhere else.   I shall use my best endeavours to have a settlement with him, if possible, but I think there is no chance whatever, of getting any thing from Mr. *Boughan.*   I am yet without a crew: in consequence of the *Macedonian* having a long passage from *Valparaiso* to this place, *Cochrane* had time to carry off the men, and captain *Downes* would not supply me from the frigate, as he thought there was a probability of his having some trouble with *Cochrane*, if he should attempt to obstruct his entrance into *Lima.*   He has taken a list of the deserters, and intends to demand them.   Understanding that there are plenty of seamen in *Valparaiso*, I have written to the consul there, requesting him to procure me a crew, and send them down by the first opportunity, so that I am in hopes of soon being able to proceed with loading, and shall use every

exertion for despatch in my power.   As I may possibly not have another opportunity direct to the *United States* shortly, I would thank you when you make insurance on the ship and cargo, also to insure for my account, the same sum which you did me favour to insure from *London* here.   I think it probable it will be shipped in silver bullion and copper.   As it is necessary to have some light and bulky article to stow with the copper, in order to raise it in the hold as much as possible, I have purchased for that purpose a few hundred hides, and shall increase the quantity to one thousand, if they can be obtained—they cost from 9 to 12 rials per hide, and will average about 28 lbs. It is usual to purchase·wood for this purpose, which is attended with considerable expense and trouble, and is afterwards worth nothing, while the hides at the above price will pay a good freight.   I have employed Messrs. *Edwards & Stewart*, of this place, as agents to purchase the *Chesapeake's* cargo, of whose integrity and honesty as merchants, I made myself perfectly satisfied of before I engaged with them; their influence with the governor and collector here is very great, from which circumstance I expect great advantages in the payment of the duties, and I have a good prospect of getting through my business without trouble or delay.

" Since writing the above, I have received a letter from Mr. *M'Clure;* he says he has on hand a quantity of silks, which, with the discount on government paper, (with which I understood he paid for them) cost about $5000, and a few other articles which would raise the amount to 1000 more ; he has also from 2000 to $2500 in cash, which he promises to put immediately at my disposal ; he also offers to make an immediate sale of the silks, &c. for cash and close the concern, if I will authorise him to do so, but it is his opinion, that to force a sale of the silks, &c. for that purpose would be attended with a loss of at least one half, and as I am only empowered by you to receive whatever he may give me, I must leave him to exercise his own discretion with respect to selling the silks, &c. but strongly recommend him to effect a settlement, if possible,

Vol. I—3.

while the *Chesapeake* remains here, as I am convinced you are anxious to have it closed.

Another letter from the plaintiffs' intestate to the defendant, dated *Coquimbo* the 4th of November, 1820.

"By the *Two Catharines* I informed you that I had commenced the purchase of the *Chesapeake's* cargo of copper, at $12 per quintal, which will cost on board, duties paid, about $14¼, depending considerably on the amount of that saved by the arrangement with the collector here, and a gain of from five to seven per cent. on the amount of the duties, by paying part of them with the government paper, which is at a discount, though so uncertain that it is dangerous to purchase it until the moment it is to be paid into the custom house.   There is now purchased for your account 9500 quintals, nearly 7000 of which is on board, and the remainder in *Guasco*, whither I shall proceed and take it in as soon as I get my crew from *Valparaiso*, which I am daily in expectation of, and hope, in about a month more, to be on my passage for *Baltimore*.   We have received accounts here stating that the *United States* had proceeded to take possession of the *Floridas*, and had acknowledged the independence of this country and *Buenos Ayres*.   If so, I think it quite likely that a war with *Spain* must ensue, and of course render me liable to capture on the homeward passage, by privateers under *Spanish* colors.   Of the truth of this I hope soon to be informed, and if it is the case, I shall endeavour to sail home in company with the *Macedonian*, which ship is shortly expected here from *Lima*, and is to proceed immediately home. I have received from Mr. *M'Clure* the sum of $5500 on your account, to obtain which, he informs me, he sold the greater part of the silks, which in a former letter I mentioned he held at a great loss; he writes me also, that he intends, if possible, to sell the remainder and close the business, though I cannot inform you to what amount he still holds.   I wrote him a few days ago to inform him that I expected to sail shortly, that he might make his arrangements accordingly.   I have got nothing from Mr. *Boughan*, nor do I think there is any probability that I shall.   He writes me that he is paying every attention to the suit he has instituted

## OF MARYLAND. 19

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

against the consignee of the *Melanthro*, and has great hopes, from the strong vouchers he has presented, of gaining the cause, but if he does, he has no hopes of recovering any money from the circumstance of the consignee being very poor. With respect to loading the ship, I have paid every attention to have the copper of the best quality, and stowed in the safest manner, but I think it altogether unsafe to put more than 9500 to 10,000 quintals on board, as it is a very laborious cargo from its dead weight and small bulk, and the ship begins now to shew her age. I have purchased about 600 hides, which cost from nine to twelve rials each, to stow with it, for the purpose of raising the weight and increasing the bulk. I shall, however, be guided by my judgment as the ship comes down in the water, and if possible, bring the whole of your funds in copper. If there should be any surplus funds, which will not be more than the $5500 received from Mr. *M'Clure*, I shall bring it in Plata Pina, or silver in bars, the former at $7 56-100, and the latter $7 81-100 per mark of 8 ozs. In my former letters I requested you to insure for my account the sum of $5000. I now have to request you will insure $1000 more. If I find the ship too heavy laden with your copper, I shall curtail my privilege in that article, and bring my funds in silver. I send this across the cordilleras, but I understand there is very little hopes of your receiving it, as the communication is very much interrupted by banditti."

A letter from *Horstman* to one of the plaintiffs, dated *London* the 29th of July, 1822.

"I have to acknowledge your letter of the 18th May, in which you request to be furnished with a copy of the account between the late Captain *Pawson* and myself, and such documents as would enable you to come to a settlement, as acting administrator, with Mr. *Donnell*. In reply I beg to state, that I had not any account running with Captain *Pawson*, as he acted entirely himself; but on reference to my books, I find the following items were paid by me, and repaid by Captain *Pawson*, the 19th April, 1820, viz: Barry, for charts, &c. amounting to

£69.1 2, which were the only pecuniary transactions with him direct.

"In regard to the bills of disbursements of the ship *Chesapeake*, which you mention: were never received by Mr. *Donnell*, I find that I sent to Mr. *Donnell*, on the 13th of May, 1820, the following, viz:  One letter, 13th May, with account of disbursements of the *Chesapeake*, £2219 13, and a list of the vouchers;—one parcel, containing the vouchers, (original accounts)—one letter from Captain *Pawson* to Mr. *Donnell*—two letters from Captain *Pawson* to different persons, (I think Captain *Hamilton* and Mrs. *Pawson*.)  These were sent to *Liverpool* for the purpose of being forwarded, and I find by letter from *Liverpool* that were sent per the *Mary*, which sailed the 15th of May, with the exception of one addressed to Mr. *Donnell*; which were sent per the *Anna Maria*, (the latter is presumed to be the one containing the vouchers.)  From Mr. *Donnell* I have received no other letter than of the 18th of November, 1819, brought by Captain *Pawson*, and 26th of December, 1819, enclosing a letter for Captain *Pawson*.  Captain *Pawson* had a bill on me, drawn by Mr. *Donnell*, for £1165 9 1, at sixty days, which was due 30th of March 1819, and paid to him.  I hope these details will answer your purpose."

A letter from *Edwards & Stewart* to the defendant, dated *Coquimbo* the 8th of December, 1820.

"With sincere regret we have to inform you of the death of our much lamented friend, Captain *John C. Pawson*, who departed this life on the fourth of the present month; to us it is particularly sensible, in consequence of his being, from the first of his attack, until his decease, in a state of torpidity, from the nature and violence of his disorder, which prevented our making any arrangements with him in relation to his affairs at this place.  We attribute, as the principal cause of Captain *Pawson's* death, his extreme anxiety on the subject of his crew, the receiving of which he had placed great reliance by a ship which arrived a few days before his decease, from *Valparaiso*, to which place he had written to a mutual friend, to ship him a crew, having lost by desertion the day after his arrival at this

port.  We were much disappointed at hearing that no men were to be found at *Valparaiso*, from the great enlistments made by the navy agent for the *Chilian* navy, which left us the only and very uncertain resource, of Captain *Downes* supplying him with a *quota* sufficient for taking the ship home.  Captain *Downes'* arrival was at that time daily expected, but an arrival from the coast of *Peru*, where the *Macedonian* had gone, brought us sad intelligence of Captain *Downes* not being able to visit this part of the coast for some months.  This news created in Captain *Pawson* a very sensible change in his state of health, which had been delicate from his arrival, by great depression of spirits, which was accompanied by a fever, which changed into the gout, entered the stomach, and after being confined four days to his bed, yielded to his Maker the debt of nature, and trust he is enjoying, through the medium of our Saviour, happiness in that world, where, sooner or later, we are all to appear."

Also the extract of a letter from *Edwards & Stewart* to the defendant, dated *Coquimbo*, January 19th, 1821.

" We likewise enclose you herewith account sales of various merchandize brought by Captain *Pawson* from *London*.  His accounts, bill of lading for two boxes of *Chinchilla* skins, to your consignment.  We also enclose you the bills of the goods for your government.  We confess we feel awkwardly situated from our perfect ignorance of Captain *Pawson's* business, and act only from conversations we have had with Capt. *Pawson*, and from our judgment.  We presume the property belonged to him which came in the ship, for the sale of which he has got credit.  His intention was, as well as we can recollect, to invest the proceeds in 250 quintals of copper, provided the ship would load more than the 10,000 quintals, if on the contrary he intended taking only 150 quintals for his account, the *Chinchilla* skins charged him in his account, and the balance of his funds in silver, if to have been had.  This we believe firmly were his views, and on which we should have acted, but fearing compromising ourselves, we have considered it most prudent passing the balance of his account to your credit, and leaving it to

your judgment to settle with his relations in the manner you think most equitable and just, founded on the above facts. We recollect Captain *Pawson* stating to us, that the cordage sold to the government was shipped on half profits by some manufacturer in *England*, and in order to throw light upon that part of his business, should you be addressed from *England* by the same, we have enclosed you separate sales of that article."

Also, the extract of another letter from *Edwards & Stewart* to the defendant, dated *Guasco*, January 28th, 1821.

"Enclosed you will receive a bill of lading for 900 pigs of copper, and thirty-six lumps of gold, as likewise another for seventy-four pigs of copper, and one large, and nines mall pigs of bar silver, and sixteen pieces of Pina silver, shipped the former for your sole account, and the latter for account of the late Captain *Pawson;* by the invoices and account which we likewise enclose you, you will perceive that the whole of your funds we have remitted to the best advantage, and we have only to beg you to call to mind, in case that every thing is not exactly correct, the disadvantages we have been under from the sudden death of Captain *Pawson*."

Also, an extract from another letter from *Edwards & Stewart* to the defendant, dated *Coquimbo*, March 9, 1821.

"As we anticipated, the crew has deserted the ship, and has remaining on board only nine men from the *Constellation*. We hope to get the residue she may want to carry her home. The carpenter of the ship, from a pique he had against Captain *Lane*, and to revenge himself, gave information of the spot where your gold and Captain *Pawson's* silver were stowed on board, to the governor. This was done with so much secrecy by both parties, that we were not aware of the treachery, until the whole was in their possession. It was shipped in *Guasco*, and stowed by Captain *Lane* in the bread locker, under all the bread, without the knowledge of any one on board excepting the carpenter, in whom both he and Captain *Pawson* placed the most implicit confidence. The exportation of virgin silver and gold have been prohibited by the government under confiscation of

the property if taken, and many severe penalties inflicted on the parties concerned.   Captain *Pawson* intended shipping any small balance he might have in those articles, from their paying better than any other remittance to *America*, from this, hard dollars being at $6\frac{1}{2}$ premium, and ounces at $17\frac{1}{4}$, so that in shipping either one or the other, you would have experienced a great loss.   We are aware we took upon ourselves some responsibility from not having had written instructions from Capt. *Pawson* to ship in these articles your balance, but were actuated for your interest, and knowing Captain *Pawson* would have acted in like manner.   We fear the hopes of recovering this property are small, as the law is explicit and severe.   We shall make the necessary representations, and send you copies by next opportunity."

And another letter from *Edwards & Stewart* to the defendant, dated *Coquimbo*, July 4, 1821.

" We enclose you the proceedings of the confiscation of the silver and gold found on board the ship, which we are sorry to say was eventually lost, notwithstanding the exertions of Capt. *Ridgely*, Judge *Prevost*, special agent of the *United States* of *America*, and our representations.   We are still in hopes that at a future period this property may be recovered, and with this view have thought proper to send you the documents to substantiate any claim you may think proper to institute."

The plaintiffs further offered in evidence, that it was the known custom of trade in *Chili* and at *Coquimbo*, to employ agents on shore in the business intrusted to *Pawson,* and that it was necessary to do so.   And also offered in evidence, that the privilege to the captain of twenty-five tons, mentioned in the contract from *Canton* to *Baltimore*, was a valuable privilege, much more so than the like one from *Coquimbo*, and that it was, and is, the usage of trade for the captain, if he does not use his privilege himself, to let it out to others, and even to be paid for it by the owner, if the owner used it for his benefit.   That the freight from *Canton* to *Baltimore*, at the time abovementioned, was from thirty to one hundred dollars per ton.   The plaintiffs' further offered evidence, that it is the usage of trade, when a captain has such a

privilege as is stated in the defendants' first letter of instructions, to wit, of twenty-five tons from *Canton* to *Baltimore*, that this privilege is entitled to a preference even over the owner, in putting the same into the vessel, and that if the captain dies in the course of the voyage, his privilege does not succeed to the next captain, but survives to his representatives.

The plaintiffs further offered in evidence, that on the arrival of the ship here, only 147 quintals of copper were delivered to the plaintiffs, as the share of the said *Pawson;* and they read in evidence, the following order and account, which were admitted by consent—"74 pigs copper, weighing 14,779 lbs. of the estate of Captain *Pawson*, received per the ship *Esther*, Captain *Low*, from *Coquimbo*,"—signed 29th October, 1821, by the defendant.

The plaintiffs also offered in evidence the following accounts:

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.——1829.

Dr. *John C. Pawson* (deceased) in account with *John Donnell*. Cr.

| | | | | | | |
|---|---|---|---|---|---|---|
| To balance per settlement in *London*, Sterg. £ 3 10 11 Short credit allowed for passengers from *London*, - - - 25 00 00 | | — $126 87 | By wages from 19th Nov. 1819, till 4th Dec. 1820, his decease at 860, - - - - | | | $750 00 |
| Premium of Insurance to *Maryland Office* on $5166, a 4 p. ct. - $207 89 Premium of Insurance to *Patapsco Office* on $6000 a 2¾ p. c. - 166 25 | | | Dividends drawn by J. D. on 16 shares Bank Stock, one 1½, one $2, - - - - | | | 56 00 |
| | 374 14 | | Transfer by *Edwards & Stewart*, of the balance due by them to Capt. *Pawson*, after his decease, (very improperly to me,) - - - | | $7,777 87 | |
| Common ½ pr. cent. on the sums insured, 55 83 | | 429 97 | In which was included the proceeds of cordage taken on board for account some person in *London*, to be deducted therefrom, | | 2,215 18 | |
| Discounts paid on 16 shares Bank Stock, hypothecat. for $1200 in Nov. 1819, renewed each 60 days, say 14 renewals a 12 80. | | 179 20 | | | | — 5,562 69 |
| Proportion of landing copper from ship *Chesapeake*, and reshipping on board the *Esther*, total 550,600 lbs. cost $2454 69, which on Capt. *Pawson* 14779 will be | | 66 00 | Amount sales of said cordage as above, 2,215 18 After deducting therefrom for freight from *London* to *Coquimbo*, being a belligerent port, and, an article contraband of war, which subjected my ship and property to confiscation, and annulled my insurance, the weight of cordage as p. sales a $5, $569 37 | | | |
| Freight paid the ship *Esther* from *Coquimbo* to *Baltimore* on 14779 lbs. at 2½ cents per lb. 369 47 Primage thereon, 5 p. c. 18 47 Storage, storing, weighing and delivering, 10 00 | | 397 94 | Cost of lumps of gold, shipped as a remitance for proceeds of said cordage, being a prohibited article, and as seized cost, - - - 1452 81 | | | |
| Amount invoice of copper and bullion shipped by *Edwards & Stewart* for account, 4,694 56 Cronometer cost 80*l stg.* 355 55 Day and night telescope of *J. Allen*, - - - 22 00 *Horsburg* Directory of *Boyd*, - - - - 24 00 | | 401 55 | *Edwards & Stewart* commiss'n thereon, at 2½ p. cent. - 36 32 Expenses incurred by claiming its restoration, - - - 44 16 | | | |
| Balance due by J. D. - - 185 00 | | | | | — 2,102 69 | 112 49 |
| | | $6,481 18 | | | | $6,481 18 |

N. B. Captain *Pawson* took from my ship such valuable articles as he fancied for the *North Point*—He took from the *North Point* every article, when he left her, for the *Chesapeake*—It is, therefore, nearly out of my power to trace them—But you can certainly show by his papers, the articles he paid for, and such had, of course, a right to take from the *Chesapeake*.                                                    J. Donnell.

| | | |
|---|---|---|
| 2 mos. interest on $165, - - $1 65 | |
| 10 mos. do on 165 70, - - 8 25 | |
| 5 mos. do on 1721, - - 43 10 | |
| | $53 00 |
| Interest on 1200 for 18 mos. - - - 108 00 | |
| | $55 00 |

Interest calculated on bonds until due, secured by J. D. and for which he has, in settlement, retained their amount in his hands—the $53 to be applied to paying the discount on *J. C. Pawson's* Stock note at the Office Discount and Deposit, is to be renewed by J. D. and with the $53, and the $55 now received, it is expected will pay the above discount, until his, *J. C. P's* return.

Received the above $55, which with the $53, interest until his bond fall due, is to be applied by me to the discount, on renewal of his stock note for hypothecated Bank Stock, 17th Nov. 1819.                    John Donnell.

" Sales by *Harrison & Sterett*, for account of the administrators of the late Captain *J. C. Pawson*," in December, 1821 and April and May, 1822, of 14,774 lbs. of copper, amounting, deducting charges, &c. to $2,843 75.

The plaintiffs further offered in evidence bills of lading, and invoice of the shipments at *Coquimbo* and *Guasco*, on the voyage aforesaid. 1. Of 8000 Spanish doubloons shipped by *Horstman* from *London* on the 4th of May, 1820, for the port of *Coquimbo*, to the order of Captain *Pawson*, on account of *John Donnell.* 2. Of 4219 pigs of copper, weighing 8076 quintals, &c. and 411 cow hides, by *Edwards & Stewart* from *Coquimbo*, on the 19th of January, 1821, for account of *John Donnell.* 3. Of, two boxes and one bundle of *Chinchilla* skins, containing 456½ dozen, being the property of the late Captain *Pawson*, and consigned to *John Donnell* for the benefit of whom it may concern, by *Edwards & Stewart*, from *Coquimbo*, on the 19th of January, 1821. 4. Of 74 pigs of copper, weighing 147 quintals, &c. one large and nine small pigs of bar silver, and sixteen pieces of Pina silver, weighing 304 marks, one ounce, shipped by *Edwards & Stewart* from *Guasco*, on the 28th of January, 1821, to *John Donnell.* 5. Of thirty-six lumps of gold, weighing 608 castellanos, five tomines, and 900 pigs copper, weighing 1795 quintals, ninety-five lbs. shipped by *Edwards & Stewart* from *Guasco*, dated the 28th of January, 1821, consigned to defendant.

"Invoice of copper and hides shipped by *Edwards & Stewart*, on board the *American* ship *Chesapeake*, Captain *Thos. A. Lane*, by order of the late Captain *J. C. Pawson*, bound for *Baltimore*, in the *United States* of *America*, and consigned to *John Donnel*, Esq. merchant, of said place.

| | | |
|---|---:|---:|
| 4219 pigs of copper, wg. 8076 qqs. 19 lbs. a 12 ds. | $96,914 | 02¼ |
| 246 ox, and 411 cow hides, - - - - | 932 | 01 |
| | $97,846 | 03¼ |
| Charges, duties, commission, &c. added, - - | 19,259 | 08¾ |
| | $117,106 | 04 |

"Invoice of copper and gold shipped in *Guasco,* by *Edwards & Stewart,* on board the *American* ship *Chesapeake,* Captain *Thomas A. Lane,* by order of the late Captain *J. C. Pawson,* bound for *Baltimore,* in the *United States of North America,* and consigned to *John Donnell,* Esq. of said place.

900 Pigs of Copper, wg. 1795 qqs.

| | | |
|---|---|---|
| 95 lbs. at $12, | - - | $21,551 03¼ |
| Storage 1 p. c. - | - - - | 215 04 |
| | | ———— $21,766 07¼ |
| 20 round lumps of gold, wg. 172 cas-<br>tellanos 7½ tomines a 19¼ rs. | | 416 01 |
| 15 do do wg. 403 do 5½ do a 19 rs. | | 958 05¼ |
| 1 do do wg. 32 do a 12½ rs. | | 78 |
| | | ——— 1452 06¼ |
| | | $23,219 05½ |
| Charges, duties and commission, &c. added, | | 4,885 03½ |
| | | $28,105 01½ |

"Invoice of copper and silver shipped in *Guasco,* by *Edwards & Stewart* on board the *American* ship *Chesapeake,* Captain *Thomas A. Lane,* bound for *Baltimore,* in the *United States of America,* by order of the late Captain *J. C. Pawson,* for acc. and risk of whom it may concern, and consigned to *John Donnell,* Esq. merchant, of said place.

| | | |
|---|---|---|
| 74 pigs of copper, wg. 147 qqls. 79 lbs. a $12, | | $1,773 04 |
| Storage 1 p. c. | | 17 06 |
| 1 large and 9 small pigs silver, wg. | | |
| 115 mks. 1 oz. a $8 p. mk. | $921 00 | |
| 16 pieces of pina silver wg. 189 mks. 0 oz. | 1488 03 | |
| | ———— $2,409 03" | |
| Charges, duties and commission, &c. added, | | 493 07½ |
| | | $4,694 04½ |

"Amount of money paid by Captain *Pawson* to the crew of the ship *Chesapeake,* which returned here from *Coquimbo,* $70 59."                              Signed by *J. D.*

And also proved that the voyage was in effect protracted by the determination to return immediately to *Baltimore,* and not go to *Canton,* as it was much more difficult to obtain a crew for the former voyage than the latter, and the ship was delayed for a long time, for the want of a crew to navigate her to *Baltimore.*

The defendant then offered and read in evidence the following letters, which were read by consent, and admitted to be in the hand writing of the respective parties thereto.

The only letter which appears to have been offered in evidence by the defendant, is one from one of the plaintiff's to the defendant, dated *Baltimore,* 15th May, 1822.

"From a minute investigation of the account you furnished, between yourself and the late Captain *Pawson,* and with a reference to sundry documents in my possession, I have made out the enclosed account.   With respect to the $2,000 for compensation, *it appears to have been regularly agreed upon between you and the deceased, as the privilege he was to have, each voyage, in your ships, consequently it is claimed as a right.* The cordage transaction, in your account, is totally inadmissible, the funds which arose from the sale of it, were laid out in bullion, (silver) which remains in *Coquimbo* under seizure, as your gold does, and as you are not known in the transaction at all, it of course remains for settlement between the owner in *London* and the executors of Captain *Pawson.*   As to your charging freight on the cordage from *London* to *Coquimbo,* it seems strange indeed.   Your ship was going in ballast, and Captain *Pawson* wrote to you that he would take merchandize, having found great difficulty in procuring the number of doubloons you ordered from Mr. *Hortsman.*   I find that in 1816, you *permitted* Captain *Pawson* to take goods from other persons *to make up his privilege* in the ship, and as, by his agreement with the owner of the cordage, he was interested in the sales, it became, of course, a part of his venture from thence.   It appears that Captain *Pawson* allowed you £25 sterling in the account he furnished before he left *London.*   Balance due to you £3 10 11.   £50 sterling he laid out for cabin stores.   The $55 83 claimed as commission for effecting insurance, you

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

never charged in any similar case. I have not ascertained whether the expenses charged on the copper, are customary or not. You'll observe, that *Captain Pawson's privilege in the ship was not taken by several thousand pounds weight*, of course you will allow for the deficiency, as you have done before."

Mr. *John Donnell* in account with the estate of the late Captain
Dr. *John C. Pawson.* Cr.

| | | | |
|---|---|---|---|
| **1819.** | | By balance due to you as per account furnished by Captain *Pawson*, in *London*, including £25 sterling, your proportion of passage money, | $15 75 |
| Nov. 18. To cash paid interest on 16 shares *United States* Bank Stock, hypothecated for $1200 p. your receipt, - - - - - | $108 00 | | |
| Interest on do. from said date until 15th October, 1821, - - - - - | 12 36 | Cash on 16 shares *United States* bank stock, hypothecated for this amount, 18th Nov. 1819, | 1,200 00 |
| Compensation in ship *Chesapeake* as per agreement, see your letter of instructions, dated 18th Nov. 1819, and *as a proof of its being customary*, see 21 October, 1817, when Mr. *Nancarrow* went supercargo, $2000, and the 25th May, 1816, when Mr. *Stith* went supercargo, $3000, - | 2,000 00 | Interest on do. from said period, until 15th Oct. 1821, Insurance in *Maryland & Patapsco* Offices, per your account, - - - - - - - Amount of copper and bullion (silver) shipped by *Edwards & Stewart*, for account of Captain *Pawson*, see their and your account, - - - - Balance in your hands on the 15th October, 1821, - - - - | 137 44  374 14  4,694 56  4,352 97 |
| Wages of Capt. *Pawson*, as per your account, - | 750 00 | | |
| Dividend received on 16 shares *United States* bank stock, as per your account, - - - - - | 56 00 | | |
| Amount transferred by *Edwards & Stewart*, of *Coquimbo*, a balance due by them to Capt. *Pawson*; see your and their account, - - - | 7,777 87 | | |
| Amount deducted out of seamen's wages, as per your account, - - - | 70 59 | | |
| | $10,774 82 | | $10,774 82 |

To balance from opposite, - - - - - - - $4,352 97
To interest on ditto until paid,
Errors and E. Excepted.

*Hamilton Graham*, Actg Adm'r.

Add the stock on the other side, for which there is no credit, - - - - - $1,200 00
                                4,352 97

His claim then is       $5,553 97
*Interest to Jan. 26, 1825,*   1,084 03
                        ————————
                        $6,637 00

Besides which he claimed
loss of privilege, - - 255 52
Drip Stones, - - - - - 13 50
Duty saved at *Guasco*, - 14 56
Interest on $255 52-100, 49 72
                        ————————
                        $6,970 30

Claim as set up in court, viz.' $5,552 97
Drip Stones and duty saved,      48 66
Loss of *Canton* privilege,     3,050 00
                                ————————
                                $8,651 03
Interest from Oct. 15, 1821,     1,686 94
                                ————————
                                $10,337 97

30     CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.    Donnell *vs.* Pawson's Adm'rs.—1829.

"The defendant then offered in evidence the following invoice of goods shipped at *London*, the 27th of April, 1820, and the account of the sales thereof, and the other accounts and papers hereinafter inserted, which were admitted by consent.

"1 bale, 8 cases British piece goods," &c.

| | |
|---|---:|
| amounting to - - - - - | £1062 10 8 |
| Commission, brokerage, shipping, &c. 5 p. c. | 53 2 7 |
| | £1115 13 3" |

"Account sales of sundries made by *Edwards & Stewart* to the government of *Chili*, for account of Captain *John C. Pawson*, of the ship *Chesapeake*,

1820

| | |
|---|---:|
| Agt. 25. 45 coils cordage, wg. 113 qqs. 87 lbs. | |
| a 20 dlls. - - - - - | $2277 03½ |
| 1 day and night glass, - - - | 30 00 |
| | $2307 03½ |
| Deduct commission 4 p. c. and spy glass, - - | 122 02 |
| Nett proceeds of cordage, - - - - | $2185 01½ |

Dr.    *J. C. Pawson's* private acc. with *Edwards & Stewart*,    Cr.

This account commenced on the 25th of August, 1820, and ended on the 18th of January, 1821.

| | |
|---|---:|
| The amount of the debits, including charges for 756½ dozen *Chinchilla* skins, and 10 marks, 6½ oz. silver, &c. - - - - - - | $2,250 07¾ |
| Amount of credits including nett *proceeds of* sales herewith sent, $8070 1¾, - - - - | 10,028 06¾ |
| Balance due, and this sum credited *John Donnell*, Esq. - - - - - - | $7,777 07 |

"Sales of sundry merchandize received by the ship *Chesapeake*, and sold by order and for account of Captain *John C. Pawson*."

The whole amount of sales, deducting charges, &c. $8070 13¼ dated *Coquimbo*, and signed by *Edwards & Stewart*.

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

*John Donnell,* Esq. of *Baltimore,* in account current with *Edwards*
Dr. & *Stewart.* Cr.

| 1821. | | | 1820. | | |
|---|---|---|---|---|---|
| Jan. 19. To bill of disbursements of the ship *Chesapeake,* at *Coquimbo,* per account herewith, - - - | $2,508 03¾ | | Aug. 28. By our draught in favor of Capt. *Brintnal* on Captain *Pawson,* - | $28,309 03 | |
| Amount of invoice of 8076 qqs. 19 lbs. of copper, shipped from this port in the ship *Chesapeake,* Captain *Lane,* as per account herewith, - - - - | 117,106 04 | | Sep. 16. Cash received from do. | 6,192 06 | |
| | | | 21. Letter of credit of Messrs. *Lynch, Hill & Co.* in favor of Capt. *Pawson,* - - - - | 3,500 00 | |
| Balance, - - - - - | 32,655 05¼ | | Oct. 25. 700 doubloons received at $17¼ - - - - - | 12,075 00 | |
| | | | 2000 do do do | 34,500 00 | |
| | | | 1300 do do do | 22,425 00 | |
| | | | Received for 4 bbls. of salt beef, a 35 dlls. | 140 00 | |
| | | | Received for 4 water casks a 15, - - - - | 60 00 | |
| | | | Months' advance made to a sailor returned, | 24 03 | |
| | | | Cash received of him, | 60 00 | |
| | | | Nov. 27. 2000 doubloons a $17¼, | 34,560 00 | |
| | | | Draught of *Ed. M$^c$Clure* favor *J. C. Pawson,* | 2,000 00 | |
| | | | 1821. | | |
| | | | Jan. 18. Cash received for 2 bbls. tar, a $10, - - - - | 20 00 | |
| | | | Do do 30 ggs. vinegar, a 50 cts. - - - | 15 00 | |
| | | | Discount on $6713,1 rrl. paid in the custom house in government paper, being this proportion allowed to be received in paper, the residue paid in cash, a 10 p. c. - - - - | 671 02¼ | |
| | | | Balance of Capt. *Pawson's* acct. current, | 7,777 07 | |
| | $152,270 05¼ | | | $152,270 05¼ | |
| | | | By balance, - - - | $ 32,655 05¼ | |

E. & O. E. *Coquimbo,* Jan. 19, 1821. *Edwards & Stewart.*

*John Donnell,* Esq. of *Baltimore,* in account with *Edwards &*
Dr. *Stewart.* Cr.

| To amount of invoice of copper and gold shipped in *Guasco,* | $28,105 01½ | | By balance of account current at *Coquimbo,* - - - - - - | $32,655 05¼ | |
|---|---|---|---|---|---|
| To amount of invoice of copper and silver, shipped on account of the late Captain *Pawson,* | 4,694 4½ | | By 10 per cent. discount, allowed on $1,777 paid in government paper on the invoice of $28,105, a 1½ rs. - - - - - | 177 05½ | |
| To amount of bill for disbursement in *Guasco,* - - - - - | 91 05¾ | | By do do on that of the late Captain *Pawson,* - - - | 14 04½ | |
| | | | By one months advance charged twice to *Eugenio,* merchant, | 30 00 | |
| | | | By charge for drip stones not received, - - - - - - - | 13 04 | |
| | $32,891 03½ | | | $32,891 03½ | |

E. E. *Guasco,* Jan. 22, 1821. *Edwards & Stewart.*

Disbursements of the *American* ship *Chesapeake*, in the port of *Coquimbo*, by order of Captain *Lane*, from the 16th February to 30th June, 1821, amounting, including commissions, to $1,654 02½.   Dated at *Coquimbo* the 3d of July, 1821, and signed by *Edwards & Stewart.*

| Captain *Lane*, ship *Chesapeake*, in account with *Edwards &* | |
|---|---|
| Dr.                                    *Stewart.*     | Cr. |
| To amount charges on 2876 bars of copper, shipped on board the ship *Esther*, - - - - - $2,454 05½<br>Do do on 300 bars shipped on board ship *Chesapeake*, - - - 315 02½<br>Amount of disbursements of ship *Chesapeake*, - - - - - - - 1,655 02½<br><br>$4,425 02½ | By 124 bars of copper, wg. 304 qqs. 24 lbs. a $14 4·100, sold to pay the expenses at the price of $12, and the duties, - - - - - $4,271 04<br>An error in the calculation of commissions in the invoice of copper shipped at *Guasco*, - - 100 00<br>Cash recd. for 839 lbs. of bread a $6 50 02¾<br>Balance, - - - - - - - - 3 03¾<br><br>$4,425 02½ |

" Amount of *charges* of 2100 bars of copper, discharged in this port, and 900 bars discharged in *Guasco*, from on board the *American* ship *Chesapeake*, Captain *T. A. Lane*, in order to ascertain the extent of injury, received on her passage from *Guasco* to *Baltimore*, of which bars of the same were reshipped by order of Captain *Lane*, on board the *American* ship *Esther*, Captain *F. G. Low*, bound for *Baltimore*, for account and risk of whom it may concern, and consigned to *John Donnell, Esq.* merchant, of *Baltimore*," amounting to $2454 05¼, dated at *Coquimbo*, and signed by *Edwards & Stewart* the 3d of July, 1821. This account included a commission on 2876 bars of copper, amounting to $1651 06.

"Account of *charges* of 300 bars of copper that were discharged from on board the *American* ship *Chesapeake*, in order to ascertain the extent of injury received on her passage from *Guasco* to *Baltimore*, and reshipped by order of Captain *T. A. Lane*, of said ship, for account and risk of whom it may concern, and consigned to *John Donnell, Esq.* merchant, *Baltimore*," amounting to $315 2¼, including commission on 300 bars of copper, amounting to $179 04¼.   Dated and signed as above.

"Disbursements of the *American* ship *Chesapeake*, Captain *John C. Pawson*, at the port of *Coquimbo*, by *Edwards & Stewart*,

amounting, including commission, to $2,508 03¾, dated the 19th of January, and signed by *Edwards & Stewart.*

An invoice of goods, &c. shipped by *Edwards & Stewart*, by order of Captain *Lane*, on board the *Esther*, whereof *F. G. Low* is master, bound to *Baltimore*, viz: 2876 bars of copper, weighing 5505 quintals, 98 pounds Spanish weight, being part of the original cargo of the ship *Chesapeake*, and shipped for account of whom it may concern, unto *John Donnell*, he paying freight, &c.   Dated *Coquimbo*, 3d of July, 1821.

Also, the check of the defendant on the *Office of Discount and Deposit*, in favour of the owners of the ship *Esther*, for $14,453 20.

To dispense with a commission to take testimony the plaintiffs admitted, 1st. The transaction of cordage from *London* to *Coquimbo*, according to the account of sales of the cordage. 2. That the cordage was for the joint account of *Pawson* and *Goddard*. 3. That gold and silver bullion are prohibited articles of exportation at *Chili*. 4. The parties agreed that all letters and accounts of sales and accounts current, from *Edwards & Stewart*, may be read on both sides.

The defendant also offered in evidence, that the usual freight from *London* to *Coquimbo*, was fifty dollars per ton. The plaintiffs then offered in evidence, that it was the usage among ship owners and masters, not to charge freight where the ship was in ballast, for any articles shipped by the captain on his own account. The defendant offered in evidence, that there was no usage as above stated, and that the captain was liable for freight to his owner like any other person, if the owner chose to exact it.

1st. EXCEPTION. The defendant then prayed the opinion of the court to the jury, that upon the evidence above stated, the defendant is entitled to set off, in this case, the freight on the goods and merchandize, shipped by Captain *Pawson*, on his own account, from *London* to *Coquimbo*; which opinion the court [ARCHER, Ch. J. and WARD, A. J.] refused to give, but were of opinion, and so directed the jury, that the defendant is entitled to set off the said freight, unless the plaintiffs can shew by testi-

mony, that there was a known and established usage that the captain, under the above circumstances, was not chargeable with freight, and that the said usage was so well known and established, that it must be supposed to have entered into the contemplation of the parties at the time they originally made the contract first herein before stated. The defendant excepted.

2. EXCEPTION. The defendant then prayed the court to instruct the jury, that according to the contract of the parties, as set forth in the correspondence exhibited in the *first* bill of exceptions, the voyage as originally projected, to wit, from *Baltimore* to *London*, thence to *Coquimbo*, thence to *Canton*, and thence home to *Baltimore*, having been altered by the direction of the defendant, and the consent of Captain *Pawson*, so as to strike out the trip from *Coquimbo* to *Canton*, and give the ship a destination direct from *Coquimbo* home to *Baltimore*, the privilege originally stipulated for Captain *Pawson* to bring home twenty-five tons from *Canton*, clear of freight, was voluntarily relinquished by him, and exchanged for the privilege of bringing home his funds in copper from *Coquimbo*, and that, consequently, the plaintiffs are not entitled to any compensation for the alleged loss of the privilege of bringing home the twenty-five tons from *Canton*. Which instruction the court refused to give, but gave the following opinion and direction to the jury:

The court are of opinion and so direct the jury, that the plaintiffs are entitled to recover an equivalent for the loss they may prove their intestate to have sustained, by being deprived of his privilege from *Canton* or *Batavia* to the *United States*, in consequence of the change made by the defendant in the destination of the vessel, unless the jury should be satisfied from the evidence, that the plaintiffs' intestate did, with a knowledge of his legal rights, waive the benefit of the privilege accorded to him at the commencement of the voyage, and did accept in lieu thereof a privilege from *Coquimbo* to *Baltimore*. The court further instruct the jury, that if they believe from the evidence that the plaintiffs' intestate shipped goods from *London* to *Chili*, on board the defendant's vessel, that the defendant is entitled to a credit for the freight thereof, unless the jury shall

believe that there existed a definite general and well known usage, at the time of the commencement of the voyage, that freight, under the circumstance of this case, should not be charged by parties standing in the relation of the defendant to the plaintiffs' intestate. And further, unless the jury believe there was such a waiver and acceptance as is stated in the first part of this direction, on the part of the plaintiffs' intestate, that then the defendant is entitled to a reasonable freight for such articles as were shipped on account of, or which belonged to plaintiffs' intestate, from *Chili* to the *United States.* The defendant excepted.

3. EXCEPTION. The defendant further prayed the court to instruct the jury, that if they believe that the contract made between the plaintiffs' intestate and defendant, was an entire contract for $2000, for the faithful performance of the duties of supercargo by *Pawson*, and a strict conformity to the instructions he should receive, that then the violation of his duty as supercargo by a departure from his instructions in taking on freight, prohibited articles, thereby putting the ship and the owner's interest therein, in jeopardy, was such an infringement of the entire contract, as took away from the plaintiff any right to demand the fulfilment of the same on the part of the defendant. Which opinion and direction the court refused to give. The defendant excepted.

4. EXCEPTION. The defendant then prayed the court further to instruct the jury, that according to the contract of the parties as set forth in the correspondence exhibited in the *first* bill of exceptions, the compensation of $2000 stipulated to be paid to Captain *Pawson*, as supercargo, had relation to the original voyage from *Baltimore* to *London*, thence to *Coquimbo*, thence to *Canton*, and thence home to *Baltimore*; and that the voyage having been shortened by striking out the trip to *Canton*, and making the destination of the vessel direct from *Coquimbo* to *Baltimore*, and Captain *Pawson* having, moreover, died at *Coquimbo*, in the course of the voyage, before he had completed the investment of the defendant's funds, that compensation is subject to abatement in the discretion of the jury on two

grounds—*First*, for the alteration of the voyage, if the jury shall be of the opinion that the labour and responsibility of Captain *Pawson* were thereby lightened—*Second*, for that portion of the contemplated services of Captain *Pawson*, which were lost to the defendant by his death at *Coquimbo*. Which instruction the court refused to give, but were of opinion, and so directed the jury, that if they believed the evidence in the cause, the plaintiffs were entitled to recover of defendant a rateable proportion of the sum of $2060, which proportion the jury should ascertain by computing the time from the commencement of the voyage to Captain *Pawson's* death, and from his death until the duties of supercargo were completed by the signature of the bill of lading, for the homeward voyage, and that the jury may allow him as supercargo such portion of the said sum as they may deem him entitled to, for acting in said capacity, up to the time of his death, at *Coquimbo*, according to the rule above stated.   The defendant excepted.

5. EXCEPTION.   The defendant then prayed the court to instruct the jury, that, according to the contract of the parties as set forth in the correspondence exhibited in the *first* bill of exceptions, the compensation of $2000, stipulated to be paid to Captain *Pawson*, as supercargo, on the voyage originally projected, to wit, from *Baltimore* to *London*, thence to *Coquimbo*, thence to *Canton*, thence home to *Baltimore*, was one entire compensation to be paid for one entire service, on the return of Captain *Pawson* to *Baltimore*, and not subject to be apportioned by a part performance of the service, unless Captain *Pawson* had been prevented by the defendant from performing the residue thereof—that the voyage having been altered by the consent of the parties (as appears by said correspondence) by striking out that part of it which related to the trip to *Canton*, and directing the destination of the ship from *Coquimbo* to *Baltimore*, without saying any thing of the aforesaid compensation to Captain *Pawson*, as supercargo, that stipulation attached upon the new voyage, precisely in the same manner in which it had been attached to the original voyage, that is to say, that it was one entire compensation for one entire service, not subject

to be apportioned by a part performance of the service, and that consequently, the death of Captain *Pawson* at *Coquimbo*, in the progress of the voyage, and before the complete performance of the service, put an end to all claim on the part of the plaintiffs, to any part of the $2000.  Which opinion and direction the court refused to give.  The defendant excepted.

6. EXCEPTION.  The defendant then prayed the court to instruct the jury, that in estimating the value of the privilege of twenty-five tons from *Canton* to *Baltimore*, which, according to the opinion expressed in the *first* bill of exceptions, the plaintiffs are entitled to claim in this action; if it was not relinquished and exchanged by Captain *Pawson*, by the privilege from *Coquimbo*, the jury should consider that privilege as having been subject to the contingency of the safe arrival of the ship at *Canton*, and the continuance of Captain *Pawson's* life, and that either the destruction of the ship or the death of Captain *Pawson* at *Coquimbo*, in the course of that voyage, would have put an end to all claim by his representatives on account of this privilege.  Which instruction the court refused to give, and instructed the jury that these contingencies ought not to enter into their calculation.  The defendant excepted.

7. EXCEPTION.  And the defendant further prayed the court to direct the jury, that the plaintiffs are not entitled to recover the said sum of $2000, nor any part thereof, under the evidence given in this cause.  Which opinion and direction the court refused to give.  The defendant excepted.

8. EXCEPTION.  The defendant also prayed the court to direct the jury, that if the jury believe that Captain *Pawson* had actually purchased before his death, a sufficient quantity of copper, which, with the other property, purchased by Captain *Pawson* for account of the defendant, and afterwards put on board, was sufficient to exhaust the funds of the defendant confided by him to *Pawson*, that then the plaintiffs are not entitled to recover the compensation of $2000, mentioned in the letters of instruction of the defendant, unless the defendant received on board his ship a sufficient quantity of copper to exhaust his

said funds. Which opinion and instruction the court refused to give. The defendant excepted.

9. EXCEPTION. The defendant further prayed the court to instruct the jury, that there is no evidence in the cause from which they can infer that Captain *Pawson* consented to the change of the original voyage from *Coquimbo* to *Canton*, and from *Canton* to the *United States*, and waived his privilege from *Canton* to the *United States*, through ignorance of his legal rights, the presumption of law being that, if he had full knowledge of the facts, he had full knowledge of his legal rights growing out of those facts. Which opinion and instruction the court refused to give. The defendant excepted.

10. EXCEPTION. In addition to the evidence stated in the preceding bills of exceptions, the plaintiffs offered in evidence, that the gold which was seized at *Guasco*, was purchased after the death of *Pawson*, and after all the copper which the said ship would bear, was actually purchased and loaded on board the said ship, and that the same was purchased with the very doubloons brought by *Pawson* for, and on account of *Donnell*, from *England*, and which remained in possession of *Edwards &* *Stewart*, at the time of *Pawson's* death ; and that the said gold was actually purchased by, and under the advice of *Thomas A. Lane*, acting as the captain—which said *Lane* was the mate of the ship, and succeeded to the command on the death of *Pawson*—that in the said proceeding *Lane* had no other authority from *Donnell* to act as his agent than what was derived from his succeeding *Pawson* as captain of the ship, and was acting under the instructions of *Donnell* to *Pawson* beforementioned. The plaintiffs then prayed the opinion of the court to the jury, that if the jury find from the evidence, that the gold which was seized and lost at *Guasco*, after the death of *Pawson*, was purchased by *Edwards & Stewart* after *Pawson's* death, with the separate funds of *Donnell*, and on his account, and shipped accordingly, without any power or authority from *Pawson* to do so, that then the defendant is not entitled to set off the value or cost of the gold against the claim of the plaintiffs in this suit.

Which opinion the court refused to give. The plaintiffs excepted.

11. EXCEPTION. The defendant further prayed the court to instruct the jury, that, according to the orders of the defendant, assented to by Captain *Pawson*, as set forth in the correspondence exhibited in the *first* bill of exceptions, it was the duty of the said *Pawson*, as the supercargo and agent of the defendant, to invest all of the defendant's funds in copper at *Chili*, if copper could be had, and to bring the same home, and deliver it to the defendant in *Baltimore;* and if, in these circumstances, *Pawson* holding both the defendant's funds, and his own, after having purchased and put on board the ship *Chesapeake*, copper equal to the amount of the defendant's funds, thought proper, for any reason, to make an investment in gold or silver, and did, during his life, make such investment; or, if his agents, *Edwards & Stewart*, succeeding to the possession of those joint funds, did, after copper had been purchased and put on board equal to the amount of defendant's funds, make any such investment in gold or silver, and if such gold and silver was afterwards seized by the government of *Chili*, and confiscated, as having been attempted to be exported, contrary to the laws of the country, that the loss must be borne by *Pawson* and his representatives, and cannot be thrown on the defendant. Which opinion and instruction the court gave. The plaintiffs excepted.

12. EXCEPTION. The defendant further prayed the court to instruct the jury, that if, upon the whole evidence in the case, they shall be of opinion, that copper was brought home, equal to the whole amount of the funds of the defendant, and equal to *Pawson's* privilege in copper, (as he was willing to accept it) that the plaintiffs are not entitled to recover of the defendant, the amount of any gold or silver which *Pawson* or his agents, *Edwards & Stewart*, may have put on board the *Chesapeake*, of their own accord, and without the knowledge, consent, or orders of the defendant, and which may have been afterwards seized by the government of *Chili*, and confiscated, as having been attempted to be exported, contrary to the laws of the land—and that the defendant's having received from Captain *Lane*, the

successor of Captain *Pawson,* in the command of the *Chesapeake,* the letters and invoices sent to him by *Edwards & Stewart,* is not, under the circumstances of the case, such a ratification of the act of purchasing and putting on board such gold and silver, as to throw the loss of it upon the defendant, and to authorize the plaintiffs to recover it from him in this action.   Which opinion and instruction the court gave.   The plaintiffs excepted.

Verdict and Judgment for the Plaintiffs for the sum of $5510·43.   From which judgment both parties, the plaintiffs and defendant, appealed to this Court.

The cause on both appeals was argued before BUCHANAN, Ch. J., and STEPHEN and DORSEY, J.

*Williams,* (District Attorney of U. S.) for *Pawson's* administrators, the appellants in the first appeal, contended in argument on the three bills of exceptions taken on the part of the plaintiffs below, viz: the 10th, 11th, and 12th bills of exceptions.

1. That the gold, which was seized at *Guasco,* and there condemned, having been purchased by *Edwards & Stewart,* after the death of *Pawson,* without his authority, but with the advice of his successor, Captain *Lane,* and with the money of the defendant, ought not to be charged to *Pawson,* nor the cost thereof deducted out of his funds.

2. That *Pawson* ought not to bear the loss of the gold, purchased, seized and condemned as aforesaid.   1st. Because he was not bound to invest all the defendant's money in copper, to the exclusion of his own funds.   2d. Because he did not purchase any gold in his lifetime;—and, 3d. Because *Edwards & Stewart* were not his agents, after his death, so far as regarded the defendant's funds, but were in that respect, the defendant's agents.

3. That *Edwards & Stewart,* being, after *Pawson's* death, only his agents, or the agents of his representatives, for the funds of *Pawson* in their hands, and being the agents of the defendant, for the funds of his in their hands, and *Pawson* having a co-equal right with the defendant to have his funds invested in copper; and the said agents having *actually* invested a part of the defendant's funds in gold, and none of *Pawson's* in that arti-

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

cle, the loss of the gold is the defendant's, and not *Pawson's* representatives.

On the *second* point he referred to 2 *Liv. on Agency*, 298. 1 *Liv. on Agency*, 261 to 278.   *Taylor vs. Plummer*, 3 *Maule and Selw.* 562.   2 *Liv. on Agency*, 281.

*C. C. Harper* for *Donnell*, the appellee in the *first*, and the appellant in the *second* appeal, stated that for the appellant in the *second* appeal, it would be contended,

1. That no usage can, in such a case, be permitted to be engrafted upon, or to control a written and express contract so plainly and unambiguously set out.   This point arises under the *first*, and a part of the *second* bills of exceptions.

2. That the privilege from *Canton* depended entirely upon the voyage to *Canton*, which was within the control of the defendant below, as owner of the ship; that this privilege was expressly waived by *Pawson* for an equivalent, with knowledge of his legal rights; and that, with knowledge of the facts, ignorance of his legal rights was no excuse.   This point embraces a part of the *second* bill of exceptions.

3. That *Pawson's* acceptance or non-acceptance of the new voyage, and substituted privilege, was a question of law, and that the court ought to have construed the writings under which the question of acceptance arose, and not have left it to the jury.   This point embraces also a part of the *second* bill of exceptions.

4. That the record affords no evidence of any ignorance of his legal rights, and that the court ought so to have directed the jury, as prayed in the ninth bill of exceptions, and erred in refusing such direction.   This point embraces the ninth bill of exceptions.

5. That the $2000 agreed to be paid as compensation to *Pawson*, depended on the performance of the entire voyage, and on his return to *Baltimore*, which were *conditions precedent*.   This point embraces the *third*, *fifth*, and *seventh* bills of exceptions.

6. That if the whole $2000 cannot be recovered, there cannot be an apportionment, and no part of it can be recovered. This point embraces the same bills of exceptions in part.

7. That *Pawson*, by departing from the instructions of the defendant, (the owner of the ship he commanded, and in whose employ he was) and by his other misconduct, as detailed in the record, lost his right to demand the compensation of $2000, or any part thereof. This point embraces the same bills of exceptions in part.

8. That the court below having pronounced an opinion that there could be an apportionment of the compensation of $2000, they erred in directing the jury not to allow any abatement by reason of the shortening of the voyage, or the death of *Pawson*, and they also erred in fixing the "date of the signature of the bill of lading for the homeward voyage," as the period at which his duties as supercargo, were completed. This point embraces the *fourth* bill of exceptions.

9. That if the privilege from *Canton* did not depend entirely on the voyage to *Canton* taking place, and the defendant was liable to *Pawson* for the loss of the original voyage and privilege surrendered by him "under a mistake of his legal rights," then the jury, in estimating the value of the privilege so surrendered, ought to have taken into their calculation the possible death of *Pawson*, or the possible loss of the ship before she reached *Canton*, and the court below erred in refusing such direction to the jury as prayed by the defendant in the *sixth* bill of exceptions.

10. That if *Pawson* had actually purchased, before his death, an amount of copper, which, with the other property purchased for the defendant, and put on board, was sufficient to exhaust the funds of the defendant, confided to *Pawson* by him, that then the plaintiffs below were not entitled to recover the $2000, unless the defendant received on board his ship, a sufficient quantity of copper to exhaust his funds, and the court below erred in not so directing the jury, as prayed for by the defendant below, as stated in the *eighth* bill of exceptions. Under this point, the defendant (now appellant) contends, that *Pawson*

was special agent for the purchase of copper; that if he was general agent, he violated his duty by not using a sound discretion; that *Edwards & Stewart* were his agents; and that the gold and silver belonged to him.

11. The appellant will also contend, under the *eighth* bill of exceptions.   1st. That independent of the hypothetical assumption in the prayer upon which this exception is founded, the fact that a surplus of copper (over and above all the defendant's funds, and over and above the 147 quintals delivered to *Pawson*) remained in the ship, is proved by the evidence in the record.   2d. That the ship was sent, and *Pawson* employed for a special purpose; that she was not a general ship, and therefore *Pawson* could not take in goods for other persons, or interfere with the owner's arrangements, and thereby throw a loss upon the owner.   3d. That if he could so use the ship as to bind his owner to third persons, the owner might set off the compensation of $2000 against such loss.

On the *second* point he cited 1 *Liv. on Agency,* 150, 151. *Doct. and Stud.* ch. 26, page, 79; ch. 46, page, 253.  *Lowry vs. Bourdieu, Dougl.* 471, (455.)   *Lammott vs. Bowly,* 6 *Harr. & Johns.* 520.

On the *fifth* point, *Portage vs. Cole,* 1 *Saund.* 320 (*note* 4.) *Furnival vs. Crew,* 9 *Mod.* 455, 459.

On the *sixth* point, *Cutter vs. Powell,* 6 *T. R.* 320.   *Cook vs. Jennings,* 7 *T. R.* 381.

On the *tenth* point, *East India Company vs. Hensley,* 1 *Esp. Rep.* 111.  *Fenn vs. Harrison,* 3 *T. R.* 757.   *Gibson vs. Colt,* 7 *Johns. Rep.* 393.   *Prince vs. Clark,* 8 *Serg. & Low,* 54.   *Esp. Evid.* 64.   1 *Com. on Cont.* 237.   2 *Liv. on Agency,* 298.

*R. B. Magruder* on the same side.   On the *first* point he cited *Poth. on Mar. Cont.* 13, 14, 32, 135.   *Abbott on Shipping,* 137, (119) 557.   3 *Stark. Evid.* 998, 1036.

On the *third* point, *Macbeath vs. Haldimand,* 1 *T. R.* 180, 182 *Ferris vs. Walsh,* 5 *Harr. & Johns.* 308.

On the *fourth* point, *Key's Exr. vs. Parnham,* 6 *Harr. & Johns.* 418.   *Davis vs. Davis, et al.* 7, *Harr. & Johns.* 36.

On the *seventh* point, *Abbott* 183. *Montgomery vs. Wharton*, 2 *Peters' Adm. Rep.* 401.    1 *Com. on Cont.* 221, 222, 225, 230, 235.    *Robinson vs. Hindman*, 3 *Esp. Rep.* 235.

On the *eighth* point, *Abbott* 482.

On the *ninth* point, *Pothier* 135.

On the *eleventh* point, *Abbott* 119, 1 *Com. on Cont.* 221, 222. *Campbell vs. Thompson*, 2 *Serg. & Low*, 481, (1 *Stark. Rep.* 490.)  *Locke vs. Smith*, 10 *Johns. Rep.* 250.   The act of 1785, ch. 46 and 47.   *Clarke vs. Magruder*, 2 *Harr. & Johns.* 77. *McFadon vs. Baltimore Insurance Company*, 4 *Harr. & Johns.* 45.

*Williams*, (District Attorney of the U. S.) in reply to the argument of the counsel of *Donnell*, on the bills of exceptions taken by him, and which constitute the subject of the *second* appeal, on the *first* bill of exceptions, he cited 3 *Stark. Evid.* 1038. 2 *Stark. Evid.* 453, 454, 447, 452. *Birch vs. Depeyster*, 2 *Serg. & Low*. 359. (1 *Stark. Rep.* 210.) *Senior vs. Armitage*, 3 *Serg. & Low*, 71.   *Cutter vs. Powell*, 6 *T. R.* 320.  *Zagary vs. Furnell*, 2 *Camb.* 240.   *Renner vs. Bank of Columbia*, 9 *Wheat.* 582.   *Jackson vs. The Union Bank of Maryland*, 6 *Harr. & Johnson*, 146.   *Bank of Columbia vs. Magruder's Admx. Ibid.* 172, 180.   *Phill. on Ins.* 18.   *Park*, 589, 630.  *Marsh.* 226, 259, 270, 365, 375, 707.   *Trott vs. Wood*, 1. *Gall. Rep.* 444. *Winter vs. Brockwell*, 8 *East.* 308.

On the *eighth* bill of exceptions, *Peake's Evid.* (*Norris's Ed.*) 416. *Winchester vs. Hackley*, 2 *Cranch* 342.  2 *Stark. Evid*, 642, 643.   *Farmsworth vs. Garrard*, 1 *Campb.* 38.

On the *third* bill of exceptions, 1 *vol. Laws of U. S.* 272.

On the *fourth* bill of exceptions, *Etting vs. Bank of United States*, 11 Wheat. 75. 1 *Liv. on Agency*, 69 to 180.   2 *Liv. on Agency* 214, 215.   *Kendrick vs. Delafield*, 2 *Cain's Rep.* 67, 72. *The United Insurance Company vs. Scott and Seaman*, 1 *Johns. Rep.* 111, 115.   *Abbott* 270.   *Thorne vs. White*, 1 *Peters. Adm. Rep.* 176 (*note.*) *Rice vs. The Polly and Kitty*, 2 *Peters Adm. Rep.* 420.

On the *fifth* bill of exceptions, *Cutter vs. Powell,* 6 *T. R.* 320. *Abbott,* 427. *Hart vs. The ship Littlejohn,* 1 *Peters Adm. Rep.* 115, 118, 119, 121. *Pothier* 116, 117, 118. *Pordage vs. Cole,* 1 *Saund.* 320 (*note* 4.)   *Campbell vs. Jones,* 6 *T. R.* 570.   2 *Stark. Evid.* 642.   1 *Pow. on Cont.* 267.

On the *second* bill of exceptions, *Laidlaw vs. Organ,* 2 *Wheat.* 178, 183, 195.   *Etting vs. Bank of United States,* 11 Wheat. 75.   1 *Liv. on Ag.* 71.   *M'Intyre vs. Bowne,* 1 *Johns. Rep.* 238, 259.   *Lammott vs. Bowly,* 6 *Harr. & Johns.* 522, 524.

On the *ninth* bill of exceptions, *Lammott vs. Bowly,* 6 *Harr. & Johns.* 522, 524, 1 *Stark. Evid.* 399.   *Etting vs. Bank of United States,* 11 Wheat. 76.

On the *sixth* bill of exceptions, *Etting vs. Bank of United States,* 11 *Wheat.* 75, *Abbott,* 489, 434.   *Val. Com. tit.* 4 *art.* 3, 2 *Bro. C. & A. L.* 533.   *Pothier* 120, 126.   *Nap. Code, art.* 250.   *Morrison vs. Galloway,* 2 *Harr. & Johns.* 461 *to* 468. *Sigard vs. Roberts,* 3 *Esp. Rep.* 71.   *Knight vs. Crockford,* 1 *Esp. Rep.* 192, 193.   *Campbell vs. Jones,* 6 *T. R.* 570.   *Hoyt vs. Wildfire,* 3 *Johns. Rep.* 518. *Sullivan vs. Morgan,* 11 *Johns. Rep.* 66.

The causes were then postponed, and by agreement, written arguments of the counsel were to be submitted to the court; and the following were accordingly submitted.

*Taney,* (Attorney General) for *Pawson's* administrators.   In the case now under discussion, (the one in which *Donnell* is appellant,) it will be found that there are three subjects in controversy between the parties.

1. Is *Donnell* entitled to charge freight on the goods of *Pawson,* shipped "on his own account" from *London* to *Coquimbo?*

2. Are *Pawson's* administrators entitled to recover any part of the $2000, mentioned in *Donnell's* letter of November 18, 1819?   And if they are entitled to recover a part, what proportion are they entitled to recover, and by what rule is that proportion to be ascertained?

3. Are the administrators of *Pawson* entitled to recover compensation for the privilege of twenty-five tons, from *Canton* to *Baltimore*, stipulated in *Donnell's* letter of November 18, 1819, and of which *Pawson* was deprived by the act of *Donnell*, in changing the voyage originally contemplated?

The defendant below has brought up *nine* exceptions, and each of them will be found to relate to one of the items above-mentioned, and to involve some of the questions [there stated. Instead, therefore, of taking up the exceptions, in the order in which they are set forth in the record, they will be classed and considered in this discussion, according to the above arrangement.

    *First point.*—Is *Donnell* entitled to charge freight on the goods and merchandize shipped by *Pawson*, on his *own* account, from *London* to *Coquimbo*.

This question is presented by the prayer of the defendant, and the opinion of the court in the 1*st exception*. The same principle is again decided in the 2*d exception*.

The whole course and objects of the voyage contemplated, when the vessel sailed from *Baltimore*, are detailed in the letter of *Donnell*, of November 18, 1819, and the alterations afterwards made, will be found in his letter of December 26, 1819.

According to both letters, the ship was to proceed in ballast from *London* to *Chili*. The amount of goods shipped by *Pawson*, and his motives for this shipment, will be found in his letter. "In consequence," says *Pawson*, "of the scarcity of doubloons, I have thought it adviseable to invest my own funds in merchandize, in hope that it may do as well, and because I would not interfere in any manner with your business." See also his letter of April 27, 1826.

It is admitted, that the contract between *Donnell* and *Pawson* was in writing, but the whole of the written contract is not before the court. It was contained in part in the shipping articles, and in part in the letters of *Donnell* before referred to. In the admissions, the monthly pay of *Pawson* as stipulated in the shipping articles, is stated:—but what else is contained in that paper does not appear. It belonged to the ship, and on her re-

turn to *Baltimore*, must, with the other papers of the vessel, have fallen into the hands of *Donnell*. It is not suggested in the record, that this document has been lost or mislaid. Why it was kept back, is not explained, nor is it necessary now to inquire. But while *Donnell* withholds the paper, and gives no proof of its contents, he cannot be allowed to say that the usage relied on by the plaintiffs, is contrary to, or inconsistent with other provisions contained in the agreement. So far as the contents of the writings are before the court, they are silent as to the privilege claimed under the usage, and certainly contain no stipulation in opposition to it, or inconsistent with it. They do not say that Captain *Pawson* may, or that he may not ship goods on his own account from *London* to *Coquimbo*. And if goods should be shipped by him, they do not say whether he shall, or shall not pay freight. The contract, as we are allowed to see it, is silent on this subject.

The writing being silent in relation to the right in question, the first enquiry is, can the known and established usage of trade, annex to this contract as incident to it, a right in the captain to ship the goods herein before mentioned, free from freight? This inquiry involves two questions. *First,* can the known and established usage of trade give to either of these parties a right, not stipulated in the writing? *Secondly,* if usage may give such a right, is the usage in question a reasonable usage, or is it unreasonable, and therefore illegal and void?

Upon the first of these questions the appellees insist, *that in a commercial contract, custom and usage may superadd a right to either of the parties, concerning which the written contract between them is silent.*

This principal of law is a familiar one, and the authorities to maintain it numerous and undisputed. The court are referred to a few of them, where the principle is clearly and distinctly set forth. 3 *Stark. Ev.* 1038. *Bank of Columbia vs. Magruder,* 6 *Harr. & Johns.* 180. *Renner vs. Bank of Columbia,* 9 *Wheat.* 581. The rule, and the reason of the rule, is so well stated in *Stark. Ev.* 1038, that the passage is transcribed for the court—"In many instances extrinsic evidence of custom and usage is

48          CASES IN THE COURT OF APPEALS

Pawson's Adm'rs vs. Donnell.   Donnell vs. Pawson's Adm'rs.—1829.

admissible for the purpose of annexing incidents to the terms of a written instrument concerning which the instrument is silent. The principle upon which such evidence is admissible, seems to be a reasonable presumption that the parties did not express the whole of their intention, but meant to be guided by custom as to such particulars as are generally known to be annexed by custom and usage to similar dealings. It is evident that in commercial affairs, and all the other usual and common transactions of life, it would be attended with great inconvenience that the well-known ordinary practice and usage on the subject should not be tacitly annexed, by virtue of such a presumption, to the terms of a contract, and that the parties should either be deprived of the certainty and advantage, to be derived from the known course of dealing, or be placed under the necessity of laboriously specifying in their contracts by what particular usages they meant to be bound."

Indeed even in the case of a sealed instrument, in which parol evidence is much more reluctantly admitted, than in the cases of commercial contracts, usage may be given in evidence to superadd a right not granted by the terms of the deed itself, and about which the deed is silent. *Wiglesworth vs. Dallison,* *Doug.* 196, 197. This case was that of a lease by deed; and usage was received in evidence, and permitted to engraft on it an additional right to the tenant, not mentioned in the deed. It was a right which by the force of usage grew out of the relation of landlord and tenant, and was a consequence of that relation which the deed had created. So here usage may engraft on the contract an additional right to the captain not mentioned in the written instruments, but which by the force of usage grows out of the relation of owner and captain, and is a consequence of that relation. In the language in 3 *Stark. Ev.* 1038, before quoted, it is annexed as an incident to the terms of the contract.

The same principle is recognized in *Senior vs. Armitage,* 3 *Serg. & Low,* 71, 72, where Baron *Thompson* says, " that as to the special agreement in order to control the custom, it must be of such a nature, that it operated upon and prevented *in*

*express terms* the custom from attaching." But it is said on be-
half of the appellant, (and much stress seems to be laid on the
circumstance,) that the written contract in this case is "express,"
and is "plainly and unambiguously" set out. And it is insisted,
that evidence of usage is admissible in those cases only, where the
written contract is ambiguous and doubtful in its terms. It
would be a sufficient answer to this argument to say, that it
cannot be predicated of this contract, that it is plainly and un-
ambiguously set out in the writing. It has been already re-
marked, that the whole written contract is not before the
court; that the shipping articles, a very material, and in this
point, the most material part of the contract are not produced.
They must be presumed to be in the possession of *Donnell*,
and surely while he withholds the writing itself, he can hardly
be permitted to rely on the clearness and perspicuity of its lan-
guage, in order to bar the claim of the plaintiffs. It is suggest-
ed indeed in the argument, that the shipping articles were in
the usual printed form, and *Abb. on Ship.* 557, has been refer-
red to by the counsel for the appellant, to prove that the lan-
guage of the usual printed form of shipping articles is express,
plain and unambiguous. It need only be answered, that there
is no proof to support the suggestion. The shipping articles
may have been in the usual printed form; but there is no proof
of it. No argument, therefore, can be founded on the assump-
tion of that fact. But let us waive this objection to the argu-
ment of the appellants and concede, *argumenti gratia*, that the
shipping articles were in the usual printed form. The language
then is plain and unambiguous: the instrument is silent as to the
privilege in question. More than this, the appellant can hardly
demand in behalf of the written contract. It is denied that the
power of usage to annex a new incident to a contract, and to
give a right not mentioned in the contract to one of the parties,
is in any degree dependent on the perspicuity, or on the ambi-
guity of the language used in the writing. It depends on the
silence of the written contract, in relation to the incidental
right claimed. The writing may be express, plain and unam-
biguous, in all the stipulations contained in it, and yet an addi-

tional right may be superadded by the force of usage, concerning which the contract is silent,

In the case of *Wigglesworth vs. Dallison*, in *Doug.* 196, 197, the deed was plain and unambiguous in all of its provisions, yet usage superadded an additional right to the tenant, beyond those granted by the deed. And the same principle is also clearly set forth in 3 *Stark. Ev.* 1038; and 3 *Serg. & Lowb.* 71, 72, before referred to, and made to depend *on the silence of the writing*, and not upon the perspicuity of the language, and the plainness of the stipulations contained in the deed. What can be more plain than an ordinary promissory note? Yet even local usages, brought home to the knowledge of the parties, may superadd to it four or five days of grace. It follows, therefore, from the authorities above mentioned, that inasmuch as the written contract is silent as to the privilege in question, it may be superadded by usage. The opinion of the court hypothetically assumes, that the usage was established by proof, and leaves it to the jury to say, whether or not it was so established by testimony.

It is not understood that the appellant objects to the opinion upon the ground that the court left it to the jury to find from the testimony, whether there was such a known and established usage as the appellees alleged. There was evidence for and against this usage; and in this state of the case, it is not contended by the appellant, that the existence of the usage was a question for the court, and not for the jury. If such an argument should be offered, the following authorities conclusively shew, that it was a fact to be tried by the jury, and not by the court. 2 *Stark. Ev.* 452. *Bank of Columbia vs. Magruder*, 6 *Harr. & Johns.* 180. Many others might be cited, but it is unnecessary to multiply cases upon a point not to be controverted. In the preceding discussion, the power of custom and usage is limited to cases where the written contract is silent, as to the right which the force of usage is invoked to sustain. But it has been extended much further in commercial contracts. There it is called in to aid in the construction of written instru-

ments. *Cutter vs. Powell,* 6 *T. R.* 320. *Abb. on Shipp.* 213. (*note.*)

In the first of these two cases the Judges declare, that if a usage could be proved, they would expound the contract according to the usage, although it appears that such an exposition would have given to the contract a different meaning from that which, in their judgment, the writing imported. In other words, the usage would have controlled, the language of the written contract. In the case in *Abbot* above referred to, the usage was in opposition to the express words of the written contract, and yet the usage prevailed. The last mentioned case is indeed questioned by *Starkie* in the note, 3 vol. 1038, and perhaps it goes farther than any other decision on the subject. Yet, the judgment of Lord *Kenyon* on such a point, sanctioned as it would seem to be by Chief Justice *Abbot,* is entitled to high respect. We are not called upon to define the exact limits of the power of usage on commercial instruments. It is sufficient for us that the contract in this case is silent, as to the privilege or right claimed by the appellees; and if there were no other cases on this subject, but those in relation to bills of exchange and promissory notes, they would be abundantly sufficient to maintain the position for which we are contending. The words of these instruments are plain and unambiguous. Yet common usage constantly annexes to them the incident of the three days of grace. Three days of grace are the right of the debtor, and this right is superadded by the force of usage to the words of the instrument. Indeed, so omnipotent is the power of usage on commercial instruments, that although three days of grace, and no more are annexed by law as an incident to every instrument of this description, yet a mere local usage, when brought home to the knowledge of the parties, is sufficiently powerful, not only to superadd a right, but to vary it from the right which the law annexes. *Renner vs. Bank of Columbia,* 9 *Wheat.* 581. *Bank of Columbia vs. Magruder,* 6 *Harr. & Johns.* 180.

It may be therefore concluded, that, inasmuch as the contract is silent in relation to the privilege in question, evidence was

admissible, to show that by the usage of trade Captain *Pawson* had a right to ship his goods free from freight. And if the usage was established by proof, it was a part of the contract and as binding on the parties, as if it had been introduced into the writing. In the language of the court, in *Bank of Columbia vs. Magruder*, 6 *Harr. & Johns.* 180, it enters into the contract, and becomes a constituent part of it.

Whether the usage was proved to the satisfaction of the jury, does not appear; nor is it material in this part of the controversy. The opinion of the court is founded on the hypothesis, that the jury should find from the testimony, that the usage was a known and established one, and that "it was so well known and established, that it must be suppposed to have entered into the contemplation of the parties at the time they originally made the contract." And if we have succeeded in establishing the rule of law before stated, then the opinion of the County Court is free from error, and ought to be affirmed, unless the usage in question is unreasonable, and therefore illegal and void. This brings us to the second question before mentioned.

2. Is the usage alleged by the appellees a reasonable usage, or is it unreasonable, and therefore illegal and void?

This point assumes, that the custom is proved to be a known and established one. The appellant contends, that although it be proved to the satisfaction of the jury, that the captain under the circumstances stated in the record, was not chargeable with freight according to the usage of trade:—And, although this usage of trade " was so well known and established, that it must be supposed to have entered into the contemplation of the parties, at the time they originally made the contract." Yet the usage so known and established, and so proved is unreasonable, and therefore illegal and void. This objection does not question the power of usage to give additional rights to the captain, not mentioned in the contract, it merely denies its power to give the particular privilege claimed. The objection applies to the nature and character of the usage, which is pro-

nounced to be unreasonable, and on that account alone illegal and void.

It is difficult to imagine how a usage proved to be as well known and established, as the opinion of the court requires, could be unreasonable.   Men are not apt to enter voluntarily and continually into contracts, contemplating upon every occasion an incident to the contract, which will subject them to unreasonable imposition.   The opinion of the court requires, that the usage shall be so well known, that the appellant must be presumed to have looked to it when he bargained.   Unless it was proved to this extent, the jury could not regard it, and were indeed forbidden to regard it.

The usage in question then could not have been proved, unless there had been a general concurrence and consent among the ship owners of *Baltimore*, for a length of time, sufficient to make it an established custom.   It can scarcely be credited, that any class of men, would so long unite together in building up a system of dealing, unreasonable and unjust to themselves. And no class of men are less likely to commit such a folly, than the merchants.   The mere fact, therefore, that it had become a known and established usage, is powerful evidence, that it must have been found by experience to be convenient and useful to both parties.   Yet it is not necessary for us to prove the usage *reasonable;* the appellant must prove it to be *unreasonable.*

" A custom may be good although the particular reason of it cannot be assigned, for it sufficeth if no good legal reason can be assigned against it."—*2 Stark. Ev.* 447, and the authorities there cited.

But is there any thing unreasonable in the usage alleged? Can any good reason be assigned against it?   The counsel for the appellant have indeed urged, that if the usage in question were established, a captain might load the ship on his own account, contrary to the owner's wishes—that he might take goods for others for his own profit, or to the injury of the owner —that he might take contraband articles, and thereby subject the ship to seizure—that he might fill the ship with passengers, and that those passengers might, by being belligerent in regard

to some other nation, subject the owner to the loss of his ship, or might in some other way do him irreparable injury.

It is an easy matter to fancy a usage that would be full of evil, and then point out the evils which would spring from it. It will be far more difficult, however, to find them in the custom sanctioned by the County Court. It authorizes none of the acts above mentioned, and permits no injury to the owner in any shape. The usage in question is confined in express terms to the goods shipped by Captain *Pawson on his own account.* It does not extend to any other goods, and does not embrace the goods shipped by *Goddard,* or by any other person but the captain himself. It does not authorize him to take goods for another, either on freight, or free from freight. The court have not decided that any usage would deprive *Donnell* of the right to charge freight on the goods shipped by *Goddard.*

The court have not said that any usage would justify him in taking one or more passengers, either for his own profit or the profit of his owner. It is not meant to question the validity of a usage, to take a reasonable number of passengers who would not encumber the ship: but we desire to shew that no question upon that subject is involved in the opinion now under discussion. The usage, of which the court speaks, relates to the goods shipped by Captain *Pawson* on his own account; and not to the passenger from *London* to *Chili,* nor to the goods of *Goddard.*

The usage in relation to the captain's goods is also confined to the circumstances of the case before the court. There must have been, says the court, a known and established usage that the captain "*under the above circumstances, was not chargeable with freight.*" They do not speak of a usage extending further, or giving a right under any other circumstances, or to any other extent.

And what were the "*above circumstances*" to which the court limited their opinion? The ship was to go in ballast—the space occupied by the goods would have been vacant—the amount shipped was within the reasonable compass of his private and separate trade—it interfered with none of the owner's plans—

did not delay the ship—did not impede her voyage, or in any respect do injury to the owner, or put to hazard his property, or interfere with his plans of commerce—and the captain was induced to take these bulky articles in order the better to promote the views and the interest of the owner, and did thereby promote them. His original design was, it would seem, to take doubloons, upon which it will hardly be contended that freight would have been chargeable; he changed his intention, because he would not go into the market to compete with his owner, or take from the quantity the owner desired to procure. Is there any thing unreasonable in a usage that, *under such circumstances*, the captain is not chargeable with freight? It would rather seem that he must be a most unreasonable owner who would demand it. It surely does not work injustice.

The counsel for the appellant have cited *Pothier on Mer. Cont.* 14, 32 and 135, to prove that the owner is entitled to the use of the whole ship, and that, by an express article of the *French* commercial code, the captain can take nothing without paying freight, except what he may put in his chest. The authority cited is certainly entitled to very high respect on all questions of commercial law. The right of the owner to dispose of his vessel as he pleases is not disputed on our part; and it depends upon his will whether the goods may or may not be taken on board, and whether freight shall or shall not be charged. And it is because he has this absolute dominion over the freight that he may grant to the captain, or any one else, the right to take goods free from freight. If by express written contract he had given the privilege in question to the captain, nobody would doubt the validity of the grant; and if by the force of usage, the privilege is an incident to the contract, then such usage enters into the essence of the contract, and becomes a constituent part of it. It is as obligatory upon the parties as if it had been set forth in the writing. The privilege then is derived from the contract of the owner himself. In other words, it is granted by him. It is not, therefore, inconsistent with his rights, but is created by the exercise of his rights. It cannot be illegal and void on that account, for the owner may,

by his contract, lawfully grant it.  The usage therefore is not inconsistent with the right of property in the owner.

Neither is it unreasonable and void, by reason of its being against law.  If we had a positive legislative enactment like the *French* ordinance in *Poth.* 135, relied on by the appellant, then any usage in opposition to the statute would be illegal and void.  But we have no statute against it; nor have we any judicial decision against it; nor is it inconsistent with any principle of law.  *Pothier's* work is very high evidence of commercial usages, because most of the principles, contained in the ordinances, have been adopted as usages of trade by the commercial world.   Still it is nothing but evidence, and not conclusive evidence.   All of the ordinances have not been adopted, and they are binding in so far only as usage has made them so : and where they do bind, it is by the force of usage alone.   If, therefore, the custom has been otherwise, and is proved to have been otherwise, the one proved must govern.   This court has decided that even a usage, acknowledged and settled by our own judicial decisions to be the law of trade, may be altered by a mere local custom, when brought home to the knowledge of the parties.   Besides, what is the usage in one place, is not necessarily the usage in another; and what is the usage in a trade to one place, is very often not the usage in a voyage to another.  The usage depends upon the place, and the voyage, and the trade in which the vessel is engaged.   And the usage is itself the law of the trade.   We know very well that usages often change; and what is the law of trade at one time, is not always the law at another.   The power that makes the law repeals it.  The new usage, when it has once become the known and established one, abrogates the old.

If we are right in the positions endeavoured to be maintained, then the usage in question is not contrary to the principles of justice, is not inconsistent with the owner's right of property, and is not contrary to any positive rule of law.   We cannot, therefore, perceive how such a usage can be deemed unreasonable, and therefore illegal and void.

It may be concluded then, 1st, that a usage which is not unreasonable, may superadd a right not expressed in the contract—and 2dly, that the one in controversy is not unreasonable.   And if these propositions have been established, it follows that when the contract was made between the parties, the right to ship the merchandize in question, free from freight, vested in *Pawson* by virtue of the contract, and consequently *Donnell* had no right to the set off which he claimed.

But in order to maintain the opinion of the court, it is not even necessary to insist that the right under it was a positive and absolute one, vesting in *Pawson* at the time the contract was made.   We might concede that a usage to that extent would be unreasonable.   We certainly make no such concession, because we are not aware that any principle of commercial law requires us to do so.   But, waiving the argument already offered to prove that the usage to the extent claimed is not unreasonable, yet if its operation be restrained to that of a license to ship under such circumstances, revocable at the will of the owner, it will hardly be contended that there is any thing unreasonable in it.   And if it be limited to a mere license, in the absence of orders to the contrary, still *Donnell* was not entitled to the freight.

It will be observed that there was no prohibition on the part of *Donnell* to take the goods in question.   There is, on the contrary, an almost necessary implication, in *Donnell's* first letter, that he might do it.   He says, "but it is understood that you are not to put any copper or heavy articles on board at *Chili.*" The prohibition for that particular part of the voyage, and the perfect silence of *Donnell*, with respect to the voyage from *London* to *Chili*, strongly implies an actual permission.   But we do not put the point on the ground of actual or implied permission in the writing; our object is to shew that it was not forbidden in the writing.

It has been already remarked that the usage, sanctioned by the court, is a usage confined to the circumstances of this case. It is one of its circumstances, that there was no prohibition to do the act.   If then it was the usage of trade, not to charge

58      CASES IN THE COURT OF APPEALS

Pawson's Adm'rs vs. Donnell.   Donnell vs. Pawson's Adm'rs.—1829.

freight on the captain's private adventure, when the ship was in ballast, unless the captain was notified that it would be charged—if the usage was in the nature of a license only, and revocable at the will of the owner, it would still, as the license had been acted on, have become compulsory and binding, and could not be recalled, and *Donnell* would not be entitled to demand the freight. *Winter vs. Brockwell*, 8 *East*. 308, is full to this point. And we think it would be difficult to shew that a usage was unreasonable, which merely inferred a license, and did not become a vested right in the captain and compulsory on the owner, until it had been executed. This point need not be enlarged on, as it cannot be deemed a necessary one to maintain the opinion given. It may be proper, however, to remark, that even in *Donnell's* account, *Pawson* is not charged with freight on these goods, although freight is charged on *Goddard's* cordage, to the amount of more than one fourth of what it sold for. If the spirit which concocted that account, could not work itself up to charge freight on *Pawson's* goods, the usage to the contrary must indeed have been well known and established. The omission to do so in such a paper, would seem of itself conclusive proof of the usage, and of the reasonableness of the usage too.

In contending that the usage was a reasonable one, we have stated that the goods did not exceed the ordinary extent of a captain's private trade in such a ship. The amount that a captain may ship, must depend on the limits of the usage. The amount actually shipped appears in the evidence, and was one of the "circumstances" by which the jury were to try, whether the shipment was within the boundaries of a known and established usage. If it exceeded the amount fixed by the usage, it was not protected by the opinion of the court; and whether it did, or did not exceed it, was a question of fact for the jury, and was one of the "circumstances" by which they were to be governed. This is mentioned in order to shew that the usage contended for does by no means imply the right of the captain to ship any quantity of merchandize he may think proper, however large. The amount, like other customs, must depend on

the nature of the trade, and the size of the vessel. It must not exceed the ordinary and reasonable extent of the private trade of a captain in such a vessel, engaged in such a voyage.   There is a standard therefore sufficiently certain, whereby the jury may try it—a rule as certain as that whereby they try "*reasonable skill and judgment*" and "*reasonable diligence*," when those questions, as happens very often, are questions for the jury, and not for the court.   In this case, the amount shipped, including commission, &c. was 1115*l.* 13*s.* 3*d.   Pawson* took with him for his private trade, 1165*l.* 9*s.* 1*d.*—and this sum it appears, was taken with *Donnell's* consent and knowledge, and in a bill drawn by him on his agent in *London.*   Moreover, *Donnell* procured the amount shipped, to be insured, and charged a commission on it.   These facts furnish evidence from which the jury might very well have found, that the merchandize in question, did not exceed the ordinary private trade of the captain in such a ship on such a voyage: and, that a private trade of this description is well known and understood, appears by *Abb. on Ship.* 213.   The other circumstances to which the usage was confined—that is, that the ship was in ballast—that it did not delay her—that it did not injure the owner, nor interfere with the objects he had in view—that it was done for the purpose of advancing the interest of the owner—that it was not forbidden—that the act was done before freight was claimed—do not appear from the evidence to have been susceptible of controversy.   They might surely be all found by the jury upon the evidence as it appears in the record.   And if these "*circumstances*"—these facts were all found by the jury, it is submitted to this court to say, whether the usage claimed can be deemed to be against justice—against positive law—or inconsistent with the rights of the owner.

*Second Point.*—Are *Pawson's* administrators entitled to recover any part of the $2000, mentioned in Donnell's letter of November 18, 1819?   And if they are entitled to recover a part, what proportion are they entitled to recover, and by what rule is that proportion to be ascertained?

The appellant has raised *three* questions on this part of the controversy; and these questions are supposed to arise under the 3d, 4th, 5th, 7th and 8th exceptions.

1st. He insists that *Pawson* violated his duty as supercargo, and thereby forfeited all claim to wages in that character.

2d. That the compensation in question is an entire one, to be paid for an entire service, and is not subject to apportionment, by a part performance of the service.

3d. That if it be subject to apportionment, yet it ought not to be apportioned in the manner directed by the County Court.

It is of importance to attend to the exceptions to which these objections are referred; for it will be found that some of the questions made here, are not warranted by the record, and do not appear to have been decided by the County Court.

1. The objection, *first* above stated, is said to arise under the 3d, 7th and 8th exceptions.   To support this objection, *Pawson* is charged with misconduct in the following instances :—1st, in taking the cordage on freight: 2d, in taking the passenger: 3d, in concealing these acts; and 4th, in the shipment of the gold and silver bullion at *Guasco.*

*The 8th exception* certainly does not bring up either of these objections.   For, according to the principle maintained by the appellant in this exception, the appellees' right to recover any part of the $2000 is made to depend *on the receipt by Donnell on board his ship* of a sufficient quantity of copper to exhaust the funds, placed by him in the hands of *Pawson.*   The prayer, is, that unless " he received on board his ship" this quantity of copper, the appellees cannot recover this part of his wages.   If this notion be correct, then although *Pawson* most faithfully and most skilfully discharged his duty according to the very letter of his instructions, still he is not entitled to recover his wages, unless *Donnell's* funds had the good fortune to come safe to his hands in his own ship.   Such a proposition can hardly be sanctioned by this court.   The exception obviously raises no question on the legal effect of any supposed misconduct on the part of *Pawson.*   It does not suggest that any misconduct has been com-

mitted by him ; and if objections exist on that score, they cannot be considered under this exception.

It is also supposed by the appellant, that the acts of misconduct above stated furnish a sufficient ground for the absolute direction that the plaintiffs were not entitled to recover, prayed for in *the 7th exception.*

If it be even admitted, for the sake of the argument, that the acts of misconduct above mentioned might bar the claim for wages as supercargo, yet the court even in that case could only have given a hypothetical direction, and could not have given the absolute one asked for by the appellant.   For each of the acts above stated may, or may not be acts of misconduct.   For example—the taking of the passenger is not of itself an act of misconduct in the captain ; for merchant vessels generally desire to obtain passengers.   And if the passenger in this case was taken by the permission of *Donnell,* express or implied, it would not be a violation of *Pawson's* duty ; and whether such assent was or was not to be inferred from the evidence, was a question of fact ; and therefore a question for the jury. So too as to the concealment alleged in the argument ; it was a question of fact for the jury.   And if the shipment of the silver and gold be a breach of duty in any body, it is surely a question of fact, whether it was or was not shipped by *Pawson* or by his directions.   If, therefore, it had been the intention of the counsel for the appellant, to found this prayer on any of these supposed acts of misconduct, the prayer offered should have been hypothetical ; that is, "if the jury find from the evidence, that the passenger was taken by *Pawson,* contrary to his duty as supercargo ;" or, "if the jury find from the evidence that *Pawson* concealed his conduct from the owner ;" or, "if the jury find from the evidence that the silver and gold was shipped at *Guasco* by *Pawson,* or by his orders, contrary to his duty as supercargo."   In this, or a like form of prayer, the question of law would have been put to the court, whether such misconduct forfeited his wages.   But as the prayer stands in the record, the court were called on to decide the questions of fact, as well as the questions of law.   If there were no other

62      CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

objections, this alone would have been sufficient to warrant the opinion given by the court in the 7th exception.

In speaking of the acts of misconduct under the 7th exception, the shipment of the cordage is not mentioned. Because this item is distinctly presented by the appellant in the 3d exception, and it is therefore unimportant whether he can or cannot avail himself of it, under the 7th. But the alleged misconduct in relation to the passenger; the concealment; and the shipment of the gold and silver, are not embraced in the 3d exception; and if these objections cannot be brought under the 7th and 8th, it is useless to discuss them; for they are not presented by the record. We have already shewn, that these three items of misconduct cannot be sustained under the 7th and 8th exceptions; neither are they included in the third; for this applies to the misconduct of "taking on freight prohibited articles," and to no other misconduct. Now the passenger and the concealment are obviously not within this description; and the gold and silver were not taken on freight, but were put on board as the property of the owner and the captain, and therefore are not embraced in the supposed misconduct, described in the 3d exception. We cannot, therefore, be called on to defend ourselves against these three instances of supposed misconduct. These questions are not brought up by the record.

With respect to the remaining item in the account of misconduct; that is—the cordage which is the foundation of the 3d exception, it is abundantly answered by the treaty between the *United States* and *Spain*. The cordage was not prohibited as contraband; 1 *vol. Laws of the United States, p.* 272. *Pawson* did not, therefore, in this particular take on freight prohibited articles.

But let it be supposed, that these questions of supposed misconduct are all brought here by the 7th exception, and that this court will decide the fact as well as the law.

The case of the cordage is already answered; there was in fact no misconduct, because it was not a prohibited article.

In the case of the passenger, if any misconduct was committed it was done as captain; and if any wages were forfeited by

it, it must have been the wages of captain. Yet the right to these wages is not dispute d. They are admitted in *Donnell's* account. The wages now in question are the wages as supercargo, and they are so call ed by the appellant in the prayers in the 3d, 4th and 5th exceptions; and the recovery is resisted altogether on that ground. If the conduct of *Pawson* forfeits any wages, it must forfeit the wages of the captain, rather than those of the supercargo.

But if the taking of the passenger be considered as the act of the supercargo, or that being done by him as captain, it shall nevertheless affect his title to wages as supercargo, still it is incumbent upon the ap pellant to prove, that this act was a violation of *Pawson's* duty. He makes the charge; he must therefore prove it. He must prove that he did the act, and that the act done was a violation of his duty. The evidence is, that the act in question was not a violation of his duty to *Donnell*, for it was sanctioned by *Donnell*. See *Donnell's* account. In the second item of this account, he charges *Pawson* with " short credit, allowed for passenger from *London*, £25." The words in which this charge is made strongly imply, that the passenger was taken in the ordinary course of business, and was a matter to be adjusted in the account between them, and not a matter to forfeit all title to wages, on the part of *Pawson*. *Donnell* claims the benefit of the contract made by *Pawson* with the passenger, and thereby certainly adopts it, and treats it as a contract made by his agent for him. He differs indeed with *Pawson* as to the manner in which the passage money is to be distributed. But no question upon that subject is presented by the exceptions. The question here is, did the act of taking the passenger forfeit his wages as supercargo? Not, how is passage money to be divided? And it is apparent from the evidence, that *Donnell* believed Pawson to have acted in this respect within the scope of his duty.

The charge of improper concealment is so entirely unsupported by the proof, that we are at a loss to know what part of the testimony is relied on to support it. It is a question of fact not

**64**     **CASES IN THE COURT OF APPEALS**

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Admr's.—1829.

involved in any one of the exceptions, and not countenanced by any part of the testimony.

The charge of misconduct, in relation to the shipment of the gold and silver, is not better supported than that of concealment.  The gold and silver was shipped after *Pawson's* death. It was shipped at *Guasco*, (see account of *Edwards & Stewart*.) Captain *Pawson* died at *Coquimbo*, before the ship sailed for *Guasco*.  It has been said that the shipment was made by his orders, although made after his death.  This is a mistake.  He left no orders on the subject.  From the beginning of his illness, he was incapable of giving any.  (See letters of *Edwards & Stewart*, December 8, 1820, and January 19, 1821.)  We might indeed safely admit that he intended, if he had lived, to have shipped the silver and gold.  But even if this shipment would have forfeited his wages, still as it is perfectly clear that he did not do the act, nor cause it to be done, it can never be contended that the mere intention to do it would work a forfeiture.  There can be no such principle known to the common law.  It is contrary to its whole spirit and provisions.  Besides, the shipment did not put in jeopardy the ship, nor the owner's interest therein.

In this case too, as well as in that of the passage money, the evidence is that *Donnell* adopted the acts of *Pawson*, and sanctioned them by his assent.  He was informed of *Pawson's* intention to ship the silver.  (See letter of November 4, 1820.) This silver was to be a part of the 6,000 dollars which *Donnell* was requested to insure.  He did ensure, and charge a premium for his agency in procuring the insurance.  (See his account.)  He has thus made a profit on this shipment, and took no steps whatever to indicate to *Pawson* that he disapproved of it.  It forms no part of his defence in his account.  Surely, all of these circumstances furnish conclusive evidence, that *Donnell* did not deem this shipment a violation of *Pawson's* duty to him.  He regarded it, and treated it as a part of the ordinary business of the voyage.

If therefore this court, under the 7th exception could decide the facts as well as the law, in these four alleged instances of

misconduct, yet the testimony in every one of them fully justifies *Pawson*, and shows that he faithfully discharged his duty: The appellants fail in the facts, if the court deem it proper to try the facts on the evidence.

But suppose we are wrong in both of the propositions we have endeavored to maintain. Let us assume, for the sake of the argument, that the objections are presented by the record, and that the acts of misconduct imputed to *Pawson* are sufficiently established; it remains to inquire, whether such acts of misconduct will forfeit all title to the wages stipulated in the contract.

In this aspect of the case, the point to be decided is this, an agent has faithfully and diligently performed his duty to his principal, according to the best of his judgment. Nothing is done, or omitted to be done in bad faith. The services have been rendered by the agent and accepted by the principal, and a large profit reaped from them. Yet the agent is supposed, in some particular instance, to have mistaken the precise line of his duty; and to have departed from it; and, by this departure, the gains of his principal are in a slight degree lessened. It is said by the appellant, that in such a case this injury to the principal, however small, forfeits the wages of the agent, however large. It is even said they are forfeited, although the owner sustain no injury. No authority has been produced to maintain either of these propositions, and it is believed that none can be found.

The principal is not without remedy in the case supposed, provided he has sustained damage. The law will not indeed forfeit the wages, by way of penalty upon the agent. Neither can the principal, technically speaking, *set off* the amount of injury received by him, in bar of the claim for wages. 1 *Peak. Ev.* (*Norris' edition,*) 416. *Winchester vs. Hackley,* 2 *Cranch. Rep.* 342. But he may maintain an action against the agent, and recover damages, commensurate with the injury sustained. And in this suit *Donnell* was at liberty to have shewn, if he could, that the duty of supercargo was not performed with fidelity and skill, and have thereby diminished the wages

to be recovered, in proportion to the injury he had sustained. And he might have defeated the claim altogether, if it had appeared to the jury, upon the evidence, that *Pawson* had performed the trust so negligently, unskilfully, or unfaithfully, that he was not entitled to demand compensation.   1 *Com. on Cont.* 226, 227, (edition of 1809;) 2 *Stark. Ev.* 642, 644, (*note.*) *Farnsworth vs. Garrard,* 1 *Camp.* 38.   But *Donnell* does not rely on this defence.   The record presents no question on these points.   *Donnell* insists that there has been a technical violation of duty by *Pawson,* and that the law visits it with the total forfeiture of his wages.   And, after having received the benefit of the services, he now claims the benefit of the forfeiture. The claim is not founded in justice, nor is it supported by authority.

If therefore the points raised were presented by the record, and the imputed acts of misconduct could be proved, still all right to the wages would not be forfeited, and consequently the prayer, contained in the 3d and 7th exceptions, ought not to have been granted.   We have already shewn that the 8th exception presents a different question, and have offered argument upon it.

2. We proceed to the *second* objection, in relation to the $2,000.   It is said that the performance of the whole service is a condition precedent to the recovery of any part of the compensation; and that, as *Pawson* died before the service was completed, his administrators can recover nothing for the services actually rendered.

This point is presented in the 5th exception, and in none other.

It is very clear that the court was right in refusing to give the direction prayed for.   The appellant called on the court to decide, what is obviously a question of fact, and a disputed question of fact.   The prayer, after stating the services for which the above mentioned sum was supposed to be compensation, proceeds thus :—" that the voyage having been altered *by the consent of parties,* (*as appears by the said correspondence,*) by striking out that part of it which related to the trip to *Canton,*

and directing the destination of the ship from *Coquimbo* to *Baltimore*, without saying any thing of the aforesaid compensation to *Pawson* as supercargo, that stipulation attached to the new voyage precisely in the same manner, in which it had attached to the original voyage," &c. &c. This quotation is made from the prayer, in order to shew that the stipulation is supposed to attach on the new voyage, as it has done to the old, by reason of the agreement to substitute the new voyage for the old one. The agreement then to alter the voyage is the foundation on which the prayer is placed by the appellant. It can be supported on none other. And he calls upon the court to say, not only that the agreement had been "altered by the consent of the parties," but also that this alteration "appears by the correspondence." In other words he assumes, that the correspondence being in writing, it is the province of the court to say, whether the consent of *Pawson* to the alteration in the voyage is to be inferred from it or not. We deny that it is within the province of the court to decide this question. One of the facts in controversy between the parties, as appears by the record, is whether *Pawson* did or did not consent to this alteration. The appellant says he did assent, and thereby waived the old agreement and made a new one. The appellees, on the contrary, insist that he merely obeyed the orders of his owner; that it was his duty to obey, and being his duty, his assent to the change cannot be inferred from the fact that he performed the new voyage cheerfully, and without objection. And they maintain therefore, that the original contract was never waived by *Pawson*, and the rights of the parties must still be decided by this agreement.

In this state of the controversy, can the court undertake to decide the question, whether *Pawson* did or did not consent to the alteration? Is it not a question of fact? It does not depend upon the construction of any particular paper, but depends upon inferences to be drawn from the whole correspondence, and the acts of the parties taken together. It is therefore a question for the jury. *Etting vs. Bank of United States,* 11 *Wheat.* 75, 76, is in point.

If we are right in these views, the judgment of the County Court upon this exception must be affirmed.

But let us waive this objection and examine the point of law proposed to be raised by the appellant, under this exception.

The ship sailed from *Baltimore*, Nov. 19, 1819. She returned October 21, 1821, having been absent nearly two years. *Pawson* died December 4, 1820, having been actively and laboriously engaged in the service of *Donnell* for more than a year. At the time of his death he had nearly completed the duties of his agency, and had, by his faithful services, insured to *Donnell* a gainful voyage. *Donnell* accepts all the benefits, which the labours and services of *Pawson* had procured for him; but contends that *Pawson* is entitled to no compensation for these services, because he died before the duties of the agency were entirely completed. According to this principle, if only a single hour's work remained to be done when *Pawson* died, his representatives would be entitled to nothing for his services, even although these services had occupied many years of his life, and had enriched the appellant. Is this the law? The principles of moral justice are opposed to it; and it cannot, we think, be supported by the authority of adjudged cases.

The cases upon this point are collected together, and the rule laid down in *Portage vs. Cole*, 1 *Saund.* 320, (*note 4,*) as relates to sealed instruments.

The conclusion from all the cases is stated as follows: "Hence," (says Sergeant *Williams,*) "it appears that the reason of the decision in these and other similar cases, besides the inequality of the damages, seems to be, that when a person has received a part of the consideration for which he entered into the agreement, it would be unjust that, because he has not had the whole, he should therefore be permitted to enjoy that part, without either paying or doing any thing for it. Therefore the law obliges him to perform the agreement on his part, and leaves him to his remedy to recover any damage he may have sustained, in not having received the whole consideration."

The same principle applies to contracts, not under seal, with this difference that the defendant is not put to his cross action, as in cases of covenant. But if the contract has not been fully performed by the plaintiff, the defendant may show it, and the plaintiff will be allowed to recover to the extent of the benefit derived by the defendant, and no further. 2 *Stark. Ev.* 643, 644, and (*note n.*) The doctrine is so clearly laid down in this authority, that we must beg leave to ask for it the particular attention of the court. For in strictness, &c. " But still," (*says Starkie, in page* 643) " if the defendant be benefitted to a certain extent, and does not repudiate the contract in toto, it seems to be a rule of policy and convenience, as well as of equity and justice, that the plaintiff should be allowed to recover to the extent of the benefit derived by the defendant, and no further."

Whatever therefore, may have been the ancient decisions upon this subject, it has for many years been settled in the *English* courts, that in ordinary contracts, with or without seal, the defendant according to the principles of the common law is liable, in proportion to the benefit derived from the contract, although he may not have received the whole consideration for which he stipulated; provided the plaintiff is not in fault, and does not possess the power to perform the whole stipulation. This is the general rule applicable to contracts. It is however admitted that if, from the words of the contract, it appears that the parties intended that the entire performance should be a condition precedent to the payment of any part of the compensation, then such condition, like every other condition precedent, must be strictly and entirely performed. For the parties have a right to contract as they please. But in order to produce this result, it must clearly appear from the words of the contract, that such was the intention of the parties; and such was the case of *Cutter vs. Powell.* The same principle prevails in commercial contracts.

If a seaman is prevented by a superior power from performing the service he contracted to perform, he is entitled to a proportional part of his wages; as in the case of sickness or

death of the mariner; and also in the case of impressment. *Abb. on Ship.* 426, (and *note* 1,) 427, (and *note* 1,) 433, (and *note* 1.) In these passages in *Abbot*, the doctrine is summed up, and the leading authorities referred to. And the cases given in the last mentioned page, seem to be conclusive on this point. The same principle is fully supported by the following authorities:—*Hart vs. Ship Littlejohn*, 1 *Peters Adm. Rep.* 115 to 121. *Johnson vs. Sims*, Ib. 215, *Poth. Marit. Cont. Placita*, 179 to 193.

If it be said that contracts for personal service stand on different grounds from other contracts, and that the performance of the whole personal service stipulated is a condition precedent to the payment of any part of the stipulated reward, for which the service is the consideration, the answer is that no good reason can be given in support of such a distinction. Neither do the authorities sanction it; for the cases of maritime contracts above quoted, were cases of contracts for personal service. Many of the cases upon the subject of hiring by the year relate to the time when the wages may be demanded—the time when they become payable. If they were to be paid at the end of the year, they cannot be demanded before. *The King vs. Inhabitants of Whittlebury*, 6 *T. R.* 467. 3 *Stark. Ev.* 1766.

And in the case of *Cutter vs. Powell*, so often referred to, it is distinctly admitted in the argument of the counsel for the defendant, and sanctioned by the court, that in the common case of a hired servant who contracts by the year, and dies in the middle of it, his executors may recover a part of his wages, in proportion to the time of service.

The case mainly relied on by the appellant, is the case of *Cutter vs. Powell*, 6 *T. R.* 320.

This case was manifestly not decided upon any general rule of law applicable to contracts for service, but was decided upon the special terms of that particular contract. The Judges say so in delivering their opinion, and the unusually high rate of the wages is greatly relied on by two of the Judges, for the purpose of proving that the wages were to be contingent and

not certain.    There is no circumstance like that in the present case.    In *Abb. on Ship.* 429, in speaking of the case of *Cutter vs. Powell*, it is said to have been decided "upon consideration of the particular terms of the note, and of the great excess of the sum to be paid to *Cutter*, if he had performed the whole voyage according to those terms, above the usual rate of wages upon a monthly hiring."

The case of *Countess of Plymouth vs. Throgmorton, Salk.* 65, referred to by *Lawrence*, Justice, in his opinion in the case of *Cutter vs. Powell*, might be sufficiently answered by saying, that if it be contrary to the cases above referred to, it is then overruled by them.    In note (*a*,) page 323, of *Cutter vs. Powell*, it is said that the ancient law was different from what the modern is in that case conceded to be.

But a further sufficient answer may be given.    The case of *Countess of Plymouth vs. Throgmorton*, does not justify the account given of it by Justice *Lawrence*: He says, in speaking of this case, "it was argued that without a full year's service nothing could be due, for that it was in the nature of a condition precedent; that it being one consideration and one debt, it could not be divided; *and this court were of that opinion, and reversed the judgment.*"

Now it does appear, it is true, that the argument above stated was offered by *Sergeant Holt*, who was counsel in the case.    But it does not appear that "the court were of that opinion," as is stated by Justice *Lawrence.*    The report in *Salkeld* does not say so.    For after giving the argument of counsel it says, "*judgment reversed*," and does not profess to give the grounds upon which the court decided.    The doctrines maintained by the counsel in argument are not ascribed to the court, by the reporter.    The full copy of the record of this case will be found in 3 *Salk.* 784; and it is apparent upon looking at it, that the declaration could not be supported, and that the judgment in the court below ought to have been reversed on the pleadings.    The declaration states the contract in substance to have been, "that the earl of *Plymouth* authorized *Edward Picke* to demand and receive all sums of money then

due to the earl of *Plymouth*, or that should become due in the next three years, and to apply the same as the earl of *Plymouth* should by writing direct; and for his care and labour in the premises, the said earl engaged to pay him a hundred pounds a year for three years.   The declaration then avers, that the said *Edward* afterwards, for the space of three quarters of a year from thence next following, from time to time, "*solicited and requested divers persons the debtors to the said earl, to pay sundry sums of money at that time due and payable to the said earl*," &c. &c.   Now, it will hardly be contended that this is a good averment, that the service stipulated was performed for any space of time.   The duty averred to have been for three quarters of a year, is not the service contracted to be done; and there is in this declaration no good and legal averment of performance of the service contracted for, even for a single day.   The case therefore must have been reversed on this ground; and it certainly does not appear that the court decided it on the ground, taken by counsel in the argument.

These two cases then can hardly be sufficient to outweigh the many authorities produced in support of the opinion of the court.   And it would indeed hardly be desired to find authorities to support the principle maintained by the appellant.   For if he be right, then where a slave is hired by the year, and dies an hour before the expiration of the year, his master loses his wages.   So too the family of an overseer would lose the fruits of his labour, if he died an hour before the expiration of the year.   And although such contracts of hiring have been common for a long time in this State, it has never been supposed that the accident of sickness or death would prevent the party or his representatives from recovering for the proportion of the service actually rendered.   Yet according to the doctrine maintained by the appellant, if by sickness or death *Pawson* was prevented from performing the most trifling proportion of his duty, he was entitled to nothing; the contract being an entire compensation for an entire service, and not subject to apportionment.   There is surely nothing like justice in the rule to recommend it to the favour of the court.

It has been also insisted on the part of the appellant, that the expressions in *Donnell's* letter, that the $2000 were to be *payable on Pawson's return*, make his return a condition precedent, and that the right to the wages depends on the happening of this contingency.

In reply to this argument, it is sufficient to refer to 1 *Pow. on Cont.* 267, 268. *Abb. on Ship.* 433, 434, (*note* 1.) The words in *Donnell's* letter do not create a condition; they are modal only; and relate to the manner in which the contract shall be performed.

Assuming then that *Pawson* had not by misconduct on his part forfeited all claim to wages as supercargo; and that the compensation agreed upon is subject to apportionment; the only remaining question, in relation to this part of the subject is, whether the County Court have given the true rule.

This question is brought up by the 4th exception, and can arise under none other. The rule of apportionment is given in the opinion of the court, and according to that rule it is to be graduated by the time *Pawson* was actually in service ; and the opinion assumes that the duty of supercargo commenced with the voyage, and terminated on the signature of the bill of lading.

We do not know that the court are supposed to have erred in fixing the commencement of the voyage as the time when the service commenced. *Pawson*, it is true, was both captain and supercargo, yet in estimating his wages as supercargo, we cannot take into consideration that he was captain. He must be dealt with as if a different person had been captain, and he nothing but supercargo. And if that had been the case, it would be too obvious for argument, that his service began when the ship sailed from *Baltimore*. 2 *Liv. on Agency,* 215.

But although the time when the service commenced is not questioned, yet the time when it terminated is disputed, and it is said the court have erred in the time mentioned in their direction.

If the court have erred in this respect, the appellant has no right to complain of it. For in his prayer, he assumes, that the duty of supercargo terminated when he had completed the in-

vestment of the appellant's funds.    The court consider it as terminating upon the signature of the bill of lading for the homeward voyage; and this must necessarily happen after the investment of the funds in the homeward cargo.    The court therefore, have in their direction, made the portion of time lost by the death of *Pawson*, to be greater than the defendant asked for; and have given, in this respect, to the appellant more than he demanded.    He, therefore, cannot allege error in that part of the opinion.

But if we put aside this answer, which is believed to be quite sufficient on this subject, yet it can easily be proved by authority, that the court have not erred in fixing the time when the service ended.    For, in the first place, the duties of master and of supercargo are known to the law, and need not be proved as matters of fact.    And in the second place, the goods would have been in the charge of *Pawson* as captain, and not as supercargo, from the signature of the bill of lading until the end of the voyage.    These propositions are both proved by the following authorities:  *Kendrick vs. Delafield*, 2 *Cain. Rep.* 67, 72.    *United Insurance Company vs. Scott*, 1 *John. Rep.* 111, 115.   1 *Liv. on Agen.* 69, 72.  2 *Liv. on Agen.* 215.    In the case of *Kendrick vs. Delafield*, the same person was captain and supercargo, and in that case, *Kent*, Justice, says:  " The captain did not, and could not lay aside his character and responsibility as master, until the vessel had performed her voyage, and arrived at the port of destination."    His expressions marking out their relative duties, are equally strong in the *United Insurance Company vs. Scott.*

The bills of lading are the contracts of the master, as master, that he will carry the goods to the port of destination.  *Abb. on Ship.* 217, 218.   See the bills of lading in the record.   After the bills of lading were signed, what more had the supercargo to do?   It would then have become the duty of *Pawson*, in the character of captain, to take the goods to the port of *Baltimore;* and during the voyage, and until the arrival in port, the cargo, if he had lived, would have been in his charge as captain, and the supercargo would have had no right to interfere.    Upon the

arrival of the vessel in *Baltimore*, the cargo was to be delivered to *Donnell* himself, or his order. The supercargo, therefore, had nothing to do, and could not lawfully interfere, after the bill of lading was signed. His services ended at that time, and the court below were right in fixing that as the period, at which his duties terminated.

It has been said that the authority of supercargo did not end at the time above mentioned, and that it was his duty to be on board the vessel on her homeward voyage, because he had the power during that voyage to alter the destination of the cargo. The answer to this argument is, that it would have been contrary to the orders of *Donnell* to have changed the destination of the ship, and take the copper to any other port. And the law hardly makes it the duty of a supercargo to be on board, in order that he may have an opportunity of committing a breach of duty. The law will not require his presence, unless he may have some duty to perform. If the court were right in fixing the time of the commencement, and of the termination of the duty of supercargo, we do not know that any other error is supposed to exist in the direction. The principle of apportionment adopted by the court, is the same with that prayed for by the appellant. His compensation, as supercargo, is not measured solely by the time he was engaged in buying or selling cargo; but the time occupied in getting to the scene of action is considered as a part of his time of service. It is difficult to imagine any other just rule of apportionment. For his time and labour were his capital, and while he was on his voyage, as supercargo, to *London* or to *Chili*, he was incapable of engaging in any other profitable occupation. This service so engrossed his whole time, as to exclude, necessarily, any other business. If he was in service, he was, of course, earning wages during all that time.

But it seems to be supposed that there ought to have been a deduction from the $2000, on account of the alteration in the voyage, and that the court erred in refusing that part of the prayer.

The claim to this deduction is not based upon the notion that *Pawson* assented to the change, or assented to any diminution of wages. His agreement in this prayer is put out of the question. And the appellant, in effect, contends that if the voyage originally contemplated, was abandoned by the orders of *Donnell*, and without the consent of *Pawson*, that the latter is entitled to wages only in proportion to the service actually rendered, and not according to the contract made between the parties.

If this principle be sound, it leads to this conclusion, that if the ship had been ordered back from *England*, and the whole speculation given up, *Pawson* could have recovered in proportion only to the duties actually performed. In other words, if *Pawson* was prevented by *Donnell* from performing the service, *Donnell* is not bound to make him any compensation. The whole current of authorities stand in opposition to this doctrine. *Pawson* sails on the voyage originally planned, and for which he was to receive for his services as supercargo, $2000. When he is in *England*, and after he had put himself out of the way of other employment, by proceeding to execute this contract, *Donnell*, without consulting him, and in the exercise of what was no doubt his lawful power, orders the voyage to be altered. It is altered in obedience to his order. *Pawson* is ready to perform his engagement, but he is prevented by *Donnell*. Is he not entitled to demand the pay when he is ready to perform the service? *Donnell* does not appear at that time to have entertained the notion that the wages were to be cut down, because the voyage was altered. He does not suggest it in his letter to *Pawson*, and their is nothing either in his letter or in that of *Pawson* in reply, from which it can be inferred that either party looked to any change in the wages agreed on before. On the contrary we think that the jury might and ought to have inferred, from the silence of both parties on the subject, that both of them understood and agreed that the compensation as it stood in the original contract was to remain unchanged. And if the jury might possibly have so inferred from the testimony, then the absolute direction asked for ought not to have been given.

But putting aside any supposed understanding between the parties, we come to the question of law proposed to be raised on this exception.   And we maintain, that inasmuch as *Pawson* was ready and willing to have performed the service originally agreed on, and was prevented from doing so by the orders of *Donnell*, he is entitled to recover from *Donnell* the whole compensation originally contracted to be given.   This principle, however, is involved in the questions relating to *the Canton privilege.*

*Third Point.*——Are the administrators of *Pawson* entitled to recover compensation for the privilege of twenty-five tons, from *Canton* to *Baltimore*, stipulated in *Donnell's* letter of November 18, 1819, and of which *Pawson* was deprived by the act of *Donnell*, in changing the voyage originally contemplated?

The only remaining subject of controversy between the parties is the privilege of twenty-five tons from *Canton* to *Baltimore*, stipulated in *Donnell's* letter of November 18, 1819. The questions on this part of the dispute arise out of the 2d, 6th and 9th exceptions.   The points presented by the other exceptions have been already disposed of.

In the *second* exception, as in some of the others hereinbefore examined, it will be found that the appellant called on the court to decide a question which properly belonged to the jury ; and that the court were on that account right in refusing the prayer, if it had even been open to no other objection.

In this exception, the appellant in his prayer in the first place assumes as a fact, that the voyage had been " altered by the direction of the defendant and the *consent of Captain Pawson*," and prays the court to instruct the jury that " the privilege stipulated for Captain *Pawson* to bring home twenty-five tons from *Canton*, clear of freight, was *voluntarily relinquished by him, and exchanged for the privilege of bringing home his funds in copper from Coquimbo.*"

Now there is no paper by which *Pawson* is supposed to have relinquished his privilege to *Canton*, and exchanged it for a privilege to bring copper from *Coquimbo*.   There is no paper the words of which are supposed to imply such relinquishment

or exchange. 'The relinquishment and exchange is inferred in the argument, from the correspondence and the acts of the parties. If he has relinquished and exchanged in the manner supposed, he has not done it in writing. It is not contended that it is done in any one of the letters or papers contained in the record. And if it is supposed to be a parol relinquishment and exchange, to be inferred from the whole correspondence and the acts of the parties taken together, then surely the question, whether there was such a parol relinquishment and exchange, must be for the jury and not for the court. *Laidlaw vs. Organ,* 2 *Wheat.* 183. *Etting vs. Bank of the United States,* 11 *Wheat.* 75. Both of these cases are believed to be fully in point, and to show that the court were right in refusing the prayer made by the appellant.

The two cases, relied upon by the appellant to prove that this is a question for the court, will be found to be distinguishable from the case before the court, and the cases in *Wheaton.* In *Macheath vs. Haldimand,* 1 *T. R.* 172, 180, the question was, whether the party who purchased for the government had made himself *personally* answerable. And this depended on the words of his written contracts; that is, on his letters, orders, &c., It was a question upon the interpretation of the written words, and therefore belonged to the court.

In *Ferris vs. Walsh,* 5 *Harr. & Johns.* 308, it was also a question upon the construction of the written instruments taken together: did the written words amount to a guaranty? Was such the true meaning and construction of the words in the instruments of writing? These questions without doubt belonged to the court, whose office it is to expound written instruments.

But the question here is a different one. It is not a question, what is the true meaning and construction of any or all of the letters. It is an attempt to infer from the correspondence a waiver and exchange, which the words of the letters do not imply. It is an attempt to infer another fact from the facts proved. The case of *Etting vs. Bank of the United States,* 11 *Wheat.* 75, is precisely like it.

If indeed *Pawson* had voluntarily relinquished the *Canton* privilege, or exchanged it for one from *Coquimbo*, nobody would contend that he was entitled to damages for the loss of a privilege which he had thus voluntarily released, or had exchanged for another. But we insist that he neither relinquished nor exchanged it. The appellant replies to us, that the voyage was altered by the consent of *Pawson*, and that by such consent did he relinquish the privilege from *Canton*, and exchange it for one from *Coquimbo*. To this we answer, 1st, that whether *Pawson* did or did not consent to the alteration is surely a matter of fact, and not a matter of law, and the court cannot assume the fact. He might have written and acted in the manner he did write and act, because he supposed he was bound to obey the owner and had no right to refuse. And he was undoubtedly bound to obey; and his obedience to the orders of *Donnell* cannot therefore be evidence of a waiver of his rights. At all events, his obedience is not *conclusive* evidence of such waiver, as is assumed by the appellant in this prayer. In the second place, if the consent of *Pawson* was admitted, it does not follow as a conclusion of law, that by such consent he relinquished the privilege from *Canton*, and exchanged it for a privilege from *Coquimbo*. The jury might indeed infer such relinquishment and exchange, from the fact of consent, but it would be an inference of fact and not of law. It would be a matter for the jury to decide, and not for the court. For the consent to the alteration might be given, reserving the right to demand compensation on account of the *Canton* privilege. The consent, and the right to compensation for the privilege might exist together. They are not inconsistent with one another. The relinquishment and exchange of the *Canton* privilege could not therefore be the legal consequence of *Pawson's* consent to alter the voyage. And upon either of the grounds above mentioned the court were right in refusing the prayer contained in this exception.

After refusing the prayer made by the appellant, the court proceeded to instruct the jury in the manner set forth in the

same exception.   The propriety of that instruction remains to be examined.

In this direction the court leave it to the jury to say, whether *Pawson* did or did not waive the benefit of the privilege from *Canton.*   We have already endeavoured to show that the question, whether he did or did not waive it was a question of fact for the jury, and not a question of law for the court.   It is unnecessary to repeat the arguments already offered on this head. We think we may safely conclude that the appellant was wrong in treating it as a matter of law; and the court right in dealing with it as a matter of fact.

But the court have gone further in their direction, and they say that if *Pawson* did waive the privilege from *Canton,* yet unless he did so with a knowledge of his legal rights, he is still entitled to recover an equivalent for the privilege lost.   It is said by the appellant that no one can avail himself of the plea of ignorance of the law, and that if *Pawson* waived his privilege he is bound by it, and cannot allege that he did it under a mistake as to the law.   The case of *Lammot vs. Bowly,* 6 *Harr. & Johns.* 500, is a complete answer to this objection, and so fully sustains the opinion of the court that it supersedes all argument, and saves us the necessity of producing and examining the mass of authorities on this subject.   In that case, the court lay down the rule in the following words: "It is not intended to say that the plea of *ignorantia juris* would in all instances be available in civil cases, (in criminal it never can be,) because some legal propositions are so plain and familiar even to ordinary minds, that *it would be doing violence to probability to impute ignorance in such cases;* but it is only meant to say, that where the legal principle is confessedly doubtful, and one about which ignorance may well be supposed to exist, a person acting under a misapprehension of the law, in such a case, shall not forfeit any of his legal rights by reason of such mistake."

The 9th exception is immediately connected with this subject, and the proposition contained in it appears to have been brought before the court, in consequence of the opinion set forth in the 3d exception,

In the prayer in the 9th exception, the court are called upon to assume that *Pawson* " *consented to the change of the original voyage*," and " *waived his privilege from Canton.*" Now it was not admitted, as we have already shewn, that *Pawson* consented to the change of the original voyage; and it was not admitted that he waived his privilege from *Canton.* Both of these matters were matters of fact, and both of them were in controversy between the parties. And the court were right in refusing the prayer upon this ground, even if there had been no other objection to it.

But if these questions of fact had, by the prayer, been left to the jury, still there would have been no error in this opinion of the court, and it was properly left to the jury to say whether, if *Pawson* had consented to the change of the voyage, and had waived his privilege to *Canton,* he had done so in ignorance of his legal rights. For the privilege from *Canton* is proved to have been a much more valuable one, than the privilege from *Coquimbo.* *Pawson* was a sea captain, toiling in his profession. *Donnell* is proved by the record to have been a merchant of great wealth. And it can hardly be imagined, that *Pawson* would have exchanged the privilege from *Canton* for one of inferior value, unless he was induced to do it by the ignorance of his legal rights. No other motive is assigned by the appellant, and it will scarcely be said that a man, trusted by *Donnell* with the execution of this great scheme of commercial adventure, could be ignorant of the relative value of the privilege from *Canton,* compared with a like one from *Coquimbo.* It is not necessary however for us to show, that there was *sufficient* evidence to prove his ignorance of the law. It is enough for us, that there was evidence tending to prove it. "Where there is any legal admissible evidence *tending* to prove the issue, the effect of that evidence is solely for the consideration of the jury." 1 *Stark. Ev.* 399, 400. In the case of *Etting vs. Bank of the United States,* 11 *Wheat.* 50, the chief justice in delivering the opinion of the court says, "If the testimony be examined, it will, we think, appear that the counsel for the plaintiff has not asked the court to give its opinion on any inferences of fact, which it was not *at least possible for the jury to draw from*

*the evidence.* The knowledge of the Bank is not questioned. *The ignorance of Etting might be inferred from the absence of all testimony, proving his knowledge* that any fraud had been practised by Mr. *M'Culloh.*" It was surely *possible* for the jury, from the facts above referred to, and the situation of the parties, to infer that if *Pawson* had waived his privilege from *Canton,* that he had done it in ignorance of his legal rights. Indeed we might safely call on the jury to infer the ignorance of *Pawson,* from the absence of all evidence proving his knowledge. For the counsel for the appellant will not say that the legal rights of *Pawson* were plain and familiar; if they were plain and familiar, there would be no difference of opinion on the subject, between the County Court and the learned counsel for *Donnell.* Yet this difference of opinion is manifested by the 6th exception. And on a point of law, where either the County Court or the learned counsel for the appellant are in error, and that too after the most mature consideration, it would *be doing violence to probability,* to impute *knowledge* to *Pawson.* In such a case, his ignorance ought to be inferred, or at all events might *possibly* be inferred by the jury, from the absence of all proof or probability of knowledge.

The appellant has relied on *Keys vs. Parnham,* 6 *Harr. & Johns.* 418, and on the case *Davis vs. Davis,* 7 *Harr. & Johns.* 36, to shew that the court may direct the jury on the sufficiency or insufficiency of evidence to establish a fact. The present case does not require us to enter on a full discussion of this principle. There is no question about the sufficiency of evidence presented by any of the prayers in the record, and this court therefore are not called on to decide it. And besides we are very willing to leave it to the court to say, whether the evidence of *Pawson's* ignorance of the law is too slight and trifling to be left to the jury.

The 6th exception is the only one which remains to be examined. Was the privilege from *Canton* subject to the two contingencies mentioned in the prayer, and liable to be lost upon the happening of either of them? It appears in the evidence, that by the usage of trade, if the captain died, the privilege in ques-

tion, survived to his representatives, and did not go to the captain who succeeded to the command of the vessel. There is no evidence of any contrary usage. The court could not, in opposition to such proved and undisputed usage of trade, say that " the death of *Pawson* at *Coquimbo,* in the course of that voyage, would have put an end to all claim by his representatives on account of this privilege;" and could not therefore give the direction prayed for. It has been said in the argument, that it does not appear that the privilege from *Canton* belonged to *Pawson* as Captain, and that it might have belonged to him as supercargo. If any doubt could be raised on this subject, we do not perceive that it would materially affect the argument. But the testimony puts it beyond doubt, that the privilege in question was a captain's privilege, and not a supercargo's. And the appellant in his prayer treats it as a captain's privilege, which he supposes was contingent on the death not of *supercargo Pawson,* but of *Captain Pawson.* Neither should the other contingency, mentioned in the prayer, have entered into the calculations of the jury. If the ship had pursued the voyage originally contemplated, and had been lost, *Pawson* might have lost the benefit of his privilege. Yet it does not necessarily follow that he would even in that case have entirely lost all benefit from it, as is assumed in the prayer. But waiving any discussion on that head, we insist that as *Pawson* was prevented from performing the voyage by the act of *Donnell,* the latter takes upon himself all the contingencies, and cannot claim an abatement on account of the hazards, to which the contemplated adventure was subject. This is the rule in the case of seamen's wages, which are always contingent on the safe arrival of the vessel. In *Poth. Mar. Cont. Pl.* 203, page 125, 126, it is said, " that if the ship is voluntarily, and of course by the master's act, unloaded in a place nearer than that which is designated in the contract of affreightment, the wages promised to a sailor hired by the voyage shall suffer no diminution." In *Hoyt vs. Wildfire, 3 Johns. Rep.* 518, it is said by chief justice *Kent,* " that the rule on this subject in the *English* law, does not, I apprehend, differ from the marine law of *France,* although I have

not met with any adjudged case in point, and a recent *nisi prius* decision, *Eaken vs. Thom*, 5 *Esp. N. P. C.* 6, looks strongly the other way." And in *Sigard vs. Roberts*, 3 *Esp. N. P. C.* 71, at the conclusion of the case, Lord *Eldon* says, "this clause (*one in the shipping articles*) therefore cannot prevent the sailors suing for their wages when the master discharges them; the *voyage then is ended* as to the man who is discharged from the ship." The same principle is ruled by Lord *Ellenborough* in *Gondell vs. Ponteguy*, 4 *Campb.* 375.

"If the plaintiff was discharged (says Lord *Ellenborough*) without a sufficient cause, I think this action is maintainable. Having served a part of the quarter, and being willing to serve the residue, in contemplation of law he may be considered to have served the whole."

In *Cook vs. Jennings*, 7 *T. R.* 381, *Lawrence*, J. in delivering his opinion upon an action for freight, says, "but he is not entitled to the whole freight, unless he has performed the whole voyage, *except in cases where the owner of the goods prevents him.*" If then the owner of the goods prevented the ship owner from performing the voyage, the owner of the goods must pay the *whole freight.* There is no deduction for hazards or contingencies, which might prevent the ship from receiving freight. The case put by Justice *Lawrence* is in principle the very case under discussion.

These cases seem to establish firmly the proposition, that when the party is to be paid by the voyage, he is entitled to full wages if he is prevented by the owner or master from rendering the service. And he is not bound to abate any part of the stipulated wages, on account of the hazards of the voyage. In this case the privilege from *Canton* was a part of the compensation, and was by the voyage, and not by the time of service. It is supposed by the appellant that this part of the compensation was liable to be lost, by the destruction of the ship on the voyage. If this be the case, it is strikingly analogous to the case of seamen's wages hired by the voyage, and to the case of freight.

The following cases will be found to maintain the same doctrines.

*Abb. on Ship.* 424, 425 (*note* 1.) *Mahoon vs. The Glocester,* 2 *Peters Adm. Dec.* 403.   *Rice vs. The Polly and Kitty, Ib.* 423, (*and note.*) *Limland vs. Stephens,* 3 *Esp. N. Pri. Cas.* 269.   *Valin. Com. B.* 3. *Tit.* 4. *Art.* 3.   2 *Br. Adm.* 533. *Jacobson's Sea Laws,* 148. *Napoleon Com. Code, Art.* 250. *Sullivan vs. Morgan,* 11 *John. Rep.* 66.

In the case last cited, the seamen were hired by the month, and no freight had been earned. Yet they received their full wages for the time they had served, according to the contract, without any deduction on account of the danger, that the ship might have been lost on the voyage before freight was earned, and consequently before wages were due. This case is the same in principle with the one at bar. In both cases if the ship had been lost in the course of the voyage, the compensation contracted to be given would have been lost also. And as it was held not to be subject to abatement on that account, in one instance, it is difficult to imagine why it should be held differently in the other.

The case of *Hulle vs. Heightman,* 2 *East.* 145, turned upon the form of action. In the case before the court the agreement in the beginning of the record removes any difficulty on that score, and permits us to recover in this action any thing that could be recovered in any other form. Besides, in the case of *Hulle vs. Heightman,* the time of payment stipulated in the contract had not arrived, when the suit was instituted. In that case, the seamen by an express stipulation were bound " to assist in bringing the ship back again, and making her fast in a proper place, before they could make any demand upon the captain for the wages due." And as the homeward voyage was not abandoned, but was in the course of execution, the time had not arrived when the wages would become due, according to the terms of the contract. They could not therefore be sued for as if due. But in this case the original voyage had been abandoned by the defendant, long before this action was brought, and the original contract at an end. The wages were as fully due, at the time

the suit was commenced, as they would be at any future time, and in this respect also the case before the court stands clear of the difficulty, which met the plaintiff in the case of *Hulle vs. Heightman.* Indeed that case furnishes another proof of the soundness of the principle for which the appellees contend; for it is not suggested that the wages are to abate on account of the hazard, that the vessel might be lost on the homeward voyage, before she was made fast in her proper place.  On the contrary, it appears to have been conceded on all hands, that if the seamen were entitled to recover any thing in that action, they were to recover according to the sum stipulated in the contract.  And that no abatement was to be made on account of any contingencies to which they might have been exposed, if they had been allowed to go on the voyage originally contracted for.

In fine, the cases taken together seem irresistibly to lead to the conclusion, that if the person to whom the service is to be rendered prevents the performance of it, he must pay as if it were done.  In this case *Donnell* had a right to change the voyage; he did change it; and *Pawson* was bound to obey, and he did obey.  *Donnell*, therefore, prevented *Pawson* from performing the service, and must pay as if it had been performed. The party who is not in fault is not bound to give up any part of the compensation, contracted to be given.  It belongs to him by the agreement, and the law will not enable the other party to deprive him of it without his consent.

*Wirt*, for *Donnell.*

The first subject to which the attention of the court is invited, is the claim for the alleged loss of the privilege from *Canton,* which is the subject of the 2d, 6th and 9th bills of exceptions, on the part of the appellant.  This is one of those things which it was not supposed possible for human ingenuity to bewilder with a moment's doubt, until the defendants' *second* prayer was refused, and the instruction was given which produced the appellant's 6th and 9th prayers.  *Graham*, the administrator of *Pawson*, is obviously a man of business, as ap-

pears by the record, and it had not entered into his imagination to make this claim. His letter to *Donnell* will be found in the record, and his account stated. By his letter it will be seen that he manifestly considered the privilege from *Coquimbo* as substituted for that originally stipulated from *Canton* or *Batavia;* and he claimed nothing more for *Pawson* than the right to bring the same weight, 25,000 lbs. from *Coquimbo,* which he was originally authorised to have brought from *Canton* or *Batavia.* " You will observe," says he, in that letter, " that Captain *Pawson's* privilege in the ship was not taken by *several thousand pounds weight;* of course, you will allow for the deficiency *as you have done before.*" It is not the value of the *Canton* privilege in *Canton* goods, which he proposes to estimate and claim; but simply the *weight* which he considered *Pawson* authorised to bring from *Coquimbo,* and which, not having been wholly brought, he claims an allowance for the deficiency. Turn to his account on the next page, and you will perceive that there is entered at the foot of the account, in the left hand column, *Graham's* estimate of this deficiency, to wit, $255 52, under the description of " loss of privilege," and this thrown in among several articles, by way of make-weight, after the account had been formally signed and closed, and consequently not presented as articles on which he meant peremptorily to insist. Besides, if *Graham,* with his knowledge of commercial usage, had considered the *Canton* privilege as a subsisting privilege, he would have charged that privilege at its full value, and we should find on the other side a credit for the freight of *Pawson's* copper and other goods from *Coquimbo.* That freight was the inevitable consequence of treating the *Canton* privilege as a subsisting claim; for Captain *Pawson* surely could not have two privileges subsisting in the same ship at the same time; an *actual* privilege from *Coquimbo,* and an *ideal* one from *Canton,* charged at its highest speculative value. The total absence of any credit for the freight of *Pawson's* goods from *Coquimbo,* and of any charge for this *Canton* privilege, *as a Canton privilege,* by *Graham,* and the total absence of any charge for the freight of *Pawson's* goods by the *Chesapeake,* in *Donnell's* account, all go to prove

88 . CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

that this vision of a subsisting privilege, in a non-subsisting voyage, had never entered the heads of these *practical* men. It was left for the ingenuity of our learned friends, on the other side, to start this *chimera*, and it did not occur even to them to start it, till their imaginations had been heated and ignited by the collisions of the trial. The court will find the proof of this fact in the account; where it will be found that, after *Graham* had closed and signed his account, under his signature, in the right hand column, there are three entries headed " *claim, as set up in court*, viz." and then assuming the balance as it had been struck by *Graham*, $5,552 97, they add to it for drip stones and duties saved, $48 06, and then, for the first time, this *Canton* privilege makes its appearance under the title of "Loss of *Canton* privilege, $3,050 !" in lieu of the $255 52, which *Graham* had entered at the foot of the opposite column, on account of the *deficiency of weight,* merely from *Coquimbo.* Nor had our learned friends the grace even to throw into the opposite scale the freight of *Pawson's* goods from *Coquimbo;* but they claim both the privilege of *supposititious* goods, on a *supposititious* voyage, and the privilege of *actual* goods on an *actual* voyage ; and thus, according to their statement of the account, *Pawson* gets the benefit of a double investment of the same capital ; that is to say, he gets the freight of an *imaginary Canton* cargo, in which his capital *might* have been invested if the ship had gone there; and also the freight of the goods in which that capital was *actually* invested at *Coquimbo:* the learned counsel, seeming to suppose, that as they had a fat pigeon to pluck, it was not necessary to be at all scrupulous as to the extent of the depredation. The court, however, not being disposed to "go the whole" length, instruct the jury, that if they allow the plaintiff the *Canton* privilege, they must allow the defendant the freight on *Pawson's* adventure from *Coquimbo.* After such a manifestation of the *grasp-all* disposition on their own part, it does not seem to be with the best of all possible graces that the learned counsel on the other side complains of *the spirit which concocted Donnell's* statement of the account. But waiving this interchange of courtesies, let us proceed from

this view of the origin of this *Canton* claim, to the consideration of its nature.

It is proper to observe, in the first place, that this is not an insulated contract for an insulated voyage.   This is not *Pawson's* first and only connexion with *Donnell*.   It appears by *Graham's* letter, that he had been previously in his employment, for in refusing to admit the freight for the cordage, he reasons upon *Donnell's* own construction of the captain's privilege in a previous voyage which had been performed for him by *Pawson in* 1816.   It is the case, then, of a sea captain, looking to a permanent and profitable connexion, in the line of his business, with an opulent and enterprising merchant.   This fact should be borne in mind.

It is essential to the successful pursuit of commerce, that the merchant should have the uncontrolled privilege of planning and altering his enterprizes at pleasure.   In all his operations he is governed by the intelligence which he is continually receiving, of the state of the markets abroad; and as these markets are always fluctuating, it is an every day's occurrence to see a complex voyage, which had contemplated several ports, varied and remodified in the course of its progress, at the pleasure of the merchant for whose benefit it is made.   Those who enter a merchant's employment, enter it with full knowledge of his sovereign power over the destination of his ship.   The captain knows that he is bound to obey the owner's instructions, without asking for a reason.   He knows, that with regard to his owner " *sic volo, sic jubeo, stet pro ratione voluntas,*" is reason enough, and that he the captain has nothing to do but to obey. With regard to any little adventure which the captain is permitted to have on board, and to carry, free of freight, it is a mere dependant on the great enterprizes of the merchant.   The overruling object of the voyage is the profit of the owner.   The captain avails himself of the owner's experience, skill and knowledge, in seeking the most profitable ports, to make his own small investments at the same ports.   He knows very well that the voyage is not made on his account, but on the sole account of his owner.   He is not the charterer of the ship.   His

*instructions* are not *charter parties* and *contracts of affreightment,* in which light they seem to be erroneously viewed on the other side.   The privilege accorded to him is a mere dependant privilege following the fortunes of the larger adventure as obsequiously as the cock-boat follows the ship to which she is lashed, and to which she belongs; and the cock-boat might just as rationally complain that the ship had changed her course, as the captain complain that the owner had changed the destination of the voyage; because the captain enters the service with full knowledge that this power of change is perfectly arbitrary on the part of the owner.   With regard to his own small venture, he knows that it will be generally true, that what is most profitable for his owner will be most profitable for himself; that if, for example, the market of *Baltimore* was already glutted with *Canton* goods, so that *his owner* had no longer a hope of a profit on *Canton* goods at that market, neither could *he* hope for a profit on the same kind of goods in the same market; and even when it is otherwise, and the captain would prefer for his own interest, that the original destination had not been changed, he knows that he is to find his indemnity for any petty temporary loss, in the permanency of his connexion with a rich and bold and skilful adventurer, whose prosperity had already shewn how well he could play at the game of commerce; and that if *he* should lose to-day by the change of a voyage, he would gain a hundred fold in the long run by the permanency of the connexion.   The captain's object is to be permitted to wield his little capital at the ports which he visits for his owner, and to carry his goods free of freight in the owner's ship.   There is no *stipulation* on the part of the owner, that his ship *shall* visit such and such ports.   If there were such a *stipulation, Pawson,* if he had lived, might have maintained an action for damages against *Donnell* for not having sent the ship to *Canton.*   But this, surely, cannot be pretended.   Nay, it is conceded that *Donnell* had the right to change the destination of the ship at pleasure: and this concession is utterly inconsistent with the idea of a *stipulation* with *Pawson,* that the ship should go to *Canton;* for if there were such a stipulation, *Donnell* had no

right to violate it, no man having *a right* to violate the *rights* of another.    Now, if the original plan of the voyage by *Canton* did not amount to a *stipulation* that the ship should go to that port, and consequently gave *Pawson* no right to sue for damages, the opinion of the court below is wrong, for this is the very thing which they permit *Pawson* virtually to do; for they permit him to claim damages for the loss of the *Canton* privilege on the ground of his title to it by stipulation.    They allow him to prove what such a privilege *from Canton* would have been worth in that year, and to recover the amount so proved in the form of damages; an opinion which cannot possibly be right, except on the postulate that *Donnell* had no right to alter the original voyage by reason of this stipulated privilege with the captain.    But it is conceded that the owner has the sovereign right to change the voyage at pleasure—and if he has a right to do so, he surely cannot be made to answer for it as wrong.

On our side, we admit that the captain is entitled to his privilege by force of the stipulation; that is, he is entitled by the stipulation to bring home twenty-five tons by admeasurement, or 25,000 lbs. by weight, of goods, in *Donnell's* ship, free of freight.    This is the substance and the whole effect of the stipulation according to the law and usage of merchants.    The error of the opposite opinion arises from considering *Donnell* as under a stipulation to send the ship to *Canton*, or to answer the captain in damages if he fails to do so.    But such a construction would lay a burthen upon commerce, which would not only embarrass it in the extreme, but destroy it altogether.    A merchant could never change the original plan of his voyage, without meeting an action for damages by the master, at every step; and if the voyage be a trading voyage, consisting of many parts, it is easy to perceive that the owner is altogether at the mercy of his captain, and the direction of the voyage taken out of the owner's hands and placed in those of his servant; a perversion of all commercial ideas so monstrous, that the opinion which leads to it cannot be right.    That the owner has a right to change the course of the voyage at pleasure, is one of the first axioms in commercial operations, and it has been necessarily

conceded on the other side.   The inevitable consequence of which is, that the privilege of the captain is *ambulatory and contingent, as to the port* from which it shall he taken.   It depends upon the owner's pleasure, and is known on all hands to depend on his pleasure in directing the movements of the ship. The substance of the stipulation is, that the captain shall carry so much free of freight; but from what port he shall carry it depends on the ultimate pleasure of the owner, and grows *necessarily* out of his sovereign control over the voyage.   Hence, when an owner in the outset, plans a complicated voyage, consisting of many parts, and gives the captain a privilege *e. g.* of twenty-five tons from the last named foreign port, it is always taken as subject to the condition that the plan of the voyage shall not be changed by the owner, or that if it shall be changed, the captain shall have his equivalent in the same number of tons from whatever port shall, under such change of voyage, become the port of departure for the home port.   Such, it is manifest, was the understanding of *Donnell,* of *Pawson* and of *Graham,* and it may be with confidence averred, that such is the understanding of all commercial men.   It cannot be otherwise without placing commerce under a load of embarrassments, which would long since have crushed and destroyed it.

If this view of the subject be sound, as it is confidently believed to be, the consent of *Pawson* to the change of the voyage, is wholly immaterial.   The privilege, *as a privilege from Canton,* fell, when the owner, in the just exercise of his authority, struck out that port from the plan of the voyage.   Being, from its nature, dependant entirely on the condition of the ship's going to that port, there was an end to it as soon as the owner determined that the ship should not go to that port; and, however the question was put to the court, the court erred in the positive instruction which they gave to the jury, that this claim depended on the question, whether *Pawson* had, with a full knowledge of his legal rights, waived this privilege, and consented to the change of the voyage.   They were wrong in treating as a reality and a substance what had never been more than a mere shadow, and which had ceased to be even a

shadow after the change of the voyage on which it depended, and they were wrong in making the extermination of that voyage to depend, in any degree, on *Pawson's* consent, because its extermination was an act within the sole and perfect competency of the owner alone, and entirely independent of *Pawson's* consent, or refusal.

But suppose, for the sake of the argument, *Pawson's* consent to the change of the voyage to have been necessary to put an end to this privilege from *Canton;* it is respectfully submitted, that that consent is as expressly given as consent in such a case can be given. Not only is it in proof, and *that in writing,* that he cheerfully acceded to the proposed change of the voyage, but that he recognized the transfer of his privilege from *Canton* to *Coquimbo,* and proposed to send home the proceeds of his little capital from *Coquimbo, not on the footing of freight,* but *on the footing of his privilege.*

*Donnell,* in his letter of 26 Dec. 1819 to *Pawson,* after stating that mature reflection had satisfied him that a *Canton* cargo could not be realized in *Baltimore,* proceeds thus—"I therefore revoke and countermand the orders I gave you to proceed from *Chili* to *Canton,* and now substitute, that you will return with the ship and cargo of copper direct from the coast of *Chili* to *Baltimore.*" He then proceeds immediately to the subject of the captain's privilege, in these words—"As relates to the disposal and investment of your own funds, you must use your own discretion by investing it in copper, or any thing else, and bringing it with you in the ship—the copper may, (as I hope it will,) be bought on terms that will, with my funds and yours, load the ship very deep, but if necessary you must load her very deep. Should you fail in getting copper on the coast of *Chili,* you will immediately, on finding it so, proceed from thence to *Samarang,* in the island of *Java,* and there invest my funds, and your own, in coffee, (no other article of the produce of the island will answer,) and proceed from thence direct to *Baltimore.* The government of *Batavia* may object to your loading at *Samarang,* being an out port, but you must use every means in your power to obtain from the government a permis-

sion, as you will be able to put on board coffee at *Samarang,* two or three dollars per picol less than at *Batavia.*"

As explanatory of this letter, it is proper to call the court's attention to the description of the captain's privilege, as it stood in the voyage first planned. It will be found at the close of *Donnell's* letter of the 18th of November, 1819, and is in these words: "To prevent misunderstanding I deem it necessary to state your compensation to be two thousand dollars, payable on your return, with a privilege from *Canton* not to exceed twenty-five tons, but it is understood that you are not to put any copper or heavy article on board at *Chili,* as my views are that you completely load her there with copper, and that only for my account." In his postscript to this letter of the 18th Nov. 1819, *Donnell* anticipates the possibility of being disappointed in procuring copper at *Chili,* and in that event gives a similar direction with that in the letter of the 26th Dec. as to proceeding to *Batavia* for a cargo of coffee, and thence direct to *Baltimore;* so that in the original plan of the voyage, *Canton* was not contemplated as a port to which the ship would *certainly* proceed: for in the owner's views of the subject at that time it was made to depend on the contingency of being able to get a cargo of copper at *Chili.* And we find him shifting the captain's privilege at pleasure from *Canton* to *Batavia,* and from *Canton* goods to *Java* coffee, at pleasure, in the full exercise of his clearly understood rights as owner. So in his letter of the 26th Dec. when he had determined that the ship should not visit *Canton,* he provides for the captain's privilege by taking off the interdict as to his putting copper, or other heavy articles on board at *Chili;* and authorises him to bring home his funds in copper, or any thing else he pleases; or if by failing to get a cargo of copper at *Chili,* he finds it necessary to go to *Java,* to bring home his funds in coffee. It is hence very manifest what *Donnell's* understanding of his rights as owner were. What says *Pawson* to this change of voyage? In his letter of Feb. 7, 1820, from *London,* he says—" I have had the pleasure to receive your letter of the 26th Dec. in which you are pleased to alter the original intention of the voyage, which will be

*cheerfully and strictly attended to*, and if on my arrival at *Chili*, I shall find it necessary to proceed to the island of *Java*, no exertions shall be wanting to have your wishes fulfilled in getting the cargo of coffee only at *Samarang*." Again, to shew *Pawson's* distinct understanding that his original privilege from *Canton* or *Batavia* was now transferred to *Coquimbo*, he says in his letter from that place of Sept. 4, 1820, "as I may possibly not have another opportunity, direct to the *United States* shortly, I would thank you when you make insurance on the ship and cargo, also to insure for my account the same sum which you did me the favour to insure from *London* here. I think it probable it will be shipped in silver bullion and copper." And again, still more explicitly, in his letter of 4th Nov. 1820, from *Coquimbo*, he says, "In my former letters I requested you to insure for my account the sum of $5,000. I now have to request you will insure $1,000 more. If I find the ship too heavy laden with your copper, I shall curtail *my privilege in that article*, and bring my funds in silver." If this be not a consent, a free, voluntary, *cheerful* consent, to take his *privilege* from *Coquimbo* in lieu of that from *Canton* or *Batavia* according to the original voyage, language has lost its meaning, and discussion is idle and delusive.

It is insisted, on the other side, that this was not a question for the court, but a question for the jury. Why? Because it is said it is a question which did not depend on letters alone, but was to be inferred from the whole correspondence, *and the acts of the parties taken together*, and so is exactly like the cases of *Laidlow vs. Organ*, 2 *Wheaton*, 183, and *Etting vs. Bank of the United States*, 11 *Wheaton*, 75. But it is not so; for it is a question arising *upon the letters alone*. We do not rely upon a *single act* of either the parties to aid our construction of the letters. We say, that upon the face of *the letters alone* there is a clear and *cheerful* consent on the part of *Pawson* to the change of the voyage, and the substitution of the privilege from *Coquimbo*, in lieu of that contemplated in the original voyage. How are these letters to be construed? Not by the technical rigour which is applied to special pleading, or to the old com-

96    CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

mon law conveyances.   They are letters written by commercial men, in a course of business, and are to be construed with the freedom and candour which are always applied to such a correspondence, and so construed there cannot be a rational doubt that *Pawson* freely and cheerfully adopted the substituted voyage and privilege.   The court's attention is particularly invited to the declaration in his last letter, that if he should find the ship too heavy laden with *Donnell's* copper, he would curtail his *privilege in that article*, and bring home his funds in silver.   His privilege in what article? *in copper*.   From where? from *Coquimbo*.   Did he mean that he would curtail his privilege from *Canton* in copper?   Did he even propose to bring home copper from *Canton*?   Once more, did *Pawson* expect to pay *freight* for the copper which he was about to bring home from *Coquimbo?*   For the court have said, and justly said, that if he meant to rely on his privilege from *Canton*, he was bound to pay freight on his goods from *Coquimbo?*   Did he expect that he was to pay such freight when he himself expressly declares that he was going to bring it home in part of his *privilege*, and the rest of his funds, if necessary, in silver.

It is unnecessary to pursue so palpable a proposition any further.   It must be manifest to the court, that *Pawson* knew that *Donnell* had merely exercised his proper rights in changing the voyage ; that *Pawson* acceded to this change willingly and cheerfully, and perfectly understood that in consequence of that change, and as a necessary part of it, his privilege from *Canton* to *Batavia*, according to the original voyage, was now commuted for the same privilege of twenty-five tons from *Coquimbo*. And as all this appears *upon the letters alone*, it was a question solely *for the court*, under the authority of *Macheath vs. Haldimand*, 1 *T. R.* 172, 180, and *Ferries vs. Walsh*, 5 *Harr. & Johns.* 308.

But the court below instructed the jury, that the right to set up this claim of damages for the loss of the *Canton* privilege, not only depended on the question, whether *Pawson* had agreed to waive that privilege, and accept in lieu of it the privilege from *Coquimbo*, but on the further question, whether he made

such waiver and acceptance *with a knowledge of his legal rights.*

In this last qualification of the instruction it is conceived that there is a double error.  1. In supposing that *Pawson* had a right to object to the change of the voyage, or to insist on this privilege, as a subsisting privilege from *Canton,* after the voyage had been changed by the authority of the owner.  2. In putting it to the jury to say, whether such waiver and acceptance were made with a knowledge of his legal rights, when there was not an atom of testimony in the cause, to draw that knowledge into question.  Every man is presumed to be conusant of his legal rights till the contrary appears.  The evidence every where exhibits *Pawson* as a man of superior intelligence. All his letters and all his actions, are those of a scholar, and a man of judgment and endowments far above the great mass of those who are engaged in similar pursuits, nor is there one *scintilla* of proof in the whole record tending in the slightest degree to impeach his capacity.  And yet it is in this case that the court, *sua sponte,* raise, for the consideration of the jury, the question, whether *Pawson* acted with a knowledge of his legal rights.  The Court of Appeals, in the case of *Davis vs. Davis,* 7 *Harr. & Johns.* 36, took the case out of the hands of the jury on the ground, that although there was some evidence in the cause, it was not such evidence as ought to satisfy a reasonable man of the truth of the proposition.  The court of *Baltimore* county, reversing this rule, refuse to decide a proposition which properly belongs to them as a court, (the construction of the letters) and hand over the whole subject to the jury, on the ground that the proposition submitted to them depended on another proposition which belonged peculiarly to the jury, to wit, whether *Pawson* acted with a knowledge of his legal rights, when there was *no evidence* in the case which had a tendency to raise this latter question.  Thus it is a question gratuitously raised, without a tittle of evidence to prompt it, and which, thus raised, is supposed to excuse the court for refusing to decide on the construction of the letters, whereas the truth is, that if the question had really been called for by the evidence, the court

ought still to have expressed an opinion on the construction of the letters, and to have made that opinion subject to the finding of the jury on the other question of *Pawson's* knowledge of his legal rights.

But it is alleged that there is evidence tending to show, that if *Pawson* did waive his *Canton* privilege, he did it in ignorance of his legal rights. And what is this evidence? It is that the *Canton* privilege was more valuable than the *Coquimbo* privilege, and therefore it is not to be presumed that *Pawson* would have made the exchange if he had known that he had still a right to insist on the privilege from *Canton.* This argument assumes, 1. That the *Canton* privilege was still a subsisting legal right after the owner had changed the voyage, which has been disproved. 2. It assumes that *Pawson*, in making his election, had nothing to consider but the value of the one privilege compared with the other; whereas it is manifest that this was a trifle, light as air, compared with the far weightier consideration of permanent connexion with such a merchant as *Donnell.* 3. The argument goes the length of maintaining the proposition, as one universally true in law, that wherever it appears by the evidence that a man has made a bad bargain, no matter what may be the degree of his intelligence and experience, the question fairly arises whether he was conusant of his legal rights, a principle which will put the sponge to the whole class of commercial contracts. But if all these assumptions and propositions were true, (which they manifestly are not) the court would still have erred in refusing this prayer of the appellant, which called upon them merely to say, that *on the face of the letters Pawson* had freely and voluntarily consented to the change of the voyage, and the substitution of the *Coquimbo* privilege in lieu of that from *Canton.* This the court might have done in perfect consistency with the notion that he had done it in ignorance of his legal rights. The court, therefore, looking to the construction of the letters, which belonged exclusively to their jurisdiction, might have told the jury, and were bound so to have told them, that the letters amounted to a free and voluntary waiver of the *Canton* privilege on the part of *Pawson ;* and then, (if the case

had been a proper one for such an addition,) have gone on to add, that, however free and voluntary this waiver was, if the jury should find from the evidence that it was made in ignorance of his legal rights, it did not bind him.  But the court refused to give any construction to the letters at all, and threw the whole case upon the jury, on the notion that the construction of. the letters even depended on *Pawson's* knowledge of his legal rights; and this in a case in which if they had been called on to instruct the jury that the waiver depended on *Pawson's* knowledge of his legal rights, they might correctly, and ought to have refused the instruction on the ground that there was no evidence in the cause to draw his knowledge of his legal rights into question, and therefore no evidence on which such a prayer could be properly founded.  And this, it is conceived, would have been a much feebler exercise of judicial authority, than that which was properly sanctioned by this court in the case of *Davis vs. Davis.*

Upon the whole it is respectfully submitted, that this *Canton* privilege ought never to have been suffered to come into controversy before the jury in this cause; that it is a mere baseless vision, and was so considered by *Donnell, Pawson* and *Graham;* and that instead of receiving the countenance which it did receive in the instruction now under consideration, it ought to have been expelled from the cause at the first moment of its appearance.

So much confidence is felt in the views which have been presented of this subject under the appellant's *second* exception, which we are now arguing, that it is thought unnecessary to add any thing on the appellant's *sixth* and *ninth* exceptions, which relate to the same subject.

The appellant's 3d, 4th, 5th, 7th and 8th exceptions, all relate to one and the same subject; the compensation of $2000, which was stipulated by *Donnell's* letter of the 18th Nov. 1819, to be paid to *Pawson on his return.*  It is not proposed to go into a rediscussion of all the topics which have been presented to the court in regard to this stipulation.  The arguments and authorities bearing on it have been already fully placed before the

court on the part of the appellant.   Relying on those arguments and authorities, and claiming the full benefit of them, it is intended to confine the further argument to two questions—

1. Whether the contract was not an entire one, and the whole compensation, therefore, lost by the death of *Pawson* at *Coquimbo* before he had completed the contract.

2. Whether if *Pawson's* representatives are entitled to recover a rateable portion of that compensation, the court did not err in the *termini* which they gave to the jury for the ascertainment of the *ratio* of compensation.

1. This question arises on the appellant's *fifth* prayer, which presents the single point of the entirety of the contract, and its defeat by the death of *Pawson* at *Coquimbo* before its completion.

Natural justice, it may be admitted, would seem to require that every contract for labour should be considered as divisible and apportionable, and where a party has been prevented by causes over which he has no control, from completing his engagements, he should be paid for so much of them as he has faithfully performed.   The law, however, leaves it to the parties to make their own contracts; and wherever they have made *an express* contract the law never interferes to vary that contract upon any notion of natural justice.   There is, perhaps, no class of contracts which more strikingly illustrates the truth of this principle than the contract for rent.   A rents of B, a storehouse on a wharf in town, and stipulates expressly to pay him so much rent at the end of the quarter or year.   The house is burnt down the next day, and the tenant has no use of the property at all; yet he must pay the rent.   A whole wharf was consumed in *Norfolk* by the great fire of February, 1804. The houses which covered that wharf, (*Campbell's* wharf,) were wholly in the hands of tenants.   These tenants, with their families, were all unhoused in the severest part of the winter, and many of them lost their goods, as well as their houses.   The extent of the calamity excited universal sympathy.   They were unable to repair; the misfortune was one beyond their control.   They had lost the enjoyment of that for

which alone they had stipulated to pay the rent.   The landlord was a minor; and his guardian was the late Judge *Tucker*, who considered himself bound to act according to law.   The tenants insisted on an abatement of the rent.   Natural justice seemed to require it.   But the law was clear.   Their contracts were *express;* and for that reason alone they were held bound to pay the rent.   In the course of the investigation a case was cited from *Aleyn's Reports*, where a tenant had been dispossessed, and held out by a hostile invasion of the kingdom.   Yet he was held bound to pay the rent by force of his express contract.   That was a case in which natural justice seemed to forbid the demand; but all considerations of natural justice were silenced by the express contract of the parties, and the unwillingness of the law to interfere with those contracts.

It is on this ground that it has become a principle of law in the construction and enforcement of contracts, that "unless there be some express stipulation to the contrary, whenever *an entire* sum is to be paid for the *entire work*, the performance or service is a condition precedent; being *one consideration* and *one debt*, it *cannot be divided*."   These are the words of *Starkie* in his 3d volume, 1765; and he adds "this holds equally, whether a specific price has been agreed on or not.   It is universally incumbent on the plaintiff to prove performance."   In the *American* edition of *Starkie* the court will find under note (k,) and note (1,) to the above cited page, a collection of *British* and *American* decisions, all going to illustrate and fortify the position, that a contract *made entire* by the parties, *cannot be divided by the court*, and several of those, it is believed, at least as strong, if not stronger, than the case now under consideration.

Thus in the modern case of *Ellis vs. Hamlen*, 3 *Taunt.* 52— "It was held that a builder who undertook a work of special dimensions and materials, and deviated from the specification, could not recover on a *quantum valebant* for the work, labour and materials."

In *The Countess of Plymouth vs. Throgmorton*, 1 *Salk.* 65, the defendant's testator had appointed the plaintiff to receive

his rents, and promised to pay £100 a year for the service, and the *testator died after the plaintiff had served him for three quarters of a year*, and the court held, that *the contract being entire could not be divided.*  In *Cutter vs. Powell*, 6 *T. R.* 326, where the employer engaged in writing to pay a sailor the sum of thirty guineas, provided he proceeded and continued and did his duty on board for the voyage, and before the end of the voyage the sailor died, it was held that the contract was entire, and that as the service, which was a condition precedent, had not been performed, nothing could be recovered.

Is it or is it not to be considered as a principle of law, that where an entire compensation is stipulated to be paid for an entire service, the whole service must be performed as a condition precedent to the demand, and that there can be no division or apportionment of the payment for a part performance of the service?  It seems impossible to deny it.  Nor will it do to speak of this principle as antiquated and obsolete: for it is traced through the *British* books down to *Starkie*, one of the most recent and authoritative writers, who has engrafted the principle on his text as an existing and solid principle of the *English* law; and the host of cases quoted by the *American* editor, shows how extensively the principle has been recognized and acted upon in the *United States.*

It is indeed admitted by the learned counsel on the other side, " that if from the words of the contract it appears that the parties intended that the entire performance should be a condition precedent to the payment of any part of the compensation, then such condition, like every other condition precedent, must be strictly and entirely performed.  For the parties have a right to contract as they please.  But in order to produce this result, it must clearly appear from the words of the contract that such was the intention of the parties; and such was the case of *Cutter vs. Powell.*  The same principle prevails in commercial contracts.

This admission is taken in the terms in which it is stated, (and it is correctly stated) and we are willing that this case shall be tested by it.  It must clearly appear from the words of the

contract, that it was the intention of the parties, that the entire performance should be a condition precedent to the payment of any part of the compensation. But when does the law hold such intention clearly to appear from the words of the contract? Let *Starkie* answer the question—" *whenever an entire compensation is to be paid for the entire work, the performance or service is a condition precedent, being one consideration and one debt, it cannot be divided*"—" *unless there be some express stipulation to the contrary.*" The law then considers this intention of the parties that the entire performance shall be a condition precedent to the payment of any part of the compensation, as *always clearly appearing from the words of the contract, where an entire compensation is to be paid for the entire work, unless there be some express stipulation to the contrary.* Such is the *legal construction* of such a contract; and such will be its fixed and final construction, unless there shall be some evidence of a general and known usage acting upon such contracts to vary its construction. In the case of *Cutter vs. Powell*, the court, after stating the construction of the instrument upon its face, admitted that it would be modified by proof of a general usage acting upon such contracts, to make them divisible ; and they stayed the ultimate judgment to let in such proof if it could be adduced, feeling manifestly all the unwillingness to enforce the legal construction of the instrument which can be possibly felt in the case at bar, if parol proof of such a usage could be adduced. But it appears by the original report of the case that no such usage could be adduced, and the instrument necessarily had its legal effect.

It will be understood as admitted by us, that *general usage*, or, what is the same thing, a *general understanding* in the community, founded on such usage, will control the construction of these contracts, and render divisible and apportionable a contract which upon its face would be indivisible according to the foregoing rule. An instance of this is put by *Lawrence*, Justice, in *Cutter* and *Powell:* for he said " that a *common servant*, although hired in a general way, was to be considered as hired with *reference to the general understanding upon the subject*, that

104     CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs.—1829.

·the servant shall be entitled to his wages for the time he served, though he do not continue in the service for a year." Here he puts the course of decision upon the *general understanding*, founded, manifestly, on the general and known usage, which usage always enters into the contract as a part of the contract. And he confines the remark to *common servants*, by which he is understood by the annotator to *Starkie*, to mean *domestic servants :* for there is no usage or understanding, it would seem, as to *servants in husbandry*, with regard to whom, therefore, the contract takes its legal and natural effect of throwing on the servant proof of the performance of the whole service, as a condition precedent to his right to demand compensation. Hence, in the case of *The King vs. Whittlebury*, 6 *T. R.* 467, the same Justice, *Lawrence*, observed " that nothing could be due to the servant, (who was it seems a servant in husbandry) till the completion of the year, or the end of the service." The same principle was decided by Lord *Ellenborough*, as to a servant in husbandry, in the case of *Spain vs. Arnott*, 2 *Starkie's* cases, 265. The learned counsel, on the other side, seems to suppose that these cases decide nothing but as to the time of bringing the action; that is, that the action, for the part of the wages due, cannot be brought till the end of the year. On the contrary, they are understood by us as being decided on the very principle now under discussion, to wit, that the entire performance of the contract is a condition precedent to the demand of compensation, and the whole wages are forfeited by the failure of any part of the performance. *Comyns*, in his Digest, tit. *Justices of the Peace*, (B 63,) says "if a servant depart from his service he shall lose his whole wages"—for which he cites *Bro.* tit. *Labourer*, 40, and the same law is laid down from *Dalton's* Justice, in the note already cited from *Starkie*. Contracts with mariners are subject, it is presumed, to the same law of usage, thus modifying the terms of a contract, which would otherwise be considered as a condition precedent, as is manifest would have been done in the case of *Cutter vs. Powell*, if any such usage could have been shewn. And on the same footing of usage and general understanding rests, it is presum-

ed, the construction of contracts for the hire of slaves in this State, if indeed the law has been ever so judicially settled, for which, however, no decision is quoted. In *England* we have seen it would be otherwise as to servants hired for the purposes of husbandry.

On this review of the authorities it may be fairly considered as established, that wherever an entire sum is stipulated to be paid for an entire service, the contract is indivisible, and the performance of the entire service becomes a condition precedent to the demand of any portion of the compensation, unless, in the language of *Starkie*, there be some *positive stipulation to the contrary*, or unless there be some *general understanding or usage in regard to such contracts* that they shall be apportioned. Now with regard to *a positive stipulation to the contrary*, none such can be pretended in this case; and with regard to *usage or general understanding*, none such can be pretended to have been shewn or to exist in regard to contracts like this with a *supercargo*. And it will not do to borrow such usage or understanding from other classes of contracts and apply them to this; to say for example that, in given cases, the contracts of mariners of domestic servants in *England*, and hired slaves in this State, have been apportioned; and then claim the analogy as applying to this contract. If this were allowable the case of *Cutter vs. Powell* would never have been decided, for there the analogy was close and at hand. The contract in that case was the contract of a mariner, and it would not have been denied that the *common* contracts of mariners were in some cases apportionable; but this analogy, close as it was, as belonging to the same class of characters and the same description of services, was not permitted to be applied to the specific description of contracts before the court, but the court called for proof of the usage as bearing on *that particular form and species of contracts*. So, if the analogies now offered would have sufficed, the acknowledged usage to apportion the contracts of *domestic* servants would have been permitted to be brought to bear on the contracts for servants *for the purpose of husbandry*. But it was not permitted, and the impassable line of demarcation be-

**106**   CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.   Donnell *vs.* Pawson's Adm'rs—1829.

tween mariners under those two forms of contract, and servants under those different species of engagement, proves that in that country at least the courts are not disposed to indulge in this loose transfer of usage and understanding from one class of contracts to another. For it is manifest to these courts, and must be obvious to every one who will look steadily at the subject, that if in answer to the principle of law which has been conceded with regard to the entirety of a contract, it be enough to say and to show that *some contracts* entire in form are apportionable by force of usage, the principle is no longer of any value; nay it has no longer an existence; it is virtually exploded, if such an answer will suffice because the same answer may be given to every objection founded on the entirety of a contract. If this principle with regard to the entirety of a contract, which grows entirely out of respect to the intention of the contracting parties, and their sovereign right to bargain as they please, be immoral or pernicious, and it is thought better that courts should not only expound but make bargains for their fellow-citizens, let the matter be avowed openly and above board, and let the *English* principle be publicly exploded. But let us not profess to admit and respect the principle in terms, while we explode it in practice, and render it virtually a nullity.

This, then, be it remembered, is a contract *with a supercargo,* as to which species of contract there is no proof in the cause of the existence of any usage or understanding explanatory of the contract. It is a contract, then, the construction of which depends solely upon its own terms, and the only remaining question would seem to be, is it a contract in which an *entire compensation* is stipulated to be paid for an *entire service?* This question can only be answered by referring to the letters of *Donnell,* which state the whole contract, both the service and the compensation. The letter of the 18th November, 1819, chalks out the whole service in detail. It is a minute specification of the duties which *Pawson* was to perform; carries him around the whole voyage; and after this specification of the services, concludes thus—" to prevent misunderstanding I deem

it necessary to state your compensation to be $2,000, *payable on your return.*"   Nothing seems to be clearer than that this is *one entire* compensation stipulated for the *entire service.*   It is not *at the rate* of $2,000; but the sum of $2,000, *in solido, payable on Pawson's return,* and clearly payable for the *entire service.*   If there be any truth in the principle therefore, or any case to which it is to be permitted to apply, this is such a case, unless there be some positive stipulation to the contrary, which is not and cannot be pretended, or some proof of usage and understanding to the contrary applicable to contracts in this form with *supercargoes,* which can be as little pretended.

In opposition to this view of the subject, it is intimated rather than directly averred in the opposing argument, that this principle rests on ancient decisions.   For the learned counsel, after having quoted Sergeant *Williams'* note (4,) to *Pordage vs. Cole,* 1 *Saund.* 320, and 2 *Starkie's Ev.* 643-4, and note (*n,*) proceeds with the following inference from those authorities:   "Whatever, therefore, may have been the ancient decisions upon this subject, it has for many years been settled in the English courts that in ordinary contracts, with or without seal, the defendant, according to the principles of the common law, is liable in proportion to the benefit derived from the contract, although he may not have received the whole *consideration for which he stipulated,* provided the plaintiff is not in fault, and does not possess the power to perform the whole stipulation.   This is the general rule applicable to all contracts.   It is, however, admitted, that if, from the words of the contract, it appears that the parties intended that the entire performance should be a condition precedent to the payment of any part of the compensation, then such condition, like every other condition precedent, must be strictly and entirely performed."   So that the learned counsel would seem to give the rule, as he would have it, to be the *general* rule and the *modern* rule ; and the principle on which we insist, as an exception from that general rule, resting only on ancient decisions, (one of which, that in the case of the *Countess of Plymouth vs. Throgmorton, Salkeld* 65, he seems to think was misunderstood by the court of King's Bench,) and deserv-

ing very little quarter on the score of morality. There is certainly no want of professional address in this mode of presenting the subject.. But we apprehend, that when the authorities relied on to maintain this view of the case shall come to be examined, it will be found that these two rules of law, instead of maintaining the relation of a general rule and an exception, are two separate and independent rules relating to different classes of cases, and each, in its respective sphere of action, equal in generality and dignity to the other. Let us make this examination of these authorities as briefly as possible.

The first of them, as cited on the other side, is *Pordage vs: Cole*, 1 *Saunders' Reports*, 320, (*n.* 4.) On turning to this note it will be found that the whole business of the note was to shew in the first place the artificial and subtle distinctions on which the question of *dependent* and *independent covenants* frequently turned in the old books; and in the next place *to offer* a few rules by way of test on that obscure and much mooted question of the law. After observing that *covenants*, &c. are to be construed to be either dependent or independent of each other according to the intention and meaning of the parties, and the good sense of the case, and that technical words should give way to such intention, he proposes the following rules for the discovery of such intention, in order to enable the pleader to distinguish when it is necessary in a declaration to aver performance on his own part. These rules are worthy of attention in this case; *first*, because of their analogous bearing; and *secondly*, to enable the court to estimate the value of the passage quoted from this note on the other side. The first rule proposed by Sergeant *Williams*, is this—1. If a day be appointed for payment of money, or part of it, or for doing any other act, and the day is to happen or *may* happen *before* the thing which is the consideration, is to be performed, the covenants are independent, and an action may be brought for the money, &c. before performance, for it appears that the party relied upon his remedy, and did not make the performance a condition precedent. Sergeant *Williams* then offers his second rule in these words: "But, 2. When a day is appointed for the payment of

money, &c. and the day is to happen *after* the thing which is the consideration of the money, &c. is to be performed, no action can be maintained for the money, &c. before performance." The court is requested to apply this rule to the case at bar, and they will see that it is decisive of this question. Sergeant *Williams* proceeds—3. Where a covenant goes only to *part* of the consideration on both sides, and a breach of such covenant may be paid for in damages, it is an independent covenant, and an action may be maintained for a breach of the covenant on the part of the defendant without averring performance in the declaration. 4. But where the mutual covenants go to the whole consideration on both sides, they are mutual conditions, and performance must be averred. 5. Where two acts are to be done at the *same time*, on the *same day*, neither can maintain an action without shewing performance of, or an offer to perform his part, though it is not certain which of them is obliged to do the first act; and this particularly applies to all cases of sale. This is a skeleton of the whole note, and the court will find by reference to it that each of these five rules is separate and distinct from the rest, embracing separate and distinct classes of cases, and neither of these rules proposed by the author as connected with or at all influencing the decisions of cases falling under any other rule. The learned counsel, not averting to this structure of the note, and the distinct classes into which the cases are thrown under these several and distinct rules, speaks of them thus: "The cases upon this point (of conditions precedent) are collected together and the *rule* laid down in *Pordage vs. Cole*, 1 *Saund.* 320, (*note* 4) as relates to sealed instruments.

"The conclusion *from all the cases* is stated as follows:" and then he gives a quotation, which suits the purpose of his argument, and which he exhibits as Sergeant *Williams'* result from a view of *all the cases touching the subject of conditions precedent*, whereas the learned Sergeant himself declares it to be his conclusion only with regard to *that class* of those cases which falls under his third rule, and which he is treating as entirely separate from those cases which belong to his other

rules. That third rule embraces, as we have seen, those cases in which *the covenant goes only to a part of the consideration on both sides, and in which the party who complains of incomplete performance, can redress himself by a cross action for damages on account of that short performance.* After citing several cases *as illustrative of this rule,* the Sergeant proceeds with the words quoted, "Hence it appears, that the reason of the decision, *in these and other similar cases,*" (that is, cases in which from the form and nature of the contract the covenant goes only to *a part* of the consideration on both sides, and in which, from the independent. character of the covenants, the party may redress himself for the incomplete performance of the covenant on the other side by a cross action,) "besides the inequality of the damages, seems to be, that where a person has received *a part* of the consideration for which he entered into the agreement, it would be unjust that, because he has not had the *whole,* he should therefore be permitted to enjoy that part without either paying or doing any thing for it. Therefore, the law obliges him to perform the agreement on his part, and leaves him to his remedy to recover any damage he may have sustained in not having received. the whole consideration." Now, before the learned counsel can have the benefit of this conclusion, he must shew that *this* is one of those cases to which alone Sergeant *Williams* applies this conclusion; that is to say, that it is a case in which, from the form and nature of the contract, the covenant goes only to a *part* of the consideration on both sides. The fallacy of the argument consists in supposing this to be a general conclusion applicable to all sorts of covenants; whereas Sergeant *Williams* limits it expressly to the specific class of cases embraced by his third head; that is to say, to cases where the covenant goes only to *part* of the consideration on both sides, and a breach of such covenant may be paid for in damages, which he says makes an independent covenant. And having cited all the cases which belonged to this head, and exhausted his own remarks upon it, among which is the passage quoted by the counsel on the other side, he proceeds to his fourth class in these words: "4. But

when the mutual covenants go to the *whole* consideration on both sides, they are mutual conditions, and performance must be averred." Now, in applying the general conclusion to the case at bar, the counsel begs the question: for he assumes that this case belongs to the third class, and not to the fourth. Whereas we insist that it belongs to the fourth class to which that general conclusion has no relation; and we prove that it belongs to the fourth class, first by the test prescribed by *Starkie*, that it is an entire consideration stipulated to be paid for an entire service; secondly, by bringing to bear upon it, the test given by Sergeant *Williams* under the second head in his note, to wit: "that a day is appointed for the payment of the money, and the day so appointed is to happen *after* the thing which is the consideration for the money is to be performed;" in which case Sergeant *Williams* adds, "no action can be maintained for the money before performance." The day here appointed for the payment of the money was after *Pawson's* return—*payable on your return*—which was necessarily after all the services had been performed.

We are much deceived, therefore, if this note, instead of operating favourably to the other side, will not, when it is carefully dissected and attended to, be found to operate the other way.

The passage cited from 2 *Starkie*, 643–4, when taken in connexion with the context and with the class of cases of which the author was treating, will be found to have no just relation to this question. *Starkie* is there treating expressly of the action *for goods sold and delivered.* He begins this investigation in page 634, and pursues it down to the passage quoted. In page 640, he says, when the goods which have been delivered do not correspond with the contract, the vendee has a right to repudiate the goods so delivered *in toto,* and if he do so, the vendor cannot recover; but if he choose to keep the inferior goods so delivered, he is considered as adopting them in satisfaction of the contract. He then proceeds, in page 642, to contemplate the case where the contract cannot be rescinded, as where the goods have been used before the inferiority

has been discovered; in this case he says the vendor is entitled to recover not the stipulated price; and then comes in the passage quoted on the other side in this connexion—"For *in strictness* the plaintiff who has not performed that which he engaged for, is not entitled to recover at all; if he contracts to build a dwelling-house, he is not entitled to recover for building a stable. But still if the defendant be benefitted to a certain extent, and does not repudiate the contract *in toto,* it seems to be a rule of policy and convenience, as well as of equity and justice, that the plaintiff should be allowed to recover to the extent of the benefit derived by the defendant, and no further, &c." The court perceive, therefore, that the author is here treating of a contract with regard to goods sold, in which the vendee may, if he choose, repudiate the contract, and return the goods; but in which he has chosen to receive and use them. The passage quoted is in application to contracts of that character. But how could *Donnell* repudiate the contract in this case and return the partial services which *Pawson* had rendered. The principle has no *practicable* application to this case. And that it is not of universal application, the case of *Ellis vs. Hamlen,* 3 *Taunt.* 52, proves; where it was decided that a builder who undertook a work of specified dimensions and materials, and deviated from the specification, could not recover on a *quantum valebant* for the work, labour and materials.

The cases cited by the opposite counsel from *Abbot, Peter's admiralty decisions,* &c. relate exclusively to *mariners;* and are founded on the laws of *Oleron, Wisbuy,* and the *Hanse-towns,* and the ordinance of *Louis* the XIV. This is a class of contracts which stands by itself, and so peculiarly by itself, that we have seen the court of King's Bench, in *Cutter vs. Powell,* refusing to extend the principles and usage of these contracts even to the case of a *mariner* when his contract was in a peculiar form which removed it from the general ground of mariners' contracts. But the case now before the court is not that of a mariner at all; but of a supercargo, whose contract is not to be tested by the principles established by those ancient laws and ordinances in favour of a particular and favoured class of

men; but which is to be tested by the general principles applicable to other contracts, which have been already cited.

It is true, as the learned counsel has remarked, on the other side, that in the case of *Cutter vs. Powell*, two of the judges did advert to the circumstance, that the wages were unusually high, as a proof that they were intended to be contingent. But they did not ground their decision on that fact. It is manifest, that they only called it in aid to fortify the construction, which they had given to the contract on its face. And it is equally manifest, that without that circumstance the contract would have received the same construction. The court is, therefore, respectfully requested to compare the terms of that contract with those of the contract in the case at bar; and we are much mistaken if they will not find that the contracts were substantially the same.

The learned counsel on the other side, supposes that Justice *Lawrence* mistook the decision in *Portage vs. Cole*, 1 *Salkeld*, 65. If he did, *Starkie* also mistook it in the note before cited, from his third volume, page 1765-6, where he presents the case as deciding the same point, "that the contract being entire could not be divided." And it is manifest, that *Salkeld* himself mistook it, too, or else his report is entirely delusive and deceptive. And with all the unaffected respect, which I feel for the learned counsel on the other side, I cannot help thinking that Justice *Lawrence*, *Starkie*, and *Salkeld*, having no particular interest to bias their judgment, will be quite as apt to understand correctly the point of an *English* decision, as our learned friend on the other side, whose judgment, without any disrespect to him, may be suspected of not being quite so unbiassed.

The learned counsel seems to think, too, that he has given quite a sufficient answer to the argument drawn from the time of payment of the $2000, to wit, that they were to be payable on *Pawson's* return, by referring to 1 *Powell on Contracts*, 267--8, and to *Abbot on Shipping*, 433, 434, (*note* 1,) and by adding, that " the words in *Donnell's* letter do not create a condition,

they are *modal* only, and relate to the manner in which the contract shall be performed."

It is wonderful that this magical word, *modal*, did not occur to the acute and learned Sergeant *Williams*, when he was compiling the note before quoted.   We find there, that in utter despite of this cabalistic term, he has erected a whole class of dependant covenants, (the 2d class,) on this circumstance alone, of the time, payment being fixed at a day posterior to that at which the services were to be rendered; which he could never have done, if he had been aware of the omnipotence of this word *modal*.

With regard to *Powell*, he is looking to a very different case from this.   He is by no means affirming it as a proposition of universal truth, that time is *never* of the essence of a contract, but is always modal.   He is asserting merely, what may be safely admitted, that there are cases in which it is merely modal.   " We must carefully distinquish, says he, between conditions annexed to contracts or agreements, and circumstances annexed, which seem to import conditions, but which are modal only; neither suspending, disannulling, nor altering, the obligation of them, but only relating to the manner of performance; as that an agreement shall be performed at a certain day, or in a certain place.   And he then puts several cases, by way of illustration, *which have no reference to the mutuality and dependence of covenants,* (*which is the very question here,*) but which regard the construction of a covenant contemplated on one side only, and in which he says, in effect, that the time and place are not of the essence of the contract, but are *modal* only, leaving the essence of the contract untouched.   This is quite a familiar principle; but it is one of a very different aspect from that which we are now considering, and which formed the subject of Sergeant *Williams'* note, which is the mutuality or independence of covenants; and where, as we have seen, the fixing a day of payment, subsequent to the time at which the service is to be performed, creates at once a condition precedent with regard to the performance of the service.

The passage cited from *Abbot* is the same on which we have already commented, the case of contracts with mariners, resting on a body of old sea-laws peculiar to themselves, and from which, therefore, no analogy can be fairly brought to bear on contracts with any other description of characters which rest on the general law.

After this review of the law on the subject, it will only remain for the court to say, whether they acknowledge the *English* principle, that where an entire compensation is stipulated for an entire service, the contract is indivisible, and the performance of the whole service becomes a condition precedent to the demand of the compensation.

2. But now admitting, *argumenti gratia*, that this contract is divisible, and the compensation to be apportioned, did the court below assume the proper *termini* of the service to make the apportionment? We say they did not; for that this is a contract with a supercargo, whose duties *begin* and *end* with the voyage, so long as there is a cargo on board. What is a *supercargo?* He is one placed over the cargo as his name imports. He is placed over the cargo, just as the master is placed over the ship. The master represents the owner of the ship; the supercargo represents the owner of the cargo. "From the general nature of the master's employment, *he is a stranger to the cargo, except for the purposes of safe custody and conveyance.*" 2 *Livermore*, 214.

"But when the character of supercargo is superadded upon that of master, (as in this case,) the person in whom these characters are united, stands in the relation of agent to two distinct principals at once. To these principals he owes distinct duties, according to the nature of the business in which they have employed him; for a breach of these duties, he is distinctly responsible to them; and they are separately liable for the injurious consequences of his misconduct in those things which respect his peculiar duties to them." *Ibid.*

The master clothed with these double characters may, in his character of supercargo, do with the cargo what the owner, if present, might do. He may (for example,) as supercargo, ac-

cept the cargo at a port short of the port of destination, and the owners of the ship will be entitled to freight. He may, as supercargo, accept and sell the goods *at a port of necessity*, which he could not do as master. 2 *Livermore*, 215, 216.

From the circumstance that the supercargo represents, exclusively, the owner of the cargo, that he has authority over the cargo in all cases of unforeseen emergency, to act for the interest of the owner of the cargo, it is his duty to accompany the cargo, in order to be ready to meet all such emergencies, and take care of the interest of his principals, and consequently, to accompany the cargo to its final port of delivery,

The court below seemed to be of opinion, that as soon as the cargo was purchased, and put on board at *Coquimbo*, and the bills of lading were signed, the duties of the supercargo were at an end, because the transportation and delivery of the cargo at the home port became then the duty of the master of the ship. The master, however, as we have seen, is *a stranger to the cargo*, except for the purpose of safe custody and conveyance. Now, suppose the ship to have been driven into a port of necessity, with a damaged cargo, which made it the interest of the owner to have an immediate sale—the master could not sell it, but the supercargo might. Suppose a case of capture and carrying into port, where the interest of the owner of the cargo might call for negociation, ransom, or sale. The powers of the supercargo are ample for all these purposes, but not so those of the captain. These contingencies, to be sure, might not happen. *But they might;* and as they might, it was the duty of the supercargo to have been on board, to meet them and take care of the interest of his principals. It is fairly to be inferred, that it was the intention of the owner of the goods, that the supercargo should be on board, to meet all possible emergencies; and hence the stipulation, that his compensation as supercargo should be *payable on his return.*

The court below, therefore, it is conceived, erred in fixing the last *terminus* of the supercargo's duty at the signature of the bills of lading at *Coquimbo*. It ought to have been fixed at the return of the cargo to *Baltimore;* the supercargo being as indis-

solubly wedded to the cargo as the master is to the ship, and having no more right to leave the cargo than the master of the ship.

It is said, however, by our adversary, that if the court have erred in this respect, we have no right to complain of it, because in our prayer we fixed the termination of *Pawson's* services at the investment of *Donnell's* funds in the return cargo; whereas the court, giving us more than we asked, have fixed it at the signature of the bills of lading.

There are two answers to this:

1. That the prayer is misunderstood.   It does not make the investment of *Donnell's* funds the termination of *Pawson's* service.   It refers to the investment with reference to the time of his death.   He died before he had even completed the investment of the funds.   The word *even*, it is true, is not there.   But it is submitted to the court, that this reciting part of the prayer fairly admits that construction.   It is not, however, in the recitals of fact, in a prayer, that you look for the prayer itself.   To find the point of the prayer, you look only to that which is the prayer: and in this fourth prayer, the prayer is, that the court will instruct the jury, that the compensation was subject to abatement on two grounds.   First, for the abridgment of the voyage, by striking out the *Canton* trip, which formed a part of it, when the compensation was fixed.   Second, *for that portion of the contemplated services of Captain Pawson, which were lost to the defendant by his death at Coquimbo:* not specifying what those services were, but leaving it open to the defendant to insist, as he is now doing, that those services reached down to the return of the cargo to *Baltimore*.   At best, it is mere matter of inference on the other side, that the defendant's counsel considered the services of Captain *Pawson*, as supercargo, to end with his investment of *Donnell's* funds.

2. Suppose the plaintiffs construction of this prayer of the defendant's right:   What then?   If the court had stopped with the simple rejection of a prayer, wrong in itself, there would have been no ground of complaint.   But the court do not stop with a simple rejection of the prayer.   They go on to superadd an in-

struction of their own, different from the prayer; and the exception is not only to the rejection of the prayer, but also *to the opinion and direction of the court.*    And surely, in the appellate court, it is perfectly competent to the appellant, on such an exception, to test the accuracy of that opinion and direction, by the rules of law.    An error in his own prayer cannot deprive him of this right.    For in this part of the subject, the question is not, whether the prayer was right, but whether the opinion and direction were right.    However erroneously a party may pray when the court, after rejecting the prayer, proceed to give an original opinion and direction of their own, they undertake to pronounce the law of the case, for that is their function.    And on an exception to such opinion and direction, the question is, " have the court pronounced the law of the case?"    And not, " have they given the appellant something more or better than he asked for ?"    Have they given him all that he is entitled to ?    Not, have they given him more than in a mistake of his rights he had asked.

We hold the question, therefore, to be entirely open to us ; and the court's opinion and direction were wrong, for the reasons which have been assigned. ·

We have concluded the argument on *Donnell's* appeal.    But as the plaintiffs counsel in the cross appeal, are about to reply on his points, we beg leave to throw together here, for consideration, the arguments which strike us as supporting the court's opinion under the plaintiff's *first, second* and *third* bills of exceptions, and as a full answer to those urged by the opening counsel on the other side.

. The attempt of the opposite argument is to throw on *Donnell* the loss of the gold, which was confiscated at *Guasco.* The question arises on the plaintiffs' three exceptions, which fully exhibit all the grounds on which the plaintiffs claimed the appropriation of this gold, and the loss of it, to *Donnell,* and on which *Donnell,* by his counsel, resisted it.

The question seems to be a very simple and easy one, when impartially and candidly considered, and the dates of the several transactions carefully noted.

*Pawson* set out upon this voyage in the double character of master of the ship, and supercargo, for *Donnell.* The instructions addressed to him in the character of supercargo, are found in *Donnell's* letters, which he bore and accepted as the guide of his actions. In *Donnell's* letter of the 18th November, 1819, he says to *Pawson,* in this character of supercargo, " with the ship and the coin on board, you will proceed to the port of *Coquimbo,* in *Chili,* for the purpose of *loading entirely* with copper, and with it proceed to *Canton.*" Again, " if you have the means of completing the purchase, you must put on board at least 12,200 quintals." Again, speaking of the probability of *Pawson's* receiving additional funds from Mr. *M'Clure,* he says, " Should you see him, and he has any funds of mine, or that he has departed from thence, and you find he has placed any of my property in the hands of any person there, in either case, I authorise and empower you to receive and carry it with you, either in *copper,* or *Spanish dollars of the old coin.*" Thus anxiously repeating the instruction, that *all his funds* should be invested *in copper,* and guarding against the possibility of any other investment, more especially a *metallic investment,* except in *Spanish dollars,* and those, too, *of the old coin.* In the close of the same letter he says, " To prevent misunderstanding, I deem it necessary to state your compensation to be $2000, payable on your return, with a privilege from *Canton,* not to exceed twenty-five tons; *but it is understood that you are not to put any copper or heavy article on board at Chili, as my views are that you completely load her with copper, and that also for my account.*" The same solicitude of the owner to invest *the whole of his funds* in copper, is kept up in his letter of the 26th December, 1819, in which he changes the voyage by striking out the trip to *Canton.* That *Pawson* perfectly understood and acceded to *Donnell's* views on this subject, as to the investment of all *Donnell's* funds in copper, is clearly established by his letters of the 15th August, 1820, and the 4th November, 1820, from *Coquimbo.* In these letters he states his progress in the investment of *Donnell's* funds *in copper.* In the last letter he says, " there is now purchased *for your account,* 9,500 quintals, nearly 7000

of which is on board, and the remainder in *Guasco*, whither I shall proceed, and take it in, as soon as I get my crew from *Valparaiso*," &c. · And in a subsequent part of the same letter, he says—"I shall, however, be guided by my judgment as the ship comes down in the water, and if possible, bring the *whole of your funds in copper*." And again in the same letter—"*If I find the ship too heavy laden with your copper, I shall curtail my privilege in that article, and bring my funds in silver*." It will be observed, that he says in the last letter, he had already engaged for *Donnell* 9,500 quintals of copper, 7000 being already on board, and the rest at *Guasco*. But there were at *Guasco*, as the result has shewn, 3,015 quintals, making an aggregate 10,015 quintals. We have seen *Pawson's* determination, already expressed in his letter, to curtail his own privilege, in order to accomplish the primary object of placing all *Donnell's* funds in copper. And as demonstration of the same purpose, in the discharge of his duty to his employer, he declares to his agents, *Edwards & Stewart*, that he would appropriate to himself only 150 quintals of the copper at *Guasco*, if the ship would not take more than 10,000 quintals, and to carry home the rest of his funds in *Chinchilla* skins and silver. See the letter of *Edwards & Stewart* of January 19, 1821. These were his *declarations*, virtually *his instructions*, made to his agents, *Edwards & Stewart*, before his death. In pursuance of these instructions, they ship for *Pawson* his 150 quintals, (short only by 23 lbs.) leaving applicable to *Donnell's* funds the whole residue of the copper brought home, *which more than obsorbs all his funds.*

Thus, before *Pawson's* death, and while he was yet the agent of *Donnell*, all *Donnell's funds had been invested in copper, in strict compliance with Donnell's instructions, and Pawson's engagements and avowed purpose. Pawson's* death, then, left *none of Donnell's funds* at the disposal of *Edwards & Stewart*. It left at their disposal only *Pawson's* funds and *Goddard's.* These had not been appropriated, except in the 150 quintals of copper for *Pawson*. And *Edwards & Stewart* fearing to expend them in the manner which they declare to have been indicated by *Pawson*, (to wit, in silver bars,) expend them in

silver, gold and *Chinchilli* skins. These were purchased with *Pawson's* funds, because the previous investment of *all Donnell's, according to his orders,* left no other funds but those of *Pawson & Goddard* at their disposal; and the attempt to throw the loss of the gold on *Donnell,* as if it had been *his,* is one of which the justice has not yet been shewn.

On what ground is the attempt placed? The counsel say that *Edwards & Stewart* bought the gold *for Donnell;* and what is their proof? It is this:

"The gold is invoiced as *Donnell's;* it is put on board, and a bill of lading taken for *Donnell.* The silver, on the contrary, is invoiced as *Pawson's,* and put on board as *Pawson's,* as *per* bill of lading."

The distribution thus made by *Edwards & Stewart* is treated as a *judicial sentence* by these gentlemen, on the rights of the parties.

There would be a little more colour for this, if those gentlemen *had professed* to have acted with full information, and to *have intended to decide on the rights of the parties.* Even then, however, we might have objected to their authority to settle the rights of *Donnell* by their arbitrament, no such authority having ever been communicated to them.

But there is no occasion to take this ground; for those gentlemen *never* did profess to act as agents for the respective parties; *or to judge of their claims, or to make a final distribution and adjustment of their respective rights.*

On the contrary, in their letter of 19th January, 1821, they expressly disclaim any purpose of deciding between *Pawson* and *Donnell.* They profess their want of sufficient information to guide them. They do not even dare to follow out what they believe to be *Pawson's* intentions. If they had, they would have invested the whole of *his* funds, (after the 150 *quintals* of copper,) in silver bars and *Chinchilli* skins. But even this, they do not venture to do. They prefer, they say, passing the whole of *Pawson's* balance to *Donnell;* leaving it to him to settle with *Pawson's* representatives in the manner he, *Donnell,* might think most just and equitable.

Vol. I—16.

Again in their letter of the 28th January, 1821, they apologize for the manner in which they had shipped these articles— their words are " we have only to beg you to call to mind, in case that every thing is not exactly correct, the disadvantages we have been under from the sudden death of Captain *Pawson.*"

Here, then, is a strange attempt to attach to the acts of these gentlemen, a consequence which they themselves never dreamed of attaching to them, and while they declare that they are acting *by conjecture,* in the necessity thus thrown upon them by the sudden death of *Pawson,* and while they also declare that their purpose is to refer every thing to *Donnell's* knowledge of the rights of the parties, because of his better knowledge of these rights, the court are called upon, *in the teeth of this declaration,* to consider these gentlemen as acting with full light and with full power, *and as intending to make a final and judicial disposition of this subject between Donnell and Pawson.*

Let us proceed a step farther.   Let us impute to these gentlemen, a purpose which it is manifest they never entertained, *to decide* upon the rights of these parties.   *What was their power; what their real situation?*

These gentlemen had been appointed by *Pawson,* in his lifetime, to purchase the copper for the Chesapeake.  (See his letter to them, of the 19th August, 1820.)

In his letter of September 4th, 1820, to *Donnell,* he informs him he had so appointed them to purchase the *Chesapeake's* cargo.

*Pawson,* then, was the agent of *Donnell,* acting under written instructions to which he had assented.  *Edwards & Stewart* were his *sub-agents* in executing the duties confided *to him* by *Donnell.*   They were, then, employed *by him* in executing those duties, *under this sub-delegation of power, and under his superintendance.*   *Their whole power was derived from Pawson's appointment; and, consequently, the limits of Pawson's power, marked the limits of theirs with regard to Donnell.   For Pawson could not delegate to them a power which he did not himself possess.   But he, Pawson, had no power to buy gold for*

*Donnell ; and therefore, he could delegate none such to Edwards & Stewart.*

During *Pawson's* life, they were acting under his superior and controlling authority. The acts done during *Pawson's* life were conclusive, as between him and *Donnell. The rights acquired by Donnell under these acts, during Pawson's life, were vested rights, which could not be divested by Pawson's successor and subdelegate. The copper already purchased was Donnell's, and at his risk. Edwards & Stewart if they had so wished, could not have altered this state of things. But it is clear that they never proposed it ; never thought of such a change.*

Yet, without the power and without the intention to make any such change; declining all interference themselves, and referring all to the decision of *Donnell,* their acts, avowedly with a different aspect, are supposed to have changed the title which was vested in *Donnell,* during the life of *Pawson,* and vested by *Pawson's* own avowed intention and acts.

One of the learned counsel has talked of *Donnell's specific doubloons* having been invested in this purchase. What a notion is this of an *ear-mark* in money ! *Pawson* held the whole of *Donnell's* funds, and they were in the hands of *Pawson, blended with his own.* Whether in doubloons or bank notes, or government paper, they became one mass in the hands of *Pawson.* They were placed by him in the hands of *Edwards & Stewart* to make all the purchases, *Donnell's* and his own. Their deposite with *Edwards & Stewart* made them *their funds. They were Donnell's no longer.* They were the property of *Edwards & Stewart,* and they were responsible to *Pawson* for all the funds placed in their hands. The application of the whole mass of these funds was under the direction of *Pawson,* during his life ; and whenever he ordered a purchase it is perfectly immaterial to this question, whether *Edwards & Stewart* used these donbloons, or any other portion of their own funds.

It is, respectfully, submitted to the court, that the several opinions of the court below, on this point, were perfectly correct.

*Taney* (attorney general) in reply.

The only question in controversy in the appeal now under consideration, is the gold and silver shipped at *Guasco*, and seized and confiscated by the *Spanish* authorities.   Three of the bills of exceptions taken at the trial all relate to this subject.

The ship arrived at *Coquimbo*, August 15, 1820, and sailed from that place for *Guasco*, January 19, 1821.   *Pawson* died at *Coquimbo*, December 4, 1820.

It appears, therefore, that the silver and gold in controversy was shipped after the death of *Pawson*, and at a port which he did not live to reach.   It does not appear that any part of the silver was purchased in his lifetime; and it is positively proved that the gold was purchased after his death.

*Pawson* had under his separate control his own individual adventure, and also the funds belonging to *Goddard*, arising from the sale of the cordage.   The appellants are willing to consider the silver to have been bought with the funds under the separate control of *Pawson*, and the gold on account of *Donnell*, and propose that the loss shall be borne accordingly.

But *Donnell* insists that neither the silver nor the gold belonged to him; and that no part of the loss of either can fall on him.   The ownership of the gold, seized by the *Spanish* government, is therefore the point in dispute between the parties.

The statement in the record shews that both *Donnell* and *Pawson* had funds in *Chili*, in the hands of *Edwards & Stewart*, at the time they purchased the gold.   It moreover, appears, in proof that the funds of *Donnell* were in fact employed in this purchase, and not the funds of *Pawson*.   But it is said on behalf of *Donnell*, that his funds could not rightfully be so employed; and that if they were so used, it was a violation of the instructions given to *Pawson*, which instructions bound the funds in the hands of *Edwards & Stewart*.

We do not mean to contend that the death of *Pawson* altered, in any respect, the rights of the parties.   We admit that the funds of *Pawson* in the hands of *Edwards & Stewart* had no

## OF MARYLAND. 125

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

greater privileges, than they had in his own hands. The first question, therefore, to be decided is, what were the powers and duties of *Pawson,* under the authority and instructions received by him from *Donnell?* And this leads us to consider, in the first place, the question presented by the *second exception.*

In this investigation we do not mean to consider the *intentions,* which *Pawson* is supposed to have entertained. They will be examined in a subsequent part of this argument. The object now is to ascertain the rights of the parties; and when this is done it will not be difficult to decide, how far the rights of *Pawson* can be affected by any designs which he formed in his life time, but which he did not live to carry into execution.

In the *second exception,* the County Court have decided that it was the duty of *Pawson* to invest all *Donnell's* funds in *Chili* in copper, if copper could be had; that *Pawson* could not, consistently with his duty, put on board any copper on his own account, while he had funds of *Donnell* under his control, which could be applied to that purpose; that if *Donnell's* funds in *Chili* were sufficient to load the ship with copper, that no copper could be put on board for *Pawson* or any one else; that if copper enough was put on board, sufficient to exhaust the funds of *Donnell,* no other part of the cargo would belong to him; and consequently that he could not be affected by the loss or seizure of the silver or gold. This is understood to be the opinion of the court, set forth in the *second exception.*

This opinion of the court denies that *Pawson* had any license or permission from *Donnell* to bring copper from *Chili* to *Baltimore,* provided *Donnell's* funds were sufficient to load the ship. It denies also that *Pawson* had any *privilege* from *Chili* to *Baltimore.*

When we speak of the *privilege* of *Pawson,* we mean that kind of privilege which is described by the testimony. A captain's privilege in the sense, in which it is there spoken of, is not a mere permission, revocable at the will of the owner, but is an absolute and vested right to a certain portion of the ship, secured to him by his contract with the owner. This portion the captain may either use himself, or let out for hire to others,

and the owner himself must pay for it if he uses it.    Such was the character of the privilege from *Canton*, as appears by the testimony in the record.

It will be found, upon recurring to the exceptions and arguments in the other appeal between the same parties, that it was in that case strongly urged on behalf of *Donnell*, that *Pawson* had a certain privilege in copper from *Chili* to *Baltimore;* and that this privilege had been substituted by the consent of parties for the one from *Canton.*    The privilege from *Chili,* therefore, was supposed to be one of the same character with that from *Canton,* for which, it was insisted on the part of *Donnell,* the privilege from *Canton* had been exchanged.

If the counsel for *Donnell* were right in the argument just stated, then the opinion of the County Court, given upon their prayer in the exception now under discussion, must necessarily be wrong.    For if *Pawson* had a substituted privilege from *Chili* to *Baltimore,* he had a right to bring home copper, or any thing else, to the extent of that privilege, although *Donnell's* funds were not exhausted.    But in this prayer they insist that he had no such privilege; that he could use no portion of the ship for his own goods, until the whole of *Donnell's* funds were invested in copper, and shipped on board this vessel; that he might then use any space which happened to be left, and if none was left he could ship nothing.    The position taken in the other case is inconsistent with the one they now maintain.    If they were right in that case, they must be wrong in this.

It is not, however, contended on the part of *Pawson's* representatives, that he had any privilege (in the sense in which that word is used in the record) from *Chili* to *Baltimore.*    We insist now as we did in the other appeal, that the privilege from *Canton* was neither forfeited nor waived; that no privilege from *Coquimbo* or elsewhere was, by the consent of parties, substituted in its place.    But that *Pawson* had permission from *Donnell* to bring home from *Chili* the whole of his funds in any thing he pleased, in copper as well as in any other article. We do not say that he was entitled to do this, without paying freight.    If he used any part of the ship under this permission,

he was unquestionably bound to pay freight. Because as this permission formed no part of the compensation of *Pawson*, there could be no reason for allowing him to exclude the goods of the ship-owner for his own benefit, without paying the usual compensation. *Pawson's* recompense for his services depended upon the original agreement between the parties—that is—the shipping articles, and the letter of November 8, 1819. And the permission, for which we now contend, is neither the privilege secured by that contract, nor any other privilege substituted for it; but is a separate and distinct permission given afterwards,—and given not by way of bargain—but by way of voluntary license;—and which being once executed, cannot afterwards be revoked. This is the character of the permission for which we contend. And we proceed to enquire, whether he had a permission or license of this character, or whether, as the County Court have said, he had no right to bring home any part of his own funds in copper, unless there was space left in the ship, after *Donnell's* funds had been exhausted in the purchase of that article.

The argument upon this point is necessarily very brief. It depends upon the construction of *Donnell's* letter of December 26, 1819. This is a written instrument and must speak for itself, and its true meaning be declared by the court. It is this paper that broke up the original voyage, and directed the new one. And it prescribes what is to be done in the new one. In this letter, *Donnell* says,—" as relates to the investment and disposal of your own funds, you must use your own discretion, *by investing it in copper or any thing else, and bringing it with you in the ship;*—the copper may (as I hope it will) be bought on terms that will, with my funds and yours, load the ship very deep, but if necessary you must load her very deep," &c.

Argument can scarcely assist the court in fixing the true construction of this letter. The permission to *Pawson* is express to invest his funds in copper or any thing else, and bring it with him in the ship. It is not a contingent permission, depending upon *Donnell's* funds loading or not loading the ship. It is not

a permission to bring a part of his funds in copper in the ship—nor to fill up any particular space. *Donnell* knew the amount of *Pawson's* funds—for he had given him the bill on *Horstman:* (*see letter from W. F. Reus,*) and with this knowledge he gives to him the unqualified permission to bring home in the ship in copper, or any thing else, the whole amount of his funds.

If, therefore, this permission be an absolute privilege, substituted for the *Canton* privilege by the consent of parties, as has been on another occasion contended for by *Donnell,* then this opinion of the court, which makes it a mere contingent permission, cannot be supported. If it be an absolute and unconditional license, to be used by *Pawson* at his discretion, as we contend, and as the words of the letter seem necessarily to import, then it is equally clear that this opinion of the court cannot be maintained. In either view of the subject, therefore, the judgment must be reversed, unless there be something in the conduct or letters of *Pawson,* which may give to the case a new aspect.

We cannot imagine how any thing contained in the letters of *Pawson* can be relied on to support this opinion of the County Court. The court have said, that he had no right to ship any copper on his own account, provided *Donnell's* funds would buy copper enough to load the ship. We say, on the contrary, that he had permission from *Donnell* to bring home the whole of his funds in copper, if in his discretion he thought proper to do so. And we produce the letter of *Donnell* giving this permission in so many words. Now, whether *Pawson* had or had not this permission, must depend upon the language used by *Donnell,* and not upon language used by *Pawson. Donnell* alone could give the permission; *Pawson* could not assume it.

It is true that *Pawson* might, in his discretion, refuse to exercise the permission given. But if he had even done so in express words, it would not support the opinion contained in this exception. The point presented is—had *Pawson* the right, under the permission given by *Donnell,* to bring home his funds in copper, if he thought proper to do so. The court say he had not the right. And, in discussing this question, it

can make no difference how far he exercised it, or how far he intended to exercise it. The question is, did he possess the right, if he thought proper to exercise it. He may, in his discretion, have determined not to use the permission to the full extent, nor even in a small degree. Yet that would not destroy his right to use it. The right would still exist, although *Pawson* did not choose to avail himself of it. And, in order to support this opinion of the County Court, *Donnell* must shew, not how *Pawson* used his discretion, but that he had no discretion to exercise. And, whether he had or had not the power to exercise any discretion on the subject, must depend on the letters of *Donnell*, who alone could confer or withhold the power.

We cannot, therefore, perceive how *Pawson's* letters, detailing what he had done or intended to do, can affect this question. It is not suggested that in any of his letters he has admitted that *Donnell* recalled the permission, given by his second letter. And, unless the letters of *Pawson* contained this admission, it is not easy to discover in what other way they could prove that the right, which had been vested in him by the license of *Donnell*, had afterwards been extinguished. Any declarations which may have been made by *Pawson*, as to the manner in which he intended to use the discretionary power confided to him by *Donnell*, would not be binding on him, nor limit the range of his power. Every intention entertained or expressed would be liable to alteration, as the business advanced, and at any time before he had acted. In stating this position, however, we shall not be understood to mean, that after *Pawson* had actually purchased copper on account of *Donnell*, he could convert it to his own use, and ship it on his own account. This we admit could not be done. When he had once purchased copper for *Donnell*, he had then exercised the discretion with which he was entrusted, and the copper would remain *Donnell's*, and must be shipped as his property. But we insist that he had the right, instead of purchasing for *Donnell*, to purchase copper for himself to the amount of his own funds, and that this power remained until he acted, and by purchasing, either for himself or *Donnell*, exercised the discre-

tion, and put an end to the power.   When we speak here of *Pawson's* funds, we must not be understood to include the proceeds of *Goddard's* cordage.

If, however, we look at the intentions of *Pawson*, as expressed in his letters, or disclosed in the letters of *Edwards & Stewart*, nothing will be found to sanction the opinion which the court have expressed.   He uses no expression which indicates a belief on his part, that he was obliged to exhaust *Donnell's* funds in copper before he could ship a single pound for himself, as the County Court have decided.   On the contrary, if you resort to his own letters, or those of *Edwards & Stewart*, he does not appear to have doubted that he had a right to ship a large amount of copper.   How much he supposed himself entitled to bring in this vessel does not appear.   But it is abundantly evident that he considered it, in a great measure, as a matter resting in his discretion; and upon which he intended to decide, when he had more certainly ascertained how much could be brought.   It seems never to have been supposed by him that his right to bring any was altogether contingent, and depended upon the ability of the ship to bear it, after all *Donnell's* funds had been first so disposed of.   On the contrary, he never seems to doubt his right—he doubts only to what extent he will use it. *See his letter to Donnell, dated November 4, 1820—and the letter of Edwards & Stewart, dated January 19, 1821.*

It is very certain, if *Pawson* had lived, he would have used the permission given by *Donnell* very sparingly.   He had the strongest inducements not to displease *Donnell*.   He was in his employment.   And *Donnell* was a man of vast wealth—extensively engaged in commerce—who, we admit, paid his agents liberally while they lived, and were useful to him; and with whom, therefore, *Pawson* would naturally wish to stand well, and be most careful not to offend.   Besides, he acted under the influence of higher and better feelings.   He was the trusted agent of *Donnell*, and as such seems upon all occasions to have preferred the interest of his principal to his own.   This was obviously the case in the purchase of gold in *London*; and it is equally manifest from his own letters, and the letters of *Edwards*

*&· Stewart,* that he was prepared again to surrender what he believed to be his rights, in order to advance the interest of *Donnell*:—that he had determined, in his own language, to curtail his privilege in copper;—that is—to take less than what he had a right to take, in order more effectually to serve *Donnell.* We admit most distinctly, that if he had lived, he would have waived his own rights in favor of his principal; and it was his intention to do so.

But we are not now to inquire what rights *Pawson* intended to waive, or what he intended to insist on.   It is our business to ascertain what were his rights; and whatever rights he had at the time of his death, it is the duty of his representatives to maintain, although we may even be satisfied that he himself intended to surrender them, if he had lived.   If the right was not actually surrendered, it belongs to the representatives; for they can have none of those inducements to waive them, which might very properly have operated on the mind of *Pawson.*

We have already endeavoured to show the character and extent of these rights, and hope we have established the following propositions:

1st.  That *Donnell's* letter of December 26, 1819, gave to *Pawson* permission to bring home his whole funds in copper, if he thought proper to do so.

2d.  That this privilege had never been recalled by *Donnell,* nor surrendered by *Pawson.*

Assuming these two propositions, let us in the next place see what were the rights of the respective parties, when adjusted according to these principles.

*Pawson* had the right, under the license given by *Donnell,* to invest his own funds in copper in preference to *Donnell's,* and bring the copper home in the ship.   It was also the duty of *Pawson,* under his instructions, to invest *Donnell's* funds in that article, provided the ship would bring it, together with his own.   But if the funds of both would overload the vessel, *Pawson* was without orders in that contingency; and consequently was left to exercise a sound discretion, as to the manner in which the surplus funds of *Donnell* should be invested.

In this state of things it must be conceded on all hands, that whenever *Pawson* bought copper for *Donnell,* and with *Donnell's* funds, the copper became his property, and could not afterwards be appropriated by *Pawson* to his own use, if he had been so disposed.   And whenever he bought copper for his own use, and with his own funds, the copper belonged to him, and could not become *Donnell's* unless it was transferred to him by his own consent, as well as that of *Pawson.*   For *Pawson* had a right so to invest the funds of either party; and when the investment was once made by him, he could not of himself recall it.   And indeed any other rule would have been liable to great objections.   Because, although copper was the favourite article, and preferred by both parties, yet as it was not all bought at once, but in different lots, the price was subject to variation, and he might have been obliged to give for some parcels more than he had given for others; and it becomes important, therefore, to fix at once for whom the purchase was made. Besides, although copper proved the most fortunate cargo, it might have happened otherwise; and if it had come to a losing market, and the gold and silver arrived safe, the latter articles might have proved the best investment.   In every view, therefore, the purposes of justice required that when the discretion was exercised, and the purchase made by the funds of one of the parties, the article purchased should become at once the property of him for whose use it was bought, and should not afterwards be transferred to the other, without the consent of both parties.

Assuming this to be the true principle, let us look at the state of the funds at the time of *Pawson's* death, and what was done with them afterwards.   And this brings up the question in the *first exception.*

On the 4th of November, 1820, *Pawson* had bought for *Donnell* 9500 quintals, nearly 7000 of which was then on board at *Coquimbo,* and the remainder at *Guasco,* to which place the *Chesapeake* afterwards intended to sail. (*See Pawson's letter.*) So far we have an actual appropriation of *Donnell's* funds.   But we have no other appropriation during his life, and no evidence

that any more copper was purchased by him. A large amount of copper was afterwards bought at *Coquimbo.* For it appears by the bill of lading, that instead of the "nearly 7000 quintals" at *Coquimbo,* mentioned in *Pawson's* letter of November 4, 1820, as purchased and shipped there for *Donnell,* there was in fact, 8076 quintals and some pounds shipped from *Coquimbo.* And there is no evidence to show for whom the additional 1076 quintals were bought; nor indeed any thing to show whether it was bought in Pawson's life time, or after his death. The 9500 quintals, bought for *Donnell,* did not exhaust his funds; it left between six and seven thousand dollars of *Donnell's* funds unappropriated; and there is no evidence to show that the additional quantity of copper was bought for him, or with his funds;—nor that any further specific appropriation of the funds of *Donnell* were made by *Pawson* in his life time. But whether any further specific appropriations of *Donnell's* funds were or were not made, it is in proof that they were not all appropriated. For it appears by the testimony, that some of *Donnell's* doubloons brought from *England* had not been expended in the purchases made for him by *Pawson*; and that these specific funds of *Donnell* were applied after the death of *Pawson,* and by the advice of his successor, in the purchase of the very gold, which was afterwards seized by the *Spanish* government. Now, as the specific funds of *Donnell* were appropriated to the purchase of this gold, and it was bought on his account, the purchased gold belonged to him, and the loss must be borne by him.

We have already endeavoured to show, that if the *Chesapeake* would not bring all *Pawson's* funds in copper, and all *Donnell's* funds also, that as *Pawson* had no specific directions how to dispose of *Donnell's* surplus funds, he had a right to exercise a sound and honest discretion on the subject, and might invest them in any article he deemed best. He died, leaving funds of his own and funds of *Donnell,* also unappropriated. The money of both of them came to the hands of persons who had no instructions, from either *Pawson* or *Donnell,* and no authority from either of them. Neither *Lane,* nor *Edwards &*

*Stewart*, in whose hands these funds remained, were appointed the agents of *Donnell*, or the agents of *Pawson*. In this state of things the money was in their hands in the same condition, and subject to the same rights, as when it remained in the hands of *Pawson*. *Edwards & Stewart*, who held the funds, became trustees for the respective parties, according to the amount of their respective funds, and according to their respective rights of investment and shipment. And when the funds of either party were invested in a particular article, that article became the property of the party whose fund was used in the purchase. The thing purchased belonged to him, and could not be claimed by the other. And if it were lost or destroyed, he could not put that loss on the other party. If indeed the trustee had misbehaved himself in the purchase, and a loss had thereby happened, the party injured would have been entitled to demand compensation of the faithless trustee. But nobody, under such circumstances, could have acted more discreetly or honestly, than *Edwards & Stewart*. There is no pretence of complaint against them. But whether *Donnell* had, or had not cause of complaint against them would not have altered the case. The funds were in the hands of *Edwards & Stewart*, precisely as they had been in the hands of *Pawson*. The funds of *Pawson* had an absolute right, derived from *Donnell*, to be invested in copper, and brought home in the ship. The funds of *Donnell* had a right to be invested in the same article, if the ship would bear it. But if the ship would not bear it, the surplus might be invested in any manner that the sound discretion of the agent would justify. These were the rights of the parties while *Pawson* lived, and the funds were in his hands. Upon his death, the funds in the hands of *Edwards & Stewart* were liable to the same appropriation, and subject to the same rights; and, by the hands of *Edwards & Stewart*, the surplus funds of *Donnell* have been specifically appropriated to the purchase of the gold. This appropriation would have been a lawful one by *Pawson*: it was equally so when made by *Edwards & Stewart*. If the shipment had proved fortunate, *Donnell* would have had a right to hold it, in opposition to *Pawson's* representatives; and as it has

proved to be unfortunate, he cannot throw the loss upon them. It is unnecessary to cite many cases on this subject. *Taylor vs. Plumer, 3 Maul. and Selw.* 574, is in point. In page 575, it is said " the product of, or substitute for, the original thing still follows the nature of the thing itself, as long as it can be ascertained to be such." The gold in question was " the product of, or substitute for," the doubloons of *Donnell.* He clearly had a right to follow the gold bought, and to claim it to the exclusion of *Pawson;* and it would be contrary to every notion of justice to give him the right to it, if it was found to be profitable, and enable him, if unfortunate, to throw the loss on *Pawson.* If he takes it all, he takes it for better or for worse. And if he has been wronged in the purchase, it was not by *Pawson,* for he died before the purchase. But in truth he has been wronged by nobody. The investment was judicious and discreet at the time, although it afterwards proved unfortunate. And as it was purchased with his money it belonged to him, and the court have therefore erred in the opinion contained in the *first exception,* as well as in that given in the *second exception,* which was first examined.

So far we have argued the case according to the rights of the parties, at the time the gold in question was purchased, and without reference to any thing that happened afterwards. We proceed now to show, that if *Edwards & Stewart* had not possessed the power to make this investment of the funds of *Donnell,* yet that *Donnell,* by his subsequent conduct, has adopted it and assented to it, and cannot now dispute it, even if he might have done so, when first informed of the transaction.

This point arises under the *second and third exceptions :* It presupposes that *Pawson* in his lifetime, and *Edwards & Stewart,* after his death, had no right to invest any part of his funds in copper, and bring it home in the *Chesapeake,* until *Donnell's* funds had been first exhausted in the purchase of that article, and had been found to be insufficient to load the ship. But, assuming this to be the law of the contract between *Donnell & Pawson,* we insist that if *Pawson* in his lifetime, or *Edwards & Stewart* after his death, holding in their hands the funds of both

parties, did specifically and separately appropriate them in any particular manner; and if *Donnell and Pawson's* representatives, after notice of such appropriations, acquiesced therein, that such acquiescence will bind the parties, and neither of them could afterwards reject and disallow it, without the consent of the other party.

We have certainly offered evidence of all the facts above stated. · 1st. It is admitted by the statement, and in prayer of the appellee that, upon the death of *Pawson*, a large proportion of the funds of both parties were in the hands of *Edwards & Stewart*.

. 2d. These funds were specifically appropriated. The gold in question was purchased with the money of *Donnell*, and shipped on his account. See where *Edwards & Stewart* speak of it as *Donnell's* gold. The *Chinchilli* skins, the one hundred and forty seven quintals and ·seventy-nine pounds of copper, and the silver mentioned in the same bill of lading, were separately shipped on account of· the funds under the immediate control of *Pawson.* See letters of *Edwards & Stewart.* Also the bills of lading. When we speak here of the funds under the immediate control of *Pawson*, we mean his own and *Goddard's*, as distinguished from *Donnell's*. The balance of *Pawson's* separate account was passed to the credit of *Donnell*, and invested for him, and shipped on his account. The 900 pigs of copper, and the thirty-six lumps of gold were shipped on *Donnell's* sole account. And it is distinctly admitted in the argument, and the evidence and figures shew it, that *Donnell's* funds, independent of those transferred to him by *Edwards & Stewart*, would not·purchase the 900 pigs of copper. These 900 pigs contained 113 quintals more than *Donnell's* own funds would have purchased, after exhausting every dollar that *Donnell* had in the hands of *Pawson.*

3d. *Donnell* and *Pawson's* representatives had notice of these specific appropriations, and acquiesed in them.

The acquiescence of *Pawson's* representatives is not disputed. They claim, according to adjustment made by *Edwards &*

*Stewart,* and have always so claimed.   They sue on that ground. See, also, *Graham's* letter, May 15, 1822.

*Donnell,* also, had notice and acquiesced.   The *Chesapeake* arrived at *Baltimore,* on her return from this long voyage, October 1, 1821.   *Donnell* then received the letters of *Edwards & Stewart,* and their accounts, and the bills of lading, and invoices contained in the record, which gave him notice of every thing that had been done, as above stated. So far as to notice : Now, as to acquiescence.   He received this notice, October 1, 1821. The 147 quintals, shipped on *Pawson's* account, as before mentioned, were delivered to his representatives as his share, October 29, 1821.   All the rest, it seems, was retained as *Donnell's.* Some months afterwards, and after a full investigation of all the accounts of the voyage, *Donnell* states an account with *Pawson.* We have said that this account was made out after a full investigation of the accounts of the voyage, because the paper itself upon the face of it, shows that this was the case ; and we have said that it was made out some months afterwards, because the earliest evidence of its existence is to be found in Mr. *Graham's* letter of May 15, 1822.   In this account he states the 147 quintals and 79 pounds, as the whole of *Pawson's* interest in the copper.   See the item in the account, in which he charges him with his proportion of the expense of landing and reshipping the copper.   *Donnell* had, at that moment, in his hands 113 quintals more than his own funds could have purchased.   Yet he gives no account of this, and speaks of the 147 quintals and 79 pounds as the whole of *Pawson's* interest. If *Donnell* acquiesced in the transfer to him of $7777 87 by *Edwards & Stewart,* then he was not bound to speak of this 113 quintals, because he would be debtor for the $7777 87, transferred to him, and he would be entitled to all the cargo purchased with it, and, consequently, to the 113 quintals above mentioned.   If he does so acquiesce, then he adopts, also, the shipment of the gold, and, of course, gives up the matter in controversy.   The gold was shipped on his sole account.   And if he adopts and ratifies the acts of *Edwards & Stewart,* as to the 113 quintals of copper bought with part of the sum transferred to him, it will hardly be said

138    CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.    Donnell *vs.* Pawson's Adm'rs.——1829.

that he may reject the gold, because it was unprofitable or lost. In fine, he may in this aspect of the case accept the transfer of the $7777 87, or reject it altogether. He cannot accept it in part, and reject it in part. He has accepted it as relates to the 113 quintals. If he has acquiesced as to that, he must acquiesce as to the gold also.

It can hardly be supposed that *Donnell* did not acquiesce as to these 113 quintals. They were bought with part of the sum of $7777 87, transferred to him as aforesaid. He had no other funds to buy it. If he did not mean to assent, then these 113 quintals belonged to *Pawson's* administrators. Yet *Donnell,* after a full view of the whole ground, accounts with them, without allowing them these 113 quintals. And after taking all the copper to himself, and these 113 quintals with the rest, he makes himself debtor for $185 09 only. Whereas, if this copper belonged to *Pawson's* administrators, it was of itself worth in *Baltimore* more than $2000. *Donnell,* therefore, stands in this dilemma. If he did not mean to ratify what was done by *Edwards & Stewart,* then he was bound to deliver over this copper to *Pawson's* representatives, for which he himself had not paid, and had no funds to pay. If he did mean to ratify what was done by *Edwards & Stewart,* he had a right to retain it. In the first case, he could not rightfully withhold it. In the second, he might honestly do so. He did retain it, honestly and justly we say, because the funds were transferred to him, and it was shipped on his account. It will not, be said on his behalf, that he withheld it from the account from any unworthy motive. He must therefore have acquiesced in the arrangements made by *Edwards & Stewart.* His conduct in regard to these 113 quintals of copper can be justified on no other ground.

We do not ask the court to say that this conduct was, in point of law, an acquiescence or consent on the part of *Donnell,* and irrevocably bound him. But we insist that it was *evidence* of his acquiescence and consent, after notice of the manner in which the funds had been appropriated; and being evidence of such acquiescence and consent, it ought to have been left to the jury to say from the evidence, whether he did, or

OF MARYLAND. 139

Pawson's Adm'rs vs. Donnell. Donnell vs. Pawson's Adm'rs.—1829.

did not acquiesce in the disposition of the funds made by *Edwards & Stewart.* If he did assent, it is quite clear that in point of law he cannot afterwards recall it. The case of *Prince vs. Clark,* 8 *Serg. & Lowb.* 54, is directly in point on this subject. In that case the agent applied the funds of the principal in a manner not authorised:—in this case, it is assumed for the sake of the argument, that the same thing was done. In that case the principal received notice of the manner in which his funds had been applied, May 29, 1822; and gave notice of his dissent, August 7, 1822; that is, in less than two and a half months afterwards. In this case *Donnell* must have received notice of the application of his funds, when the ship arrived, October 1, 1821; and he expresses no disapprobation of the transfer of *Pawson's* funds to his account, until he rendered his account. And there is no evidence of the time of rendering that account, but the letter of Mr. *Graham;* which letter is dated May 15, 1822, seven months and a half after the arrival of the ship. If in the case of *Prince vs. Clark,* the silence of the principal, or rather the absence of any evidence of dissent by him for the space of two and a half months, was evidence, from which the jury might properly find that he had acquiesced and assented to the act of the agent;—surely the silence of *Donnell,* for the far longer period above stated, was evidence, from which a jury might have inferred his assent and acquiescence in the acts of *Edwards & Stewart,* in the transfer of *Pawson's* funds to him, and in the shipment of the copper *and gold,* on his "*sole account,*" as stated in the letters and bill of lading. Indeed this case has this strong additional circumstance against the principal, that the legal representatives of *Pawson* were known to him, were living in the same town with him, and to whom he had delivered the property, shipped on account of *Pawson,* October 29, 1821. And in the case of *Prince vs. Clark,* it was not very clear that *Leigh* was the proper person to receive the notice; and if he was the proper person, it was not very clear that *Prince* knew it. We confidently, therefore, rely upon this case to prove that the court erred in the opinion contained in the *third exception,* in which they decide that the

**140    CASES IN THE COURT OF APPEALS**

Pawson's Adm'rs *vs.* Donnell.    Donnell *vs.* Pawson's Adm'rs.—1829.

evidence above stated, is not a ratification of the acts of *Edwards & Stewart*. Whether *Donnell* did, or did not consent to them was a question of fact for the jury, and not of law, for the court. And if he did acquiesce in them after notice, and the jury had so found, then in point of law it ratified what *Edwards & Stewart* had done.

So far we have considered the case as if *Donnell* in his account had dissented from the appropriation of the funds made by *Edwards & Stewart*. But is this the meaning of the account in question? Does he in this account dissent from what had been done? It is very true that he says, in noticing this item, that the transfer of $7,777 87, was very improperly made to him. But he does not reject it. He does not refuse to accept it. On the contrary, he credits *Pawson* with the whole amount, rejects from it *Goddard's* funds, and then reduces the balance by charging freight, the cost of the gold, &c. &c. and, finally, leaves a balance against himself, on account of this transfer of $112 49; and this sum of $112 49 is a part of the balance of $185 09, which *Donnell* admits to be due from him to *Pawson's* representatives. Is not this a direct acquiescence in the transfer? Is it not a positive adoption of it? True, he complains of it, and denies the right of *Edwards & Stewart* to make it. Yet he accepts it; accounts, as he supposes, for all but $112 49; and admits that he owes that sum on account of this transfer. If he did not accept it, he owed nothing on that account. He does, therefore, in admitting this balance to be due, also admit, by necessary implication, that he assented to the transfer.

The account is in writing; and whether *Donnell* does, or does not by this account accept the transfer above mentioned, must depend upon the language of the account which is to be taken all together; and being in writing, is to be expounded by the court. We have endeavoured to shew the court, that by the true construction of the account, he has assented to and accepted the transfer. If we are right in this, then the court ought to have instructed the jury that, "*under the circumstances of the case*," the account of *Donnell* was a ratification of the

acts of *Edwards & Stewart.* For, if by the written language of the account, according to its true interpretation, *Donnell* had accepted the transfer, his assent was in point of law a ratification; and the other evidence need not have been left to the jury. If, however, we are wrong in our interpretation of this account, yet all must concede to us that the circumstances, herein before detailed and relied on, furnish evidence from which a jury might have inferred his consent, and that therefore the opinion of the court cannot be maintained.

It has been said that this copper was retained by *Donnell,* in order to meet any claim that *Goddard* might make against him. Now the motive which induced him to retain was necessarily a question of fact for the jury, and not one of law for the court. *Donnell* contends that he retained it to meet any demand that *Goddard* might make: we insist that he retained it as his own property, shipped to him and on his own account by *Edwards & Stewart.* In this state of the dispute the jury must decide the controversy. The court cannot decide what motive or intention influenced *Donnell.* It is a question of fact. The argument, therefore, on the motives which governed *Donnell,* does not tend to support the opinion given by the court. As the motive was controverted, it was not in the province of the court to decide the controversy. It may not, however, be improper to remark here, that *Donnell* does not, in his account, suggest that he retained this copper for the reasons now assigned in the argument. He gives no account of it whatever, and *Pawson's* representatives did not know any thing about it. It is quite evident that *Goddard* could have no claim against *Donnell,* or against the copper brought in the *Chespeake.* He never pretended to have a claim against either; and we shall be ready, at the proper time, to shew that he has no just demand against *Pawson's* representatives. With that controversy, however, we have nothing to do at this time. It is sufficient for us, on this occasion, to show that it cannot be taken as an admitted fact, that *Donnell* retained this copper for *Goddard.* The opinion of the court, therefore, in the *third exception,* cannot be sustained on that ground.

There is another objection to the opinion contained in the third exception, which we must briefly notice. We understand the first branch of the direction to be this:—that if *Pawson*, in his lifetime, was willing to waive the privilege he had to bring home his whole funds in copper, but died before he had actually invested the funds in his hands, and before he had actually waived it, that his declared intention, his *willingness* to curtail his rights would bind his representatives, and compel them to relinquish what Pawson had been willing to relinquish, and had intended to relinquish, but which intention he had not, in his lifetime, carried into execution. This, we presume, must be admitted to be the meaning of the first branch of this direction.

Upon what principle can it be sustained? Is there any case in which the intention to do an act has been held to bind the party, or his representatives? It is not pretended that he did, by any act of his own, surrender a part of his privilege; nor is it supposed that he contracted to surrender it, or any part of it. The direction stands on the hypothesis, that he was *willing* to accept less than he was entitled to. His willingness to do an act cannot be equivalent to the act itself. We are not to inquire what either party was willing to do, but what they had done; and what were their rights at the time of *Pawson's* death; for it is according to these rights that the cause must now be decided. It is time, however, that this argument should be brought to a conclusion.

We have endeavoured to show,—1st, that *Pawson* had the permission of *Donnell* to bring home in copper the whole of his own funds, if in his discretion he thought proper to do so. And that this permission had never been recalled by *Donnell*, nor surrendered by *Pawson*. 2d. That upon the death of *Pawson* the funds remaining unexhausted came to the hands of *Edwards & Stewart*, clothed with the same rights and privileges that belonged to them, in the hands of *Pawson*. 3d. That being so in their hands, *Edwards & Stewart* were not bound to exhaust *Donnell's* funds in copper, before they invested any part of *Pawson's* funds in that article; but, on the contrary, had a right

to invest if they thought proper to do so, the whole of *Pawson's* funds in that article, and send it in the ship.   4thly.  That *Edwards & Stewart,* holding thus the funds of both parties in their hands, and *Pawson's* funds having a right to be preferred in the investment in copper; if *Edwards & Stewart* in the exercise of an honest discretion, actually invested any part of *Donnell's* funds in gold, that the gold became the property of *Donnell;* and, if a profitable investment, he was entitled to claim it ;  and if it proved to be a losing one, he could not throw the loss on *Pawson's* representatives.   5thly.  We have endeavoured to show that whatever might have been the rights of the parties, there is evidence to prove that all of them, after notice, acquiesced in what was done by *Edwards & Stewart;* and if from that evidence the jury should find such acquiescence, *Donnell,* as well as *Pawson's* representatives, are bound by it, and cannot recall it, no matter what might have been their rights before. And 6thly, we have endeavoured to show that by his account, *Donnell* has given a written assent to the appropriations of the funds made by *Edwards* & *Stewart;* and that although he denies the propriety of the transfer to him, yet he adopts it, and states the account upon the principle, that he is to account for the money so transferred, and does not deliver or offer to deliver the property in which it was invested, but retained it as if it were his own.   And, relying upon the soundness of these propositions, the case is submitted to the Court.

DORSEY J. at this term delivered the opinion of the Court.

Of the refusal of the Court to grant the instruction prayed for, which forms the ground of appeal on the appellant's first bill of exceptions, we entirely approve.  Had the instruction been given, it would have been a palpable invasion of the unquestionable and exclusive right of the jury: that of deciding on facts, of which contradictory testimony is adduced.   The appellees "had offered in evidence, that it was the usage among ship owners and masters, not to charge freight where the ship was in ballast, for any articles shipped by the captain on his own account."   The appellant then "offered in evidence that

there was no usage as above stated, and that the captain was liable to freight to the owner, like any other person, if he chose to exact it." In such a state of the proof, the court could not do otherwise than reject the prayer, calling on them to decide a fact thus controverted.

In the appellant's second bill of exceptions are involved questions of great magnitude to the commercial world and of much intrinsic difficulty; and we regret that we are called to the decision of these questions, without proof of commercial usages upon the subject. In the argument it is conceded by both parties, that the owner of the ship and cargo has the uncontroled power of breaking up or changing the voyage, but they differ most widely as to the consequences which would ensue, and the nature of the responsibilities, to which the owner would thereby be subjected. For the appellant it was contended that this well established prerogative of the ship owner, entered into the contemplation of *Donnell* and *Pawson*, who contracted in reference to it. That upon its exercise no new liabilities were created; the *Canton* privilege no longer formed any part of the contract; nor had *Pawson* any claim to indemnity for its loss. This is assuming much broader ground than was occupied by the prayer to the court below: which appears predicated on the admission of *Pawson's* title to recover, but for his alleged voluntary relinquishment of his right. The appellees, on the other hand, insist, that upon the change of the voyage, *Pawson* was not only entitled to claim an indemnification for the injuries thereby sustained: but the full value of the *Canton* privilege, exempt from all the casualties to which it was naturally liable: and also the whole compensation, stipulated as an allowance to the supercargo, whether the services for which it was equivalent were ever rendered or not; all which on the part of the appellants, is strongly controverted. The principles, contended for by each party, are perhaps stretched further than reason or justice would sanction or public policy requires. And it may readily be imagined, how the counsel on both sides, if yielding to the impulse of their clients interest, would have changed hands in the argument, had a new modification been given to the facts, in the case,

which whilst it varied its aspect, would not in the slightest degree have removed it from the operation of the principles now attempted to be applied to it.   Suppose, for example, the voyage contracted for had been from *Baltimore* to *London*, and thence home with a cargo of dry goods, the stipulated compensation of Captain *Pawson*, in addition to his monthly wages, being three hundred dollars ; but no privilege.   After the sailing of the vessel, owing to a sudden depression in the price of dry goods, *Donnell* changes the voyage : directs that eight thousand doubloons be taken on board at *London :* be transported to *Coquimbo :* there converted into a full cargo of copper : which was to be sold at *Canton,* and the proceeds of sale there invested by *Pawson* in a suitable invoice were to be brought home by him, in the *Chesapeake* to *Baltimore :* under such circumstances would *Pawson's* counsel, as they now do, insist on the compensation fixed in the original contract, when the emolument incident to the substituted voyage, by universal usage of trade, were twenty times as great as those which belonged to the original? Impelled by the interests of their client, they surely would require, the accustomed reward for the services rendered.   Whilst the counsel for the appellant, if influenced exclusively by his interests, would insist on his discharge, upon payment of the sum specified in the agreement.—But suppose another case slightly variant in circumstances, but the same in principle—A ship-owner in *Baltimore,* for a fixed compensation (say $300) employs a captain to navigate his vessel to the *Havana :* there to sell his outward and purchase a return cargo.   Before she reaches the mouth of the *Chesapeake,* her destination is changed ; she is ordered on a trading voyage that may last for years; she is to double *Cape Horn* and return by the *Cape of Good Hope;* would it be attempted to limit the reward for the captain's services to the sum mentioned in the original agreement?   But to present the question on facts more immediately before us, suppose the *Chesapeake* on her originally destined voyage, before she had passed the waters of *Maryland,* had been ordered to *Norfolk,* there to sell her cargo and return to *Baltimore;* could it be pretended that *Pawson* would in such circumstances have been en-

titled to the two thousand dollars, and the undiminished value of the *Canton* privilege!

If the rule contended for either by the appellants or the appellees be a good one, it must work both ways, as well to cases where the length of the voyage is increased, as where it is diminished. In its operation it would always work injustice to one party or the other; and in the latter case, it would, in effect, annihilate that acknowledged and invaluable right in ship owners, of controling the destination of their property; as its enjoyment would be visited by penalties more than equivalent to the losses apprehended from the original, or benefits anticipated from the substituted voyage. Reason, justice and public policy, are never to be lost sight of in the construction of commercial contracts; in unison with which, it would be difficult to reduce the rules insisted on by the parties to this controversy. The principles which should govern cases like the present, according to our views, (in the absence of all commercial usage on the subject,) are these. If by the exercise of this important privilege, a special injury is done to the captain or supercargo, the ship owner must bear the loss; he must make a reasonable indemnity. If on the contrary, by the change of voyage the captain or supercargo be necessarily discharged from the performance of all the duties, for which a remuneration has been stipulated, his claim to such remuneration is thereby extinguished. If a part of the duties have been executed, then such a proportion of the stipulated compensation should be allowed, as appears just, on comparing the services rendered, under the voyage originally contemplated, with those which remain unperformed. For the interpolated part of the voyage the usual compensation must be paid. The parties should be placed, as nearly as may be, in the same condition in which they would have stood, had a previous contract, for the voyage as changed, been entered into between them. To all the customary emoluments of a captain or supercargo, on such a voyage, are those officers respectively entitled.

The County Court, we therefore think erred, in the appellant's second bill of exceptions, in refusing to instruct the Jury as

OF MARYLAND. 147

Pawson's Adm'rs *vs.* Donnell. Donnell *vs.* Pawson's Adm'rs.—1829.

prayed, that " the plaintiff (below) is not entitled to any compensation, for the alleged loss of the privilege of bringing home the twenty-five tons from *Canton;*" that being a privilege, so inseparably connected with the vessel's destination to *Canton;* that upon its ceasing, *as it did*, to be one of the *termini* of the voyage, the privilege of necessity expired with it.

With the opinion of the court below in the third bill of exceptions we concur. The alleged misconduct of the captain, having produced neither injury nor inconvenience to the appellant, forms no defence to the present action.

According to the views before expressed by us, the County Court were in error in their refusal to grant the prayer in the appellant's fourth bill of exceptions; and also in the opinion and direction they thereon gave to the jury, and in conformity with the same views, we approve of their refusal of the opinion and direction prayed for in the appellant's fifth bill of exceptions.

The decision made by this court on the second bill of exceptions, renders it unnecessary for them to examine the opinion of the County Court in the appellant's sixth bill of exceptions: as by that decision the appellant's prayer becomes wholly immaterial and irrelevant to the issues in the cause; and let the determination of the County Court be what it might, it would furnish no ground for reversing their judgment. The same may be said in relation to the appellant's ninth bill of of exceptions.

Of the refusal of the Court below to grant the prayer in the appellant's seventh bill of exceptions we in part approve and in part disapprove. They were wrong in refusing to instruct the jury that the plaintiffs below were not entitled to recover the said sum of two thousand dollars: but were right in refusing to instruct the jury that they were not entitled to recover " any part thereof."

We concur with the County Court in their refusal to grant the appellant's prayer contained in his eighth bill of exceptions.

There being cross appeals in this case, it now becomes necessary to consider the exceptions on the part of the appellees. It has been attempted to sustain the opinion of the County Court in the appellee's first bill of exceptions, on the ground that

148    CASES IN THE COURT OF APPEALS

Pawson's Adm'rs *vs.* Donnell.    Donnell *vs.* Pawson's Adm'rs.—1829.

*Edwards & Stewart* were the agents not of *Donnell*, but of *Pawson*, and, that he only must be answerable for their acts. With this doctrine to the extent to which it is urged we cannot concur. It is in proof, that it was the known and necessary custom of trade at *Chili* and at *Coquimbo* in the business in which *Pawson* was engaged, to employ agents on shore, such as *Edwards & Stewart*. That the selection of such agents in this case, was not made bona fide, and with discretion, there is no insinuation. The consequences of the neglect, omissions, or mis-conduct of *Edwards & Stewart*, in their agency, not imputable to *Pawson*, must be borne by *Donnell;* in fact they are his agents, though appointed by, and under the immediate control of *Pawson*. For their acts therefore, after *Pawson's* death, not flowing from any instructions previously given by him, in rela-tion to *Donnell's* funds, they only, and to him alone, are answer-able. This doctrine is fully sustained by the opinion of this court in the case of *Jackson vs. The Union Bank of Maryland*, 6 *Harr. & Johns.* 150, and by the late decision of *Judge Hallowell* before a special jury in the district court of the city and county of *Philadelphia*. In refusing, therefore, to give the instruction prayed for, we think the County Court erred.

The prayer in the appellee's second bill of exceptions being in the alternative, the court below were right in instructing the jury, that if *Pawson* in his lifetime made the investment in gold, that he must bear the loss; but in the instruction given on the latter branch of the alternative, we conceive the court were wrong, upon the grounds assumed by us in the consideration of the appellee's first bill of exceptions. It being a question, under all the proofs and circumstances of the case, fairly open for discussion before the jury; whether the purchase of the gold was made under any instruction or authority from captain *Pawson*. By their decision, they have determined that matter of fact in the affirmative, and consequently overleaped one of the barriers interposed between the court and the jury.

The first branch of the third exception of the appellee's, is inaccurately drawn; and if construed according to its obvious import, might have been rejected by the court for irrelevancy

to the matters in issue before them.   It prays an instruction to the jury "that the plaintiff (below) is not entitled to recover of the defendant, the amount of any gold or silver, which the said *Pawson*, or his agents, the said *Edwards & Stewart*, may have put on board the *Chesapeake*, of their own accord, and without the knowledge, consent or orders of the defendant (below) and which may have been afterwards seized by the government of *Chili*, and confiscated as having been attempted to be exported contrary to the laws of the land."   The plaintiff did not claim to recover the amount of any gold or silver; on the contrary, the gist of the controversy was his disclaimer of all interest in the gold or the funds with which it was purchased.   The prayer was therefore inapplicable to the issue.   But give to the exception that construction which has been ascribed to it in the argument; that it presents the question whether the amount of this gold, could by the jury be discounted from any claim which *Pawson* might have upon *Donnell*, and the prayer is too wide to be gratified in *extenso*.   If the investment in gold was made by *Pawson* in his lifetime, or in obedience to his directions, then the discount contended for should have been sanctioned by the court; but if the investment were the act of *Edwards & Stewart* without orders from *Pawson*, then the loss of the gold shipped must fall upon *Donnell*.   The instruction of the County Court embraces both alternatives, and is therefore erroneous.   In their opinion, on the latter part of this exception, regarding the ratification by *Donnell*, of the purchase and shipment of the gold, we concur with the County Court.

Having assented to the decisions of the court below, contained in the appellant's first, third, fifth and eighth bills of exceptions; but dissented from those in the appellant's second, fourth and seventh bills of exceptions; and having dissented from their opinions in the appellees three bills of exceptions:

Their JUDGMENT IS REVERSED AND A PROCEDENDO AWARDED.